# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No.: 14-3040

REGIS INSURANCE COMPANY, INC.,

Appellant,

v.

A.M. BEST COMPANY, INC.,

Appellee.

**BRIEF OF APPELLANT AND
APPENDIX – VOLUME I OF V, Pages 1a – 111a**

On Appeal from an Order of the Honorable Petrese B. Tucker, Entered
May 20, 2014 in the United States District Court for
The Eastern District of Pennsylvania

Of Counsel on the Brief:
Danielle M. Weiss, Esquire

CLIFFORD E. HAINES
Haines & Associates
1835 Market Street, Suite 2420
Philadelphia, Pennsylvania 19103
215-246-2200 Phone
215-246-2211 Fax
*Attorneys for Plaintiff/Appellant Regis
Insurance Company, Inc.*

Date: October 16, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………...……….iii

STATEMENT OF SUBJECT MATTER JURISDICTION AND APPELLATE
JURISDICTION……………………………………………………………...…..1

STATEMENT OF ISSUES AND PLACE OF RAISING BELOW……………………..2

STATEMENT OF RELATED CASES AND PROCEEDINGS………………………...3

STATEMENT OF THE CASE…………………………………………...…………4

STATEMENT OF FACTS…………………………………………………………6

     B.    Underlying Factual Background .................................................6

     C.    Regis Followed the Court's Direction As Provided in Its March 1,
           2013 Opinion and in Its April 19, 2013 Order. ................................. 10

SUMMARY OF ARGUMENT……………………………………..………17

ARGUMENT OF APPELLANT……………………………………………………...20

     A.    Standard of Review. ........................................................................ 20

     B.    The Factual Issues that Existed Before Trial Still Existed At the
           Time of Trial and Were Presented In Regis' Case-In-Chief.............. 22

          1.    The issue of falsity should have been submitted to the jury
                because the trial court had already determined that the
                statements in the Press Release were capable of a
                defamatory meaning at the summary judgment stage,
                creating a genuine issue of material fact to be decided by
                the jury.................................................................................. 25

          2.    Regis presented sufficient evidence at trial to raise
                questions as to the falsity of certain statements made about
                it in the Press Release.......................................................... 29

               a.    Regis' comptroller, Sharon Rinaldo, established that
                     statements in the Press Release were false…………….30

b.    Deputy Commissioner Stephen Johnson of the Pennsylvania Insurance Department further supported a finding that Best made false statements in the Press Release......................................................33

c.    Regis' outside accountant, Earl W. Helstrom, gave testimony that supported a finding that Best made false statements in the Press Release...........................36

d.    Best's employees, Marc Liebowitz and Gerard Altonji, gave testimony that supported both the conclusion that Best made false statements in the press release and the conclusion that Best knew that the statements were false and/or misleading...........................................38

3.    Regis presented evidence that Best acted with actual malice..40

a.    Plaintiff's Exhibit 41 standing alone provides sufficient evidence from which the jury could have found that Best recklessly disregarded the truth about Regis when it published the Press Release...............................42

b.    Regis' expert witness supported the conclusion that Best departed from its stated rating methodologies, and, therefore, intentionally misled the readers of the Press Release......................................................46

CONCLUSION..........................................................................50

REQUIRED CERTIFICATIONS................................................51

CERTIFICATE OF SERVICE..................................................52

INDEX TO APPENDIX VOLUME I

APPENDIX VOLUME I

# TABLE OF AUTHORITIES

## Cases

*Agriss v. Roadway Express, Inc.,* 483 A.2d (Pa. Super. 1984) ............................... 27

*Am. Bearing Co., Inc. v. Litton Ind., Inc.,* 729 F.2d 943 (3d Cir. 1984) ................ 21

*Bakare  v. Pinnacle Health Hosp., Inc.,* 469 F. Supp. 2d 272 (M.D. Pa. 2006) ..... 26

*Bogash v. Elkins,* 405 Pa. 437 (1962) .................................................................... 28

*Brophy v. Phila. Newspapers, Inc.,* 422 A.2d 625 (Pa. Super. Ct. 1980) .............. 27

*Bro-Tech Corp. v. Thermax, Inc.,* 651 F. Supp. 2d 378  (E.D.Pa. 2009) ............... 24

*Fanelle v. LoJack Corp.,* 79 F. Supp. 2d 558 (E.D. Pa. 2000) ............................... 26

*Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171 (3d Cir. 1992) .............. 21

*Glenn Distribs. Corp.,* 297 F.3d  294 (3d. Cir 2002) .............................................. 25

*Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657 (1989) .... 41, 47

*LePage's Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003) ................................................. 20

*Lightening Tube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir. 1993) ........................ 21

*Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072 (3d Cir. 1985) ..... 40

*McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337 (1991) ....................................... 20

*Mzamane v. Winfrey,* 693 F. Supp.2d 442 (E.D. Pa. 2010) ........................ 26, 27, 28

*Neutron v. Medical Serv. Assoc. of Pa., Inc.,* 254 F.3d 444 (3d Cir. 2001) ........... 24

*New York Times v. Sullivan,* 376 U.S. 254 (1964) ................................................. 40

*Price v. Trans Union, LLC,* 839 F. Supp. 2d 785 (2002) ........................................ 21

*Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.,* 570 Pa. 242  (2002) ........ 24

*Rebozo v. Washington Post Co.,* 637 F.2d 375 (5th Cir. 1981) .............................. 47

*Sarkees v. Warner-West Corp.,* 349 Pa. 365 (1944) ................................................. 28

*Sharon v. Time, Inc.,* 599 F. Supp. 538 (S.D.N.Y. 1984) ........................................ 47

*Smith v. Sch. Dist. of Phila.,* 112 F. Supp. 2d 417 (E.D. Pa. 2000) ....................... 26

*St. Amant v. Thompson,* 390 U.S. 727 (1968) ................................................... 40, 41

*Thomas Merton Ctr. v. Rockwell Int'l Corp.,* 497 Pa. 469 (1981) .......................... 28

*Tucker v. Phila. Daily News,* 848 A.2d 113 (Pa. 2004) ........................................... 27

**Statutes**

28 U.S.C. § 1291 ........................................................................................................ 1

28 U.S.C. § 1332(a) .................................................................................................... 1

42 Pa. C.S. § 8343(a) ........................................................................................... 17, 26

**Rules**

Fed. R. Civ. P 50(a) ................................................................................. 5, 11,18, 20

Fed. R. Civ. P. 56 ..................................................................................................... 21

Fed. R. Civ. P. 59 ..................................................................................................... 21

Fed. R. Civ. P. 59(a)(1) ............................................................................................ 21

**Other Authorities**

Restatement (Second) of Torts § 566A ..................................................................... 27

Restatement (Second) of Torts § 623(A) (1977) ...................................................... 24

## STATEMENT OF SUBJECT MATTER JURISDICTION AND APPELLATE JURISDICTION

The United States District Court for the Eastern District of Pennsylvania had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

Plaintiff Regis Insurance Company, Inc. ("Regis") has appealed from the final order of Judge Petrese B. Tucker, entered in the United States District Court for the Eastern District of Pennsylvania on May 20, 2014, denying Regis' Motion for Post-Trial Relief. (Joint Appendix "JA" 44a; District Court Docket Entry "Doc." 109). This Court has jurisdiction over appeals from final orders of the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1291.

**STATEMENT OF ISSUES AND PLACE OF RAISING BELOW**

1.  Whether the trial court erred by granting A.M. Best's Motion for

    Judgment as Matter of Law Pursuant to Fed. R. Civ. P. 50 at the

    conclusion of Regis' case-in-chief.

    *This issue was preserved by Regis Insurance Company's opposition to
    the defendants' motion for judgment as a matter of law (JA 2164a-
    2169a; 3442a-3585a) and in its motion for a new trial.* (JA 2014a-2136a;
    Doc. 90).


2.  Whether the trial court erred by determining as a matter of law that Regis

    failed to produce sufficient evidence at trial from which a jury could

    determine that A.M. Best published a false statement about Regis with

    actual malice.

    *This issue was preserved by Regis Insurance Company's opposition to
    the defendants' motion for judgment as a matter of law (JA 2164a-
    2169a; 3442a-3585a) and in its motion for a new trial.* (JA 2014a-2136a;
    Doc. 90).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Regis is not aware of any related cases or proceedings.

## STATEMENT OF THE CASE

Regis filed this diversity matter on June 30, 2010.   (JA 125a-147a; Doc. 1).

The Complaint contained five counts: Tortious Interference with Contractual

Relations (Count I), Tortious Interference with Prospective Contractual Relations

(Count II), Commercial Disparagement (Count III), Defamation (Count IV) and a

prayer for declaratory relief (Count V).  (JA 125a-147a; Doc. 1).  After motion

practice, only Regis' claims for defamation (Count IV) and commercial

disparagement (Count III) remained at the time of trial.  (JA 84a, 87a-108a; Doc.

50, 51).

After a period of discovery lasting almost two years, A.M. Best ("Best")

filed a motion for summary judgment on May 18, 2012. (JA 163a-706a; Doc. 46).

Regis filed a memorandum of law in opposition to the motion for summary

judgment.  (JA 707a-1533a; Doc. 47).  On March 1, 2013, the Court issued an

Opinion and Order granting in part and denying in part Best's motion for Summary

Judgment.  (JA 84a, 87a-108a; Doc. 50, 51).  The Court's Order permitted Regis to

proceed to trial on its claims of defamation and commercial disparagement.  On

March 13, 2013, Best filed a motion for certification of the Court's March 1, 2013

Order for immediate interlocutory appeal, which Regis opposed.  (JA 1545a-

1591a; Doc. 53; JA 1593a-1607a; Doc. 55).  On April 19, 2013, the Court entered

an Order denying Best's Motion for Certification.  (JA 109a; Doc. 60).

4

Trial of this matter began on May 20, 2013. Regis presented its case-in-chief over the course of six trial days between May 20, 2013 and May 28, 2013. (JA 2536a-2743a; 2771a-3585a). On May 28, 2013, Best made an oral motion pursuant to Fed. R. Civ. P. 50(a) for judgment as a matter of law, which, after oral argument, was granted from the bench on that date. (JA 2743a-2745a; 3442a-3585a). The Court signed an Order dated May 28, 2013, which was docketed on May 29, 2013, entering judgment in favor of Best and against Regis. (JA 83a; Doc. 85).

Regis filed a motion for post-trial relief in the form of an order granting a new trial. (JA 2104a-2136a; Doc. 90). The trial court held oral argument on the motion. (JA 3588-3610a). Almost one year after granting the motion for judgment as a matter of law, the trial court denied Regis' request for post-trial relief. (JA 44a; Doc. 109). Regis filed a Notice of Appeal on June 17, 2014. (JA 1a-43a; Doc. 111). This appeal is taken from that Order.

## STATEMENT OF FACTS

### A.    Underlying Factual Background[1]

Regis is a small property and casualty insurance company based in

Pennsylvania.  Best is a credit rating agency specializing in the rating of insurance

companies.  For over 25 years, Regis was rated by Best.  Over that period of time,

Regis had never received a rating below a B.  In fact, for the ten year period

preceding the downgrade, Regis had been rated A- or B+.  However, in January

2010, after learning for the first time of a large judgment against Regis' parent,

Tiber Holding Corp., Best downgraded Regis from a rating of B+ (Good) to B-

(Fair).  Best issued a press release announcing the downgrade contemporaneously

with the downgraded rating.  (JA 125a-147a; Doc. 1).

Over the decades in which Regis was rated by Best, Regis has enjoyed

positive ratings.  From 2000-2009, Regis was never given a financial strength

rating (FSR) of less than a B.  (JA 828a-860a; Doc. 47, at Ex.D)  In 8 out of 10 of

those years, Regis was rated B+ (Good).  Regis was consistently rated at that level

from 2005-2009.  (JA 828a-860a; Doc. 47, at Ex. D).  However, Regis was

downgraded to B- in January, 2010.  (JA 739a-741a; Doc. 47, at Ex. A.).  This

---

[1]        The facts underlying this case have been briefed on a number of occasions, but at great length in Regis' Memorandum in Opposition to the Motion for Summary Judgment (JA 707a-1533a; Doc. 47).  That statement of facts is incorporated here by reference.  The Court's version of the facts as supplied in its March 1, 2013 Opinion also provides sufficient background facts.  (JA 84a-108a; Doc. 50).  Regis is content to rely on the trial court's recitation of the basic background facts.

rating assignment was the culmination of Best's annual review of Regis, which began in November, 2009.

Notwithstanding Regis' legitimate requests to raise the rating from B- to B+, which were supported by Regis' demonstrably strong capitalization and very high objectively quantified Best Capital Adequacy Ratio (BCAR) score, Best published its new rating for Regis. (JA 739a-741a; Doc. 47, at Ex. A.). Because this was a downgrade, according to Best policy, a press release (Press Release) was issued announcing the decreased rating on January 10, 2010. (JA 739a-741a; Doc. 47, at Ex. A.).

The Press Release forms the basis of this lawsuit. It stated that "A.M. Best Co. has downgraded the financial strength rating to B- (Fair) from B+ (Good) and issuer credit rating to 'b-' from 'bbb-' of Regis Insurance Company (Regis) (Wayne, PA)." (JA 739a-741a; Doc. 47, at Ex. A.). The Press Release goes on to state "the outlook for both ratings has been revised to negative from stable." The Press Release further indicated that "the downgrade was meant to reflect a recent disclosure of lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation (Tiber) (Wilmington, DE)." The downgrade was also meant to reflect "Regis' poor operating performance." (JA 739a-741a; Doc. 47, at Ex. A.).

Following the publication of the rating, Richard A. Di Loreto, Regis'

President, continued to seek what he felt were justified changes in the rating report.

At Mr. Di Loreto's request, Stephen Johnson, Deputy Commissioner, Pennsylvania

Insurance Department, wrote a letter to Best representatives memorializing his

stated position about Regis' strength as a Pennsylvania insurance company during

their telephone conversations.[2]  (JA 1274a-1279a; Doc. 47, at Ex. FF, Johnson's

1/25/10 letter).   The letter reiterated that from the Department's standpoint, Regis

was a healthy, vibrant and commercially viable company.  Nothing about the

judgments against Tiber influenced Regis' viability or standing as Pennsylvania

insurance company from a regulatory standpoint. Best's failure to accept Mr.

Johnson's reassurance is a clear departure from its stated methodology, which

unequivocally states that Best defers in all circumstances to a company's

regulating authority.[3]  (JA 1280a-1295a; Doc. 47, at Ex. GG, Expert Report of

Michael A. Cohen).  As a representative of the Pennsylvania Insurance

Department, Stephen Johnson speaks for Regis' regulating authority.  (JA 2965a-

---

[2]    Relevant portions of the letter were read to the jury at trial. (JA 2957a-2961a, Trial Tr., 5/21/13).  The letter itself was also published to the jury.

[3]    Mr. Cohen, Regis' expert, explained this to the jury in his trial testimony.  (JA 3451a-3562a).  Though this testimony related specifically to the rating process, it was intended to give the proper context for the issuance of the Press Release, which announced a downgraded rating of Regis.  It was also meant to provide the jury with information from which it could analyze that Best published the Press Release with actual malice. Indeed, it is the publication of the Press Release that forms the basis of this lawsuit. Regis does not challenge the trial court's determination that the Press Release is a publication distinct from the after-published rating report.

5972a; Trial Tr., 5/21/13).  Best was unconvinced it should maintain Regis' 2009 rating and published the Press Release on January 10, 2010, even with knowledge that the fears about Regis' financial condition were unfounded and irrational.

Best contended, in defense of Regis' defamation claim throughout the litigation, that its ratings publication was factually accurate because of the weak financial condition of Regis' parent company, Tiber Holding Corporation.  Best claimed that the weak financial condition of Tiber which was not disclosed to it until November/December 2009, would have a serious impact on Regis' ability to raise capital in the future and put Regis at risk for being seized to satisfy Tiber's financial obligations.  These two consequences, according to Best, could result in a negative impact on Regis' claims-paying ability.  Best also advanced arguments before trial that its publications about Regis were protected by the First Amendment; therefore, it was entitled to judgment as a matter of law.  For each of these reasons, Best believed it was not responsible for the harm to Regis as a result of the publication of the Press Release and therefore that it was not liable for defamation.

Although all of the evidence of Regis' claims as had been set forth in response to Bests' motion for summary judgment were entered into evidence at trial, and Best's fact-based defenses and its legal arguments were rejected by the trial court at the summary judgment stage and never tested at trial, the trial court

reversed course after Regis presented its case-in-chief over six trial days and granted Best judgment as a matter of law when Regis rested. In so doing, the trial court found that Regis did not offer any evidence at trial that Best published a false statement about Regis with reckless disregard for the truth sufficient to demonstrate actual malice. (JA 2164a-2169a; 3442a-3585a). But, Regis' trial presentation was based wholly and completely on the framework set forth by the trial court in its summary judgment Opinion (JA 87a-108a; Doc. 50) and in its Order denying Best's request for an interlocutory appeal to the Third Circuit before trial (JA 109a-111a; Doc. 60). Indeed, the only change from the summary judgment stage through the conclusion of the plaintiff's case-in-chief was the trial court's view of the legal and factual issues.

### B.   Regis Followed the Court's Direction As Provided in Its March 1, 2013 Opinion and in Its April 19, 2013 Order.

When preparing for trial and in presenting its case in chief, Regis was guided by the trial court's March 1, 2013 Opinion (JA 87a-108a; Doc. 50) denying summary judgment on Regis' defamation and commercial disparagement claims and the trial court's April 19, 2013 Order (JA 109a-111a; Doc. 60) denying Best's motion for certification for interlocutory appeal. The trial court very clearly stated the genuine issues of material fact to be resolved by the jury and the evidence the trial court believed supported a potential decision in favor of Regis. Regis

10

presented nearly identical evidence in opposition to the motion for summary

judgment as it did at trial.[4]

The trial court determined at the summary judgment stage that there existed

two key genuine issues of material fact to be determined by a jury at trial. First, the

trial court determined that Regis presented sufficient evidence from which a

reasonable jury could conclude that the press release contained statements that left

the reader without sufficient context to evaluate whether Best's opinions were

founded on truth. That is to say that a reasonable jury could conclude that the

press release gave the reader a misimpression of Regis and the reasons why it was

downgraded by Best. (JA 100a; Doc. 50, p. 13). For example, the trial court

determined that a jury could find that Best *knew* that the judgment against Regis'

parent was not "recent." (JA 87a-108a; Doc. 50). The trial court reasoned that

only a jury can determine whether Best framed its rating and press release in that

way to create a misimpression in the marketplace that Regis is in poor financial

health. The trial court also opined that a reasonable jury may so find in light of the

---

[4]    Indeed, Best filed only one motion in limine to preclude certain evidence of damages. (JA 1861a-2005a; Doc. 73). Regis opposed the motion. (JA 2006a-2078a; Doc. 78). The Court granted the motion, but did not enter an order. Although this precluded evidence was submitted in opposition to the motion for summary judgment, it has no probative value with respect to the issue raised at the motion for judgment as a matter of law pursuant to Fed. R. Civ. P 50(a): whether Regis presented sufficient evidence at trial from which the jury could conclude Best published a false statement about Regis with actual malice. Thus, the Court's ruling prohibiting Regis from using this damages evidence at trial did not have an apparent effect on the Court's decision.

undisputed fact in this case that Regis enjoyed a very high Best Capital Adequacy

Ratio ("BCAR") Score, which is an objective and quantitative analysis.  The trial

court was particularly persuaded that Best failed to disclose in the press release that

Regis operated under similar conditions (with an insolvent parent) for a decade all

the while enjoying positive Best ratings.  (JA 87a-108a; Doc. 50).  Nothing

changed at Regis in 2009, but Best did not make that clear in its press release.

Second, the trial court agreed with Regis at the summary judgment stage that

a reasonable jury could find that Best acted with actual malice.  In support of its

position that Best acted with actual malice, Regis presented deposition testimony

and documents tending to show that Best had several conversations with an

insurance regulator, Regis' outside accountant, Regis' President and others, who

provided assurances and documentary support of Regis' position that it was not in

any way affected by the judgments against the parent.  (JA 707a-1533a; Doc. 47).

At the summary judgment stage, the trial court did not find that Best did in fact act

with malice, but determined there was sufficient evidence from which a jury could

reasonably conclude that it did.  (JA 84a-108a; Doc. 50, 51).  The same evidence

of actual malice presented in opposition to the motion for summary judgment was

presented during Regis' case-in-chief, except via live witness testimony and

documents.  (JA 2079a-2103a; 2164a-2169a; 2172a-2204a; 2536a-2745a; 2771a-

3585a).

But, even if the trial court's March 1, 2013 summary judgment Opinion was not clear enough, the trial court entered another Order on April 19, 2013 reasserting this same position that Regis was entitled to a trial of the issues. (JA 109a-111a; Doc. 60). Best effectively sought review of the trial court's Order denying (in part) summary judgment when it filed its motion for certification for immediate interlocutory appeal. (JA 1543a-1591a; Doc. 53). At that juncture, the trial court could have reconsidered its March 1, 2013 Order. But it did not. Indeed, the Court remained steadfast in its determination that Regis was entitled to trial. Footnote 1 to the Court's April 19, 2013 Order states (JA 109a-111a; Doc. 60), in pertinent part:

> On March 1, 2013, the Court denied A.M. Best's ("Best") motion for summary judgment on Plaintiff Regis Insurance Company's ("Regis") claims for defamation and commercial disparagement. Best now argues that the Court should certify this matter for interlocutory appeal because this case "raises serious First Amendment and freedom-of-speech concerns, including the risk that a credit rating agency will be exposed to the litigation and potential liability every time it issues to its sophisticated audience (e.g., lenders, financiers, brokers[,] and insureds.) a rating opinion and press release." (Doc. 52 at 1.) The Court disagrees. In its motion for summary judgment, and now in its motion to certify for interlocutory appeal, Best has stridently attempted to universalize the implications of this case by painting this case in the broadest strokes possible. At every turn, Best has insisted that its actions were absolutely protected: first by averring that its rating was merely its opinion, and now by attempting to bolster its previously asserted (and already considered) First Amendment arguments.

13

At every turn, Best has raised the specter of the potential for litigation and the chilling effect on ratings issued by credit rating agencies that could result if the Court permits Regis' claims to proceed to trial. What Best has consistently failed to appreciate, however, is that the facts of this case are highly unusual. This case is unusual because this was not your typical ratings situation. It is precisely because this was not your typical ratings situation that Best's arguments in favor of summary judgment and certification of an interlocutory appeal fail. This Court did not find that the statements contained in the press release were defamatory as a matter of law, only that a reasonable jury could conclude that they were capable of defamatory meaning. Further, despite what Best argues, the Court has at no point ruled that Best is not protected by the First Amendment. Rather, the Court has simply ruled that there are genuine issues of material fact that must be resolved by a jury in order to determine whether or not Best is protected by the First Amendment in this particular instance. Nothing Best argues in its motion for interlocutory appeal changes that determination.

\*\*\*

At bottom, the viability of Regis' defamation and commercial disparagement claims come [sic] down to this single question: whether Best properly communicated to its audience the bases for its decision to downgrade Regis. The Court found that there is a genuine issue of material fact on this question. To be clear: the problem with the press release is that it arguably implies Regis experienced certain financial difficulties in 2009, when, in fact, it had not. The only thing that had changed in 2009 was that Best learned of information about the financial health of Regis' parent company of which it was previously unaware. As detailed in the Opinion, see Doc. 50 at 13-16, a reasonable jury could find that Best recklessly framed its rating and press release in such a way as to create the

false impression that Regis experienced certain financial difficulties in 2009.

Further, in keeping with the communicative intent element required for establishing actual malice in a defamation-by-implication case, a reasonable jury could find that Best intentionally or recklessly worded its press release in this way because it was in the best interests of its company to do so. Id. at 14-15 ("There is a marked and appreciable difference between implying that Regis' parent company is experiencing recent financial difficulties and clearly stating that Regis has been operating for almost ten years despite its parent company's financial difficulties (and that Best is only now learning of it.")

(JA 109a-111a; Doc. 60). There is no question that the trial court laid out a clear and succinct statement of the factual issues raised by the record in this case to be determined by a jury, as well as the legal standard to be met in proving it. Regis followed the trial court's instructions to the letter. Yet, on much the same record as that which was before the Court on summary judgment, the trial court concluded after Regis rested that Best was entitled to judgment as a matter of law.

Thus the case was never submitted to a jury for determination of the genuine issues of material fact that the trial court identified as having been raised by the record at the summary judgment phase, and which the Court reiterated in its April 19, 2013 Order. Best's third bite at the same apple was somehow successful on May 28, 2013. (JA 83a; Doc. 85). The trial court's determination that Best is entitled to judgment as a matter of law cannot be permitted to stand under these

circumstances. The trial court should have granted Regis' request for a new trial. The Court must reverse the trial court's error denying post-trial relief and remand this case for a new trial.

## SUMMARY OF ARGUMENT

To prevail on its defamation and commercial disparagement claims, Regis was required to prove at trial that Best's Press Release announcing that Regis had been downgraded "(i) was defamatory; (ii) it was published by the defendant; (iii) the communication applies to the plaintiff; (iv) the recipient of the communication understands the communication's defamatory meaning; (v) the recipient understands the communication to be intended to apply to the plaintiff; (vi) special harm resulting to the plaintiff from its publication; and (vii) abuse of a conditionally privileged occasion." 42 Pa. C.S. § 8343(a) .

At the summary judgment stage, the trial court determined that the Press Release was capable of a defamatory meaning. Thus, it was for the jury—and only for the jury—to determine whether the statements made about Regis in the Press Release were actually defamatory. Thus, Regis needed to demonstrate that the statements made about it were false, or though technically true, were crafted so as to leave the reader with a false impression of Regis, i.e. defamatory by innuendo. Regis also was required to prove that the statements were made with actual malice, i.e., with knowledge of or reckless disregard for their falsity.

Through testimony and exhibits entered during six days of trial, Regis established facts, that if believed by the jury, would have supported judgment in Regis' favor. Nonetheless, the trial court granted Best's motion for judgment as a

matter of law pursuant to Fed. R. Civ. P. 50 at the conclusion of Regis' case-in-chief.  The trial court determined that Regis failed to present any evidence from which the jury could conclude that false statements were made in the Press Release or that Best published the Press Release with actual malice.

But, the trial court clearly ignored two of its rulings—one made at the summary judgment stage, and a second one made when Best filed a motion for interlocutory appeal to avoid going to trial—that clearly and succinctly stated that the pre-trial record raised genuine issues of material fact as to the falsity of the statements made in the Press Release (i.e. that the Press Release was capable of a defamatory meaning by innuendo) and that Best published the Press Release with actual malice.

Pennsylvania law makes clear that once a court determines, as a matter of law, that a statement is capable of a defamatory meaning, it is then the task of the fact-finder to determine whether the statement is actually defamatory.  Similarly, a jury is required to determine whether the defendant acted with actual malice when publishing the defamatory statement.

The trial court admitted a key piece of evidence, Exhibit 41, at trial which tended to establish that Best made changes to the Press Release before it was published that were aimed at hiding the truth about Regis from the public.  In other words, that Best published a false statement about Regis with knowledge of or

18

reckless disregard for its falsity so as to constitute actual malice.  Yet, the trial court determined that Regis did not present any evidence sufficient to submit the case to a jury.  In light of the trial record, this was clear error.

Regis filed a motion for new trial making these same arguments, but the trial court refused to grant the requested relief.  Accordingly, the order denying Regis' motion for a new trial must be reversed and this case remanded for a new trial on the merits.

## ARGUMENT FOR APPELLANT

Regis presented sufficient evidence at trial to support its claims that the statements made in the press release were defamatory by innuendo. Regis also presented sufficient evidence that Best published those defamatory statements with actual malice. Therefore, Best's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) should have been denied. But, since it was not, Regis' motion for a new trial should have been granted to correct the clear legal error. The trial court erroneously substituted its own judgment for that of the jury. Therefore, the Court must reverse the Order denying Regis a new trial and remand this matter for trial of the genuine issues of material fact raised during Regis' case-in-chief and before Best was erroneously granted judgment as a matter of law.

### A.    Standard of Review.

A motion for judgment as a matter of law made pursuant to Fed. R. Civ. P. 50(a) should be granted only where the facts and the law "will reasonably support only one conclusion." *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356 (1991). A court should only grant such a motion only "if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *LePage's Inc. v. 3M,* 324 F.3d 141, 145-46 (3d Cir. 2003) (quoting *Lightening Tube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d

Cir. 1993)).  In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.  *Id.* (citing *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 190 (3d Cir. 1992)).  The question is not whether there is literally no evidence supporting the party against whom judgment is to be granted as a matter of law, but whether there is evidence upon which the jury could properly find a verdict for the nonmoving party.  *Lightening Tube, Inc.,* 4 F.3d at 1166 (citations omitted).  Notably, this standard "mirrors" the standard for a motion for summary judgment pursuant to Fed. R. Civ. P. 56.  *Price v. Trans Union, LLC,* 839 F. Supp. 2d 785, 792 (citing *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.,* 297 F.3d 294, 299 (3d Cir. 2002)).

Under Fed. R. Civ. P. 59, the Court may grant a new trial on some or all of the issues after a trial, for any reason for which a new trial has "heretofore been granted in an action at law in federal court..." Fed. R. Civ. P. 59(a)(1).  It is within the Court's discretion to order a new trial.  The Court may grant a new trial if required to prevent injustice.  *Am. Bearing Co., Inc. v. Litton Ind., Inc.,* 729 F.2d 943, 948 (3d Cir. 1984).

Here, the Court should remand this matter for a new trial because the trial court impermissibly weighed or otherwise determined evidence at trial to reach the conclusion that Best was entitled to judgment as a matter of law, when, in fact,

21

there was sufficient record evidence to send the case to the jury. In addition, the

trial court erred when it did not grant a new trial to correct this error in judgment.

Indeed, the trial court was correct when it denied summary judgment on the basis

of a nearly identical record. Because the trial record raises genuine issues of

material fact regarding the falsity of statements made about Regis in the Press

Release and whether Best acted with actual malice, this matter should have been

submitted to a jury and Best's Rule 50 motion should not have been granted. This

matter must be remanded for trial.

### B.     The Factual Issues that Existed Before Trial Still Existed At the Time of Trial and Were Presented In Regis' Case-In-Chief.

In its opinion denying Regis' motion for a new trial, the trial court clarified

what Regis has understood since the ruling on summary judgment—that the rating

itself as expressed in the Best Report is not subject to legal challenge, as it

constitutes protected opinion speech. (JA 45a-82a; Doc. 109). As Regis made

clear in its motion for new trial, Regis always understood that the legal challenge at

trial was to the publication of the Press Release. (JA 2104a-2136a; Doc. 90).

Indeed, to the extent testimony and evidence was offered at trial regarding Best's

rating and its process, which it was, such information was necessary to provide

context and for a determination of actual malice. In its opinion denying post-trial

relief, the trial court criticized Regis for referencing the rating and the rating

process in its opening statement. (JA 45a-82a; Doc. 109). But, as the trial court

22

should well know, opening statements are not evidence and are meant as a summary. Indeed, openings should not even be particularly argumentative. That in its opening, Regis' counsel may have taken umbrage with the rating and the rating process does not mean that an evaluation of the rating or the process would have been put before the jury at the appropriate time, or does it mean that it should not have been mentioned during trial. What Best knew at the time the Press Release was issued, regardless of how the knowledge was acquired, is dispositive of the relevant issues in the case. The trial court impermissibly relied on the opening to support the conclusion that Regis was not entitled to a trial and that Best was entitled to judgment as a matter of law.

The trial court noted in its opinion on the post-trial motion that Regis often conflated the Press Release and the rating and noted that the trial court endeavored to be clear in its various rulings that there is a meaningful and distinct difference between the rating and the Press Release. (JA 52a-53a; Doc. 109, pp. 7-8). Any such confusion that may have arisen as to a conflation of these issues within Regis' non-evidentiary arguments could have been easily and readily cured by a targeted and specific jury charge. It did not provide a basis for granting judgment as a matter of law or for denying a new trial.

Finally, the trial court opined that Regis did not put the Press Release before the jury at all, but rather focused the vast majority of the evidence and testimony

on the rating and the ratings process. (JA 53a-82a; Doc 109, pp. 8-37). But, the

Press Release was intended to announce the downgrade and in order to evaluate

whether and to what extent the Press Release constituted a defamatory statement

concerning Regis, it was vital for the jury to hear how Best arrived at the

downgrade, what information was available to it when the decision was made, and

what it knew or didn't know when making the statements about Regis. It is clear

from the trial court's opinion on summary judgment that the background

information underlying the Press Release is essential to that analysis. (JA 87a-

108a; Doc. 50).

The trial court's separate, but wholly consistent, rulings denying summary

judgment (JA 84a, 87a-108a; Doc. 50, 51) and denying certification of

interlocutory appeal (JA 109a-111a; Doc. 60) clearly identified genuine issues of

material fact that must be decided by the jury. First, the jury was required to

decide whether the Press Release defamed Regis as a matter of fact.[5] The trial

---

[5]    The word "defamation" and its derivatives are used interchangeably with
commercial disparagement throughout this brief. Though the claims are legally distinct, the
standard of proof for each is substantially similar. Under Pennsylvania law, to prove commercial
disparagement, the plaintiff must show that the defendant published a statement about plaintiff's
business to another and: (i) the statement was false; (ii) the publisher intended the publication to
cause pecuniary loss or reasonably should have recognized that publication would result in
pecuniary loss; (iii) pecuniary loss did in fact result; and , (iv) the publisher either knew the
statement was false or acted in reckless disregard of its truth or falsity. *Pro Golf Mfg., Inc. v.
Tribune Review Newspaper Co.,* 570 Pa. 242, 246, 809 A.2d 243 (2002) (citing Restatement
(Second) of Torts § 623(A) (1977); *see also Neutron v. Medical Serv. Assoc. of Pa., Inc.,* 254
F.3d 444, 448-49 (3d Cir. 2001); *Bro-Tech Corp. v. Thermax, Inc.,* 651 F. Supp. 2d 378, 416
(E.D.Pa. 2009). Indeed, the trial court found on summary judgment that for all the reasons Regis
defeated the motion for summary judgment as to its defamation claim, its commercial

court also determined that a reasonable jury could find, based on the record developed in discovery, that Best abused a conditional privilege to publish these statements. The Court specifically ruled that Regis could prove this abuse by expert testimony that Best departed from its stated methodologies to determine the rating it ultimately published about Regis. Regis followed this framework in its trial presentation.[6] If there was sufficient evidence to overcome summary judgment on the defamation claims, then that same evidence, when presented at trial also should have been sufficient to reach a jury. *Glenn Distribs. Corp.*, 297 F.3d at 299. Best's motion for judgment as a matter of law should not have been granted at the conclusion of Regis' case-in-chief.

    1.    **The issue of falsity should have been submitted to the jury because the trial court had already determined that the statements in the Press Release were capable of a defamatory meaning at the summary judgment stage, creating a genuine issue of material fact to be decided by the jury.**

To prevail on its defamation claim in Pennsylvania, Regis was required to establish at trial: "(i) the communication was defamatory; (ii) it was published by

---

disparagement claim also survived that motion. (JA107a; Doc. 50, p. 20). That determination is not challenged here and Regis believes for all the reasons why the trial record supports sending the case to the jury on the issue of defamation, the case should also have been submitted to the jury on the issue of commercial disparagement.

    [6]    Indeed, Regis presented stronger evidence of actual malice at trial than it did when it successfully overcame summary judgment. At trial, Regis presented Plaintiff's Exhibit 41, which was not part of the record on summary judgment. The trial court acknowledged this evidence was not before it on summary judgment, but, apparently, did not agree which Regis' belief that in its probative value. (JA 44a-82a; Doc. 109).

the defendant; (iii) the communication applies to the plaintiff; (iv) the recipient of

the communication understands the communication's defamatory meaning; (v) the

recipient understands the communication to be intended to apply to the plaintiff;

(vi) special harm resulting to the plaintiff from its publication; and (vii) abuse of a

conditionally privileged occasion." 42 Pa. C.S. § 8343(a) (Purdon's 2010); see

also *Fanelle v. LoJack Corp.,* 79 F. Supp. 2d 558, 561-62 (E.D. Pa. 2000). The

plaintiff need not prove special harm for statements that constitute defamation per

se. Defamation per se includes publications that "impute to another conduct,

characteristics, or a condition that would adversely affect his or her lawful business

trade." *Bakare  v. Pinnacle Health Hosp., Inc.,* 469 F. Supp. 2d 272, 298 (M.D.

Pa. 2006)(citations omitted). To the extent that the ratings of a company are based

on quantitative analysis, such analysis is capable of proof. When opinion speech

discloses untrue statements of fact, it is no longer absolutely protected. See, e.g.,

*Mzamane v. Winfrey,* 693 F. Supp.2d 442, 481-83 (E.D. Pa. 2010).

Only statements of fact can afford a basis for a defamation action. *Smith v.*

*Sch. Dist. of Phila.,* 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000). Statements of

opinion that disclose fact are not actionable when the opinion-holder discloses the

entire factual predicate for the opinion. Courts have found that when all the facts

are disclosed, an opinion cannot be defamatory because the listener is able to

evaluate the facts for himself and is free to disregard the conclusion made from the

facts. *See* Restatement (Second) of Torts § 566A; see also *Mzamane,* 693 F. Supp. 2d at 481. But when an opinion is based on undisclosed facts, it may be actionable. *Id.*

It is for the court to determine whether the statement is capable of a defamatory meaning. In making a determination whether the statement is capable of defamatory meaning, the Court must consider the nature of the audience. *See, e.g., Agriss v. Roadway Express, Inc.,* 483 A.2d 456 (Pa. Super. 1984)(finding that the audience for the defamatory statement made it clear that plaintiff would be subject to contempt and ridicule). The ultimate question is whether the alleged defamatory statement will have a tendency to lower the plaintiff's esteem in the community. It is for the Court to determine as a matter of law whether statements are capable of defamatory meaning. *Mzamane,* 693 F. Supp. 2d at 481 (citations omitted); *Tucker v. Phila. Daily News,* 848 A.2d 113, 123 (Pa. 2004).

So long as a statement is capable of defamatory meaning, it is for the jury to decide whether the statement is in fact defamatory. *Brophy v. Phila. Newspapers, Inc.,* 422 A.2d 625, 628 (Pa. Super. Ct. 1980). In other words, once it has been determined that as a matter of law a statement is capable of defamatory meaning, a jury *must* then determine whether that statement is defamatory as a matter of fact. Only a fact-finder can determine whether a statement is actually defamatory.

In the Order denying Best's motion for summary judgment on Regis' claims of defamation and commercial disparagement, the trial court determined that there was a genuine issue of material fact regarding whether the Press Release defamed Regis by innuendo.  A plaintiff is defamed by innuendo when "the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane,* 693 F. Supp.2d at 477; see also *Thomas Merton Ctr. v. Rockwell Int'l Corp.,* 497 Pa. 469, 467, 442 A.2d 213, 217 (1981); *Bogash v. Elkins,* 405 Pa. 437, 440, 176 A.2d 677, 679 (1962); *Sarkees v. Warner-West Corp.,* 349 Pa. 365. 567-368, 37 A.2d 544, 546 (1944). (JA 98a; Doc. 50, Op. p. 11).

Regis presented sufficient evidence at trial from which a reasonable jury could have concluded that it met its burden of proof on the genuine issues of material fact raised regarding the falsity of the statements made in the Press Release and the degree to which Best recklessly disregarded the truth when making the publication.  Accordingly, Best should not have been granted judgment as a matter of law at the conclusion of Regis' case-in-chief and Regis was entitled to a new trial.  The Court must reverse the trial court's order denying post-trial relief and remand this case for trial.

**2.    Regis presented sufficient evidence at trial to raise questions as to the falsity of certain statements made about it in the Press Release.**

Here, the Court appropriately determined in its Order denying Best's

Motion for Summary Judgment, that the four statements within the Press Release

that Regis identified as defamatory are capable of a defamatory meaning because,

even if they are merely an expression of Best's opinions, the statements tend to

imply undisclosed defamatory facts about Regis. (JA 100a; Doc. 50 at p. 13).

Indeed, the trial court was particularly persuaded that Best's description of the

judgment against Tiber and its potential effect on Regis was crafted to intentionally

lead the reader of the Press Release to conclude that the judgment was entered

"recently" and could lead to a catastrophic financial crisis at Regis, when, in fact,

the judgment was nearly a decade old and Regis's surplus had continued to grow

significantly over that time period, the judgment notwithstanding. (JA 100a; Doc.

50 at p. 13). The Court appropriately noted that Pennsylvania law is clear that

whether a statement is in fact defamatory is necessarily a jury question.

The Court reiterated this position in its footnote 1 to its Order denying Best's

motion for certification for immediate interlocutory appeal, stating that there was a

genuine issue of material fact to be determined by the jury as to whether "whether

Best properly communicated to its audience the bases for its decision to downgrade

Regis." (JA 109a-111a; Doc. 60, Order Denying Certification, fn.1).

Accordingly, at trial, Regis presented evidence of the falsity of each statement that the Court had previously determined was capable of a defamatory meaning. Regis' case-in-chief was dedicated to parsing out the language of the Press Release and demonstrating that what was said in that summary of Best's rating decision was defamatory by implication. Regis also presented evidence that the Press Release was purposefully crafted to give the reader a misimpression that something had happened at the parent company level <u>in 2009</u> that would have a negative impact on Regis. As is described more fully below, Regis established at trial that nothing of note happened at the parent company level in 2009 and that Best knew that to be the truth.[7] Thus, the same genuine issue of material fact raised in the trial court's summary judgment order and opinion were raised at trial and should have been submitted to a jury for decision.

### a.    *Regis' comptroller, Sharon Rinaldo, established that statements in the Press Release were false.*[8]

Through its very first witness, Sharon Rinaldo, Regis' comptroller, Regis set out to prove, *inter alia,* that the Press Release was specifically crafted to provide a misimpression of Regis' financial condition. (JA 2630a-2741a; Tr. Trans. 5/20/13,

---

[7]    Regis does not present a discussion of the witnesses in the order in which they testify, but rather presents its arguments for why the record establishes those genuine issues of material fact which the trial court ruled were absent from the trial record in a manner consistent with the issues to be proved.

[8]    Ms. Rinaldo's testimony is transcribed in full at JA 2537a-2741a; Tr. Trans. 5/20/13. Where indicated, specific citations are included. However, much of what is argued is in summary format and based upon a reading of the testimony as a whole.

pp 66-177). Ms. Rinaldo's testimony established that from the time she came to work at Regis in 2006, approximately three years before the Press Release was issued, she was aware that Regis' parent, Tiber, had a judgment against it, that Tiber was insolvent, and that those facts had no impact on Regis' financial condition. According to her testimony, Ms. Rinaldo knew from the first day of her employment that there were judgments against Regis' parent company, but was told that the judgments would not impact Regis and she was not to regard the judgments or their consequences. From 2006-November 2009, Ms. Rinaldo performed her duties at Regis, watching the surplus grow and the company thrive without any negative impact from the judgments. Indeed, after that first day of work, Ms. Rinaldo did not need any, nor did she seek any, further information about the judgments until after the 2009 ratings meeting with Best at which she was asked to produce a financial statement for the parent. The parents' consolidated financial statement was promptly provided to Best, which caused the series of events giving rise to the trial. From Ms. Rinaldo's testimony, a reasonable juror could conclude that from at least 2006-2009, Regis was running without any negative impact from the judgments against its parent company. The jury could also reasonably conclude from this testimony that the judgments were not "recent" as of 2009.

On cross examination, Best attempted to establish the truth of the statements contained in the rating report, without regard for the fact that the rating report contained far more information for the reader to consider than the one-page Press Release. Indeed, it was established that very little by way of financial information regarding the positive aspects of Regis' financial condition were included in the Press Release. For example, Rinaldo testified that the rating report described that "Regis has a strong level of capitalization as measured by Best's capital adequacy ratio with the BCAR." When she was confronted with that statement, Rinaldo replied, "Right and we would have loved to have seen that in the press release." (JA 2699a; Tr. Trans. 5/20/13 at p. 135).

From this testimony the jury might have concluded, if provided the opportunity, that Best was in possession of data and other information that tended to show a different, more optimistic side of Regis, that it did not include in the Press Release, in order to maximize the negative impact of the rating downgrade for Regis. Certainly this testimony tended to prove that Regis was not in a weakened financial condition in 2009 as measured on an objective scale. The trial court entirely discounted the probative value of Ms. Rinaldo's testimony, dismissing it as having established only "the mechanics of A.M. Best's ratings process" when in fact, it was replete with evidence demonstrating false statements

in the Press Release and tending to establish that Best knew the statements were false. (JA 54a ; Doc. 109 at p. 9).

> **b.    Deputy Commissioner Stephen Johnson of the Pennsylvania Insurance Department further supported a finding that Best made false statements in the Press Release.[9]**

To prove Best was aware that the judgment against Tiber had minimal, if any, impact on Regis, and to further establish Regis' relative strength during the period in which the judgment existed, Regis also presented the testimony of Stephen Johnson, Deputy Commissioner, Pennsylvania Insurance Department (the "Department").   Among other things, Mr. Johnson's testimony established that Regis, like all insurance companies, is regulated by the government of the state in which it's domiciled.

Johnson provided ample testimony about Regis' financial health and stability and the non-impact on Regis of the judgments against Tiber from the standpoint of Regis' operations as a healthy Pennsylvania insurance company.  As Johnson made clear, the Department was well aware of the judgments against Regis' parent.  Johnson also established that the Department knew of the judgments since at or about the time the judgments were entered, and that Regis continued to do business within Pennsylvania and in other places with no greater

---

[9]    Deputy Commissioner Johnson's testimony is transcribed at JA 2961a-2989a; Trial Tr. 5/21/13.  This text provides a summary of its probative value when taken as a whole.

level of governmental supervision or intervention than was required before the judgments were entered against the parent. Johnson confirmed that Regis was considered to be a healthy Pennsylvania insurance company at the time it was downgraded by Best in January 2010, especially because the judgments had no impact on Regis' financial health or claims-paying ability. Mr. Johnson also established the important fact that the judgment holder made no effort to seize Regis to satisfy the parent company's debt in 2009, or ever. Indeed, Johnson testified, the Department would necessarily be made aware of any such efforts, because the Department oversees all money coming out of an insurance company and also must approve the sale or liquidation of any insurance company.

Johnson testified that Pennsylvania insurance law protects policyholders such that insurance companies cannot be stripped of their assets to the detriment of the policyholders. That means that while dividends can be paid to a parent company, or an owner, those dividends cannot exceed a certain (small) percentage of the insurance company's surplus in order to guarantee that sufficient funds are left in the insurance company to pay any claims. Mr. Johnson's testimony further explained that Regis could not be sold piecemeal to satisfy its parent's debts in the sense that Regis could not be stripped of its assets. In essence, if Regis were sold, it would be sold as an insurance company, to a buyer who wanted to run it as an

insurance company and who would continue to operate Regis for the benefits of its policyholders.

Mr. Johnson confirmed that he had conversations with employees of Best in early January 2010, which detailed the Department's position with respect to the impact of these judgments on Regis and that notes of the conversations as made by Best's employees were consistent with his recollection of what was discussed in the conversations. He also confirmed that he wrote a letter to Best memorializing the positions he had taken in these conversations. (JA 2957a-2961a, Trial Tr., 5/21/13).

In reviewing Johnson's testimony, it is important to note that Best's own rating methodology makes clear that Best is deferential to insurance regulatory authorities. Thus, Johnson's position, speaking for the Department about the very issues underlying the downgraded rating, should have been afforded special treatment. The jury should have been permitted to determine whether and to what extent Best followed its own rule.

From Mr. Johnson's testimony, a reasonable jury could have concluded that from a regulatory standpoint, the judgments had no impact on Regis' financial strength in the real world. In other words, the jury could have determined, if permitted, that Best's statements about Regis' financial condition were unfounded, unreasonable, and otherwise inconsistent with the realities of the operations of the

insurance industry in Pennsylvania—Regis' marketplace. The jury could have also reasonably concluded that Regis' policyholders would not be harmed by any potential sale of Regis; that a sale of Regis would have no impact on its claims-paying ability; and that the judgments posed no threat to Regis' financial strength or to any of its policyholders. As will be described more fully below, Mr. Johnson's testimony also provides ample evidence from which the jury could reasonably have concluded that Best acted with actual malice when it published false statements about Regis in the Press Release. Nonetheless, the trial court rejected this testimony as non-probative of the issues to have been proved at trial.

> **c.    *Regis' outside accountant, Earl W. Helstrom, gave testimony that supported a finding that Best made false statements in the Press Release.*[10]**

Regis' outside accountant, Mr. Helstrom, provided testimony from which the jury could have concluded Regis was defamed. Mr. Helstrom testified about Regis' financial condition in 2009 and early 2010. His testimony confirmed that Regis' surplus was trending upward during that time period and that the judgments against the parent company had no impact on Regis' financial health. More importantly, Mr. Helstrom testified about Regis' historical financial health from the 1990s through 2010. Mr. Helstrom testified that Regis has always operated its

---

[10]    Helstrom's testimony is transcribed at JA 3125a-3251a; Trial Tr., 5/23/13. The Court should read it in its entirety. The brief merely argues from a summary what the jury might have concluded after hearing all of the testimony.

finances independent of its parent. Further, in the approximately 20 years in which Mr. Helstrom served as Regis' outside accountant, he was not aware of a single instance on which Regis needed to obtain an infusion of capital from any source. Indeed, at all times between at least 1993 through January 2010, Regis was more than adequately capitalized. Mr. Helstrom testified that Regis did not experience financial problems of any kind until after it was downgraded in January 2010.

Mr. Helstrom also provided a detailed description of his conversations with Best's employees and the reasonable assurances he gave to them in the course of those conversations that the judgments against the parent company would not and did not have any impact on Regis financial performance in the nearly 10 years since the judgments had been entered. Indeed, the evidence adduced at trial confirmed that Regis grew its surplus by over $2 million between the date the judgments were entered against the parent and January 2010, when Regis was downgraded. In January 2010, Regis' surplus was at an all-time high.

A reasonable jury could have found from this evidence that the judgments against Regis' parent had no impact on Regis' claims-paying ability, or capitalization. The jury also could have reasonably concluded that Best's fear that the judgments against Regis' parent would be a limitation on Regis' ability to raise capital was irrational. The testimony from Mr. Helstrom (and Ms. Rinaldo) established that when Regis was downgraded in January 2010, it had surplus

37

capital in excess of $8 million. This meant that, net of all possible policyholder claims and other liabilities, Regis had more than $8 million in excess cash on hand. This is not a picture of a struggling or weak company.

Despite the probative value of Mr. Helstrom's testimony, the trial court did not find that Mr. Helstrom provided evidence from which the jury could have found Best was liable to Regis for defamation or commercial disparagement.

> **d.  Best's employees, Marc Liebowitz and Gerard Altonji, gave testimony that supported both the conclusion that Best made false statements in the press release and the conclusion that Best knew that the statements were false and/or misleading.[11]**

Although Regis presented the majority of its evidence of the falsity of the statements contained in the Press Release through its own witnesses, Ms. Rinaldo, Mr. Helstrom and Deputy Commissioner Johnson, Regis also called two Best employees to testify in its case in chief, Marc Liebowitz and Gerard Altonji. These Best employees confirmed, among other things, that using Best's objective measure of capitalization, Regis was considered very well capitalized. This testimony contradicts the Press Release's claim that Tiber's financial problems created a negative financial impact on Regis. This evidence, too, when viewed in

---

[11]    Mr. Liebowitz's testimony is transcribed at 2843a-2869a; Trial Tr. 5/21/13; JA 2889a-2961a; Trial Tr. 5/23/13; JA 2990a-3124a; Trial Tr. 5/23/13. Mr. Liebowitz was taken off the stand to accommodate Mr. Johnson's schedule. Mr. Altonji's testimony is transcribed at JA 3282a-3305a; Trial Tr. 5/23/13; JA3308a-3441a; Trial Tr. 5/24/13. Again, the brief describes the argued probative value of the testimony when taken in its entirety. Regis intends for the Court to read it in full to get a sense of what was actually presented to the jury.

the light most favorable to Regis, tends to prove that the Press Release's attempt to make Regis look somehow weakened in 2009, specifically, was defamatory. Indeed, the testimony of these witnesses confirmed that on January 10, 2010, when the Press Release was issued, Best was aware that Regis had a nearly decade-long period of prosperity notwithstanding Tiber's insolvency. Nonetheless, the trial court supplanted the province of the jury and weighed this evidence, finding it to be of minimal probative value. Indeed, in its opinion denying Regis' motion for post-trial relief, the trial court opined that this testimony provided mere background regarding the rating process and Regis' history with Best, and did not provide any facts from which the jury might have determined that Regis was defamed. This wholly and completely ignores the fact that these Best employees admitted that they were aware in 2009 that the judgments against Tiber were not "recent," as reported in the Press Release.

It is clear from the trial record that with respect to the first genuine issue of material fact identified by the court at the summary judgment stage, whether the statements published about Regis were defamatory, there was sufficient evidence presented from which the jury could have concluded that the Press Release was defamatory by innuendo. Regis was entitled to have a jury decide this issue. Accordingly, this case must be remanded for a new trial.

### 3. Regis presented evidence that Best acted with actual malice.

The trial court concluded in advance of trial that there was a genuine issue of material fact as to whether Best published the alleged defamatory statements with actual malice. Indeed, in footnote 1 to its Order denying certification for interlocutory appeal, the Court succinctly stated that, "a reasonable jury could find that Best recklessly framed its rating and press release in such a way as to create the false impression that Regis experienced certain financial difficulties in 2009." (JA 109a-111a; Doc. 60). In the context of a defamation claim, actual malice means knowledge that a published statement is false or acting with reckless disregard for the truth or falsity of the statement it published. *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964); *see also Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1089 (3d Cir. 1985). Reckless conduct "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Rather, to demonstrate reckless disregard for the truth or falsity of a defamatory statement, the plaintiff must show "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of its publication." *Id.* This is a subjective inquiry that may be based on circumstantial evidence that demonstrates sufficient evidence to show that the defendant had a

high degree of awareness of probable falsity. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)(citations omitted).

It is rare in a defamation case to find direct evidence of a defendant's "serious doubts" as to the truth of a published defamatory statement. *St. Amant*, 390 U.S. at 732. Although failure to fully investigate alone is insufficient to carry this burden, a failure to pursue the most obvious available sources for corroboration of the truth of a published statement may be sufficient. *Id.*

The Court spent over two pages of its Opinion denying summary judgment analyzing the evidence of actual malice, concluding, "[a] reasonable jury could find it was *reckless* for Best to arrive at such a substantial downgrade." Docket No. 50, p. 19 (emphasis supplied). The Court reiterated its position in its footnote 1 to the Order denying certification for interlocutory appeal. (JA 109a-111a; Doc. 60). The footnote makes clear that in the Third Circuit, the touchstone for establishing actual malice is recklessness. But, even when asked to revisit whether Regis had provided sufficient evidence in opposition to the summary judgment motion to warrant submission of the question to a jury, the Court unequivocally confirmed that the record evidence was sufficient for the question to reach a jury.

> a. **Plaintiff's Exhibit 41 standing alone provides sufficient evidence from which the jury could have found that Best recklessly disregarded the truth about Regis when it published the Press Release.**

Even assuming that Best was entitled to disbelieve everything it had been told by Stephen Johnson and Earl Helstrom at the time the ratings evaluation was made, Best cannot escape two critical pieces of evidence submitted for the jury's consideration in Regis' case-in-chief: (i) Regis had experienced steady growth of its surplus in the 5 year period before the downgrade, and the judgments existed against the parent company in each of these years, which was discussed in detail above in section B.2.; and (ii) Best's own draft press release, entered at trial as Exhibit 41, establishes that Best's analysts wanted to convey the whole truth in the press release, but were instructed to remove certain language from it that would have clarified the factual predicate.

Best's employees, Mr. Liebowitz and Mr. Altonji, gave testimony about what may have been the most important exhibit at trial, Plaintiff's Exhibit 41 (JA 2131a; Pltf's Mot. New Trial, Ex. A). Exhibit 41 is an email containing a draft of the press release, which contained language that fairly and accurately reported the circumstances of Best's coming to learn about the old judgment against Tiber. The draft, which was prepared by Liebowitz and Altonji, told the story as they understood it, but that true version of the story was vetoed by Mr. Altonji's "boss' boss' boss." (JA 3347a-3348a; Tr. Trans. 5/24/13, pp.40-41). Best's own

employees provided ample evidence that Best intentionally withheld information from readers of the Press Release so as to create a false impression of Regis in support of its downgrade as publicized in the Press Release. This constitutes actual malice.

As the trial court's opinion denying the post-trial motion makes clear, these Best employees offered testimony specifically regarding the Press Release and not just simply the rating process or rating report. Indeed, buried in footnote 6 of the Opinion, the trial court acknowledges that Exhibit 41 "challenges 'the recent disclosure' language." (JA 44a-82a; Doc. 109 at p. 33). Yet, the trial court found that Exhibit 41 "*at most* only proves that A.M. Best could have used better, more accurate language. **But the mere availability of better language, without more, would have been insufficient for a jury to find that the language actually used rises to the level of falsity or reckless disregard for the truth.**" (JA 44a-82a; Doc. 109 at p. 35). But, then the trial court dropped a footnote to that statement to clarify its position that it "remains unconvinced by Best's argument that the press release was not intended to be a complete reflection of Regis' circumstances." This is a clear indication that the trial court exceeded the boundaries of its authority by weighing evidence, and in doing so, was not thoroughly convinced that Best provided the whole story. That is precisely the issue that the trial court had repeatedly identified as the reason a trial was required. If the trial court

43

continued to have doubts, that means that Best was not entitled to judgment as a matter of law and the question should have been submitted to a jury.

At a minimum, the trial testimony established that Best knew that it had been almost ten years since the judgments had been entered against Regis' parent. Best knew that Regis' financial strength was not weakened by the judgments against the parent and that it had objectively grown its surplus to its highest point in over a decade despite the judgments against the parent. Best knew that Regis had not been seized to pay off the parent company's debts, nor had the judgment holder made any effort to seize Regis for that, or any purpose. Best knew that Regis had not attempted to raise capital, and that at least since the early 1990s, it had no need to do so. Best unequivocally knew that Regis had enjoyed positive Best ratings in each of the previous years in which the parent had been encumbered. Best was aware from Mr. Johnson, that the Department did not consider these judgments to be an impediment to Regis' financial health or claim-paying ability. Best also knew that any attempt to seize Regis would be supervised and approved by the Department and that the policyholders would be protected. Most importantly, the passage of time between the entry of the judgments and Regis' ongoing success despite the judgments, is proof in itself that Best's fears were simply irrational. Unlike a company suddenly saddled by debt at the parent

level, which might have some negative impact, Regis had almost a decade of history to prove that none of these fears have, or will, come to pass.

Thus, Best's choice to omit or delete important details from the press release is evidence of actual malice and evidence of an effort to maximize the harm to Regis from the defamatory publication. From Exhibit 41, and the other evidence described above, the jury could have reasonably concluded that by leaving out these details, Best intentionally created ambiguity and implied facts about Regis that were false and defamatory. Therefore, there was sufficient evidence presented at trial from which the jury could have concluded that it was reckless for Best to have removed details from the draft press release. This issue should have been given to the jury to decide.

Yet, when the Court granted Best's Rule 50(a) motion, it determined that Regis failed to present sufficient evidence of Best's recklessness to send the case to the jury. In other words, the Court determined that there was insufficient evidence from which a reasonable jury could conclude that Best acted with reckless disregard for the falsity of the statements it published about Regis. This ruling is wholly inconsistent with the Court's prior rulings on the issue and is also inconsistent with the evidence actually presented at trial.

It is also entirely inconsistent with the trial court's own finding purportedly in support of its position that Regis was not entitled to a new trial that Exhibit 41,

the draft press release, was insufficient evidence in and of itself from which the

jury could conclude that Best recklessly disregarded the truth the clarifying

language in the Press Release regarding the fact that the judgment was only just

discovered by Best, but was not actually recently entered, was removed from the

finalized Press Release. The trial court impermissibly minimized that exhibit's

probative value, finding that it only offered more precise language. But that is the

crux of the issue for trial—whether Best intentionally mislead readers of the Press

Release. Exhibit 41 is clear and convincing evidence of that kind of intentional

act. On the basis of Exhibit 41 alone, the question of actual malice should have

been submitted to the jury.

> ### b.  *Regis' expert witness supported the conclusion that Best departed from its stated rating methodologies, and, therefore, intentionally misled the readers of the Press Release.*[12]

But, even if the Court is not satisfied that Exhibit 41 is in itself sufficient

evidence of actual malice, Regis' ratings methodology expert, Michael Cohen,

gave an opinion that Best acted with reckless disregard for the truth of its

published statements about Regis by failing to gather all the necessary information

to confirm its position.

---

[12]     Mr. Cohen's testimony is transcribed at JA 3451a-3562a. Again, the Court
should read the testimony in full to gain an appreciation for what the jury heard. The testimony's
probative value is argued in the brief.

Indeed, other courts have found that it if a report is created in the absence of any fact finding at all, that is not reckless, but doing a partial investigation while purposefully avoiding the key question may constitute reckless conduct. *Harte-Hanks,* 491 U.S. at 693; *see also, Rebozo v. Washington Post Co.,* 637 F.2d 375, 382 (5th Cir. 1981); *Sharon v. Time, Inc.,* 599 F. Supp. 538, 584-85 (S.D.N.Y. 1984). Even assuming that Regis cannot attack the ratings analysis itself, the same evidence could be used to prove recklessness with respect to the reporting of the ratings analysis as set forth in the press release.

Mr. Cohen opined that Best should have contacted the judgment holder to determine whether it planned to take any action with respect to Regis in order to satisfy the debts of the parent company. Put another way, the failure to gather the information required to underlie the decision as reported in the press release was reckless. He also testified that Best deviated from its stated rating methodology by failing to defer to the assurances of the Department, Regis' regulating authority. The jury could easily have been swayed by this opinion and, therefore, concluded that Best's failure to acquire all of the relevant information to support its downgrade of Regis was reckless.

In its opinion denying Regis' motion for a new trial, the trial court impermissibly weighed Cohen's opinion and entirely disregarded it, finding it irrelevant to the publication of the Press Release. While Cohen did not give

testimony specific to the Press Release, his testimony was designed to give the jury an idea of what goes into a rating analysis and how Best applies its published methodology for rating an insurance company. Thus, his testimony about deviation from the standard is probative of actual malice in that it provides information from which the jury could have decided that Best did not properly gather the information necessary to honestly report Regis' financial strength in the Press Release.

Furthermore, Best did not move to strike Cohen's testimony as irrelevant, nor was it ever stricken from the record. Since it was fair game for the jury to have considered if the case had been submitted to the jury, the Court, too, should consider it here. Indeed, the trial court considered these same arguments at the summary judgment stage. On March 1, 2013, the Court agreed with Regis that it was entitled to a jury determination of the issue of whether the statements at issue were in fact defamatory and whether Best published the statements with actual malice. The Court renewed its commitment to that position on April 19, 2013 in the Order denying Best's motion for certification. Then, curiously, after six days of trial, when Regis rested its case-in-chief, the Court suddenly reversed its course and decided that the same evidence was insufficient to reach a jury on these issues.

When the evidence adduced at trial is taken in the light most favorable to Regis, it is clear that the jury could reasonably have found in favor of Regis as to

48

each one of these critical factual issues.  Therefore, the Court should not have

granted Best's Rule 50 motion and should have afforded Regis a new trial pursuant

to Rule 59 to avoid this injustice and prevent further prejudice.  Accordingly, this

matter must now be remanded for a new trial.

## CONCLUSION

Regis presented sufficient evidence at trial from which the jury could reasonably have concluded that the Press Release issued by Best defamed and commercially disparaged the company. Even if the jury did not decide in its favor, Regis raised genuine issues of material fact regarding whether the statements made in the Press Release were false and whether Best made those false statements with actual malice. By granting Best's motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 at the conclusion of Regis' case-in-chief, the trial court exceeded the boundaries of its authority and deprived Regis of a trial on these issues. The trial court further erred as a matter of law when it did not grant Regis' Motion for a New Trial. Accordingly, the Order denying Regis a new trial must be reversed and this case remanded for trial.

Respectfully submitted:

**HAINES & ASSOCIATES**

*/s/ Clifford E. Haines*
CLIFFORD E. HAINES (PA 09882)
1835 Market Street
Suite 2420
Philadelphia, PA 19103
(t) (215) 246-2200
(f) (215) 246-2211
*Attorneys for Regis Insurance Company*

Of Counsel on the Brief:
Danielle M. Weiss

Dated: October 16, 2014

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member in good standing of the Bar of this

Court.

_/s/ Clifford E. Haines_
CLIFFORD E. HAINES

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)(C)

I hereby certify, pursuant to Fed. R. Civ. App. Proc. 32(a)(7)(C), that the

within Brief for Appellant complies with the type volume limitation.  This Brief

contains 11,971 words, as determined by Microsoft Word 2010.

_/s/ Clifford E. Haines_
CLIFFORD E. HAINES

## CERTIFICATE OF CONFORMITY WITH ELECTRONIC FILING

I hereby certify that the text of the PDF version of this brief, filed

electronically, and the hard copies filed with the Clerk are identical.

_/s/ Clifford E. Haines_
CLIFFORD E. HAINES

## CERTIFICATE OF VIRUS CHECK

I hereby certify that the PDF version of this brief, filed electronically, was

virus-checked before filing, using Microsoft Security Essentials, 2.0.657.0, and

that no virus was detected.

_/s/ Clifford E. Haines_
CLIFFORD E. HAINES

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2014, the Brief for Appellant Regis

Insurance Company was electronically filed with the Clerk.  I further certify that I

directed that a copy of the Brief for Appellant and Joint Appendix be sent via first

class mail, postage prepaid to:

Michael K. Furey, Esquire
Stephanie R. Wolfe, Esquire
Riker Danzig Scherer Hyland & Perretti
One Speedwell Avenue
Headquarters Plaza
Morristown, New Jersey 07962-1981
*Attorneys for Appellee A.M. Best Co., Inc.*

Due to volume, the Appendix is being submitted to the court in hard copy only.  A

complete hard copy of the Appendix has been mailed to the above recipients.


        */s/ Clifford E. Haines*
        CLIFFORD E. HAINES

# TABLE OF CONTENTS TO APPENDIX

## VOLUME I

Notice of Appeal, filed June 17, 2014.................................................................. 1a

Memorandum and Order that Plaintiff's Motion for New
Trial is Denied, Filed May 20, 2014 .................................................. 44a

Memorandum and/or Opinion signed by Chief Judge Petrese B.
Tucker, filed on May 20, 2014........................................................ 45a

Judgment in Favor of Defendant, A.M. Best Company, Inc.
and against Plaintiff, Regis Insurance Company,
filed May 29, 2013 ......................................................................... 83a

Memorandum and Order that Defendant's Motion is
Granted in Part and Denied in Part by Honorable Petrese B.
Tucker on February 28, 2013, filed March 1, 2013 ......................... 84a

Order decreeing that this matter shall have a Trial Certain
date of Monday, May 20, 2013,
filed March 20, 2013 ...................................................................... 85a

Order granting Defendant's Motion for Leave to File
a Reply Memorandum of Law in Support of Its Motion
for Certification for Interlocutory Appeal........................................ 86a

Memorandum Opinion that Defendant's Motion is
Granted in Part and Denied in Part of Honorable Petrese B,
Tucker on February 28, 2013, filed March 1, 2013 ......................... 87a

Order denying Defendant's Motion for Certification for
Interlocutory Appeal of the Court's March 1, 2013
Order, filed April 19, 2013............................................................ 109a

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REGIS INSURANCE COMPANY,<br>Plaintiff | : | CIVIL ACTION |
| | : | NO.: 10-3171 |
| v. | : | |
| A.M. BEST COMPANY, INC.<br>Defendant | : | |

### NOTICE OF APPEAL

Notice is given that Plaintiff Regis Insurance Company hereby appeals to the United States Court of Appeals for the Third Circuit the Opinion (No. 109) and the Order (No. 110) dated May 20, 2014 denying Plaintiff's Motion for New Trial which was entered on the docket on the same date they were signed by Honorable Petrese B. Tucker. The Opinion and Order are attached to this Notice as Exhibits "A" and "B", respectively.

The transcripts of the oral argument and the trial have been requested and received.

Respectfully submitted:
**HAINES & ASSOCIATES**


 */s/ Clifford E. Haines*
CLIFFORD E. HAINES (PA 08992)
DANIELLE M. WEISS (PA 201067)
Haines & Associates
1835 Market Street
Suite 2420
Philadelphia, PA 19103
*Attorneys for Plaintiff*
(T) 215-246-2200
(F) 215-246-2211

Date: June 18, 2014

# EXHIBIT 'A'

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,

      Plaintiff,

      v.

A.M. BEST COMPANY, INC.,

      Defendant.

CIVIL ACTION

NO. 10-3171

MEMORANDUM OPINION

Tucker, C. J.                                                             May 20, 2014

    Plaintiff Regis Insurance Company ("Regis") brought this civil action against Defendant

A.M. Best Company, Inc. ("A.M. Best" or "Best") for damages it allegedly suffered as a result of

A.M. Best's downgrade of Regis' credit rating in early 2010. This matter proceeded to trial on

May 20, 2013. After six days of Regis presenting its case in chief to the jury, A.M. Best moved

for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The Court granted the motion.

Regis has now filed the instant Motion for New Trial pursuant to Fed. R. Civ. P. 59. Upon

consideration of Regis' motion, all responses thereto, and following oral argument, Regis'

motion will be denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

    The highly technical facts of this case were fully set forth in the Court's March 1, 2013

Memorandum Opinion. Regis Ins. Co. v. A.M. Best Co., Inc., CIV.A. 10-3171, 2013 WL

775521 (E.D. Pa. Mar. 1, 2013). Regis's Complaint alleged five counts against A.M. Best: (1)

declaratory judgment, (2) defamation, (3) commercial disparagement, (4) tortious interference

1

with contractual relations, and (5) tortious interference with prospective contractual relations.

Regis voluntarily withdrew its claim for a declaratory judgment. In the March 1, 2013

Memorandum Opinion, the Court granted A.M. Best's Motion for Summary Judgment as to both

of Regis' tortious interference claims. However, the Court denied the Motion for Summary

Judgment as to Regis' defamation and commercial disparagement claims. Subsequently, on

March 13, 2013, Best filed a Motion for Certification for Interlocutory Appeal. On April 19,

2013, the Court entered an Order denying A.M. Best's Motion for Certification. (ECF No. 60)

("April 19, 2013 Order").

This matter proceeded to trial on May 20, 2013. After six days of Regis presenting its

case in chief to the jury, A.M. Best moved for judgment as a matter of law pursuant to Fed. R.

Civ. P. 50(a). The Court granted A.M.'s Best motion, stating the following:

> In considering the Rule 50 Motion, the Court is of the opinion that
> there is some issue as to whether or not there is sufficient evidence
> and I have to take the rating separate from the press release.
>
> As to the rating, the Court is of the opinion that this is...a situation
> of an opinion about which reasonable persons can differ, and I
> don't find it a matter of false statements. But even assuming that
> the statements were false, the Court finds no evidence of reckless
> disregard or actual malice, which is necessary in order to
> proceed.
>
> As it relates to the press release, the Court is of the same opinion
> that while the statements may have been changed, the substance of
> the press release was the same, and the change was not so
> material that it entered into the area of actual malice.
>
> So accordingly, this Court finds that the evidence is insufficient
> on defamation and commercial disparagement as it relates to
> the rating and the press release for the claims to go to the jury.
> And accordingly, the Court grants the Rule 50(a) motion in this
> matter.

2

(Tr. Rule 50(a) Mot. Ruling 2:2-3:1, May 28, 2013) (emphasis added). The instant Motion for

New Trial challenges the Court's ruling granting A.M. Best's Rule 50(a) Motion.

## II. STANDARDS OF REVIEW

### A. Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs a motion for judgment as a matter of law

("JMOL"). A district court may grant JMOL only if "a reasonable jury would not have a legally

sufficient evidentiary basis to find for [a] party." Fed. R. Civ. P. 50(a)(1). Further, JMOL is

appropriate only where, "viewing the evidence in the light most favorable to the non-movant and

giving it the advantage of every fair and reasonable inference, there is insufficient evidence from

which a jury could reasonably find liability." Warren v. Reading Sch. Dist., 278 F.3d 163, 168

(3d Cir. 2002); see also Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993) ("The

question is not whether there is literally no evidence supporting the party against whom the

motion is directed but whether there is evidence upon which the jury could properly find a

verdict for that party.") (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978)).

### B. Motion for New Trial

Federal Rule of Civil Procedure 59 governs a motion for a new trial. A court may grant a

new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an

action at law in federal court." Fed.R.Civ.P. 59(a). A court may grant a new trial on the grounds

of: (1) improper admission or exclusion of evidence; (2) improper instructions to the jury; (3)

newly discovered evidence exists that would likely have altered the outcome of the trial; (4)

improper conduct by an attorney or the court unfairly influenced the verdict; (5) the jury's

verdict is against the clear weight of the evidence; or (6) the verdict is so grossly excessive or

inadequate as to shock the conscience. See Goodman v. Pennsylvania Tpk. Comm'n, 293 F.3d 655, 676 (3d Cir. 2002) (citing Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir.2000)); Am. Bd. of Internal Med. v. Von Muller, 10-CV-2680, 2012 WL 2740852 (E.D. Pa. July 9, 2012); Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002); Davis v. Gen. Acc. Ins. Co. of Am., 153 F. Supp. 2d 598, 599-600 (E.D. Pa. 2001); Griffiths v. Cigna Corp., 857 F.Supp. 399, 410–11 (E.D.Pa.1994), aff'd, 60 F.3d 814 (3d Cir.1995) (unpublished table decision). The overriding principle is that a court has the power and duty to order a new trial to prevent injustice. 11 Charles Alan Wright et al., Federal Practice and Procedure § 2805 (2d ed.1995). Determining whether to grant a new trial is within the "sound discretion of the trial court." Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980); Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1017 (3d Cir.1995).

The standard that a district court is to apply when ruling on a motion for a new trial differs with the grounds asserted in support of the motion. Lind v. Schenley Industries Inc., 278 F.2d 79, 89 (3d Cir.1960). The district court has broad discretion when the asserted ground for a new trial is a ruling on a matter that initially rested within the discretion of the court, such as an evidentiary ruling or jury instruction. Klein v. Hollings, 992 F.2d 1285, 1289–90 (3d Cir.1993); Lind, 278 F.2d at 90; Farra v. Stanley–Bostitch, Inc., 838 F.Supp. 1020, 1026 (E.D.Pa.1993). Where the motion for a new trial is based on an assertion of legal error, the court conducts a two-step analysis. First, the court determines whether it erred at trial. Second, the court determines "whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'" Farra, 838 F.Supp. at 1026 (quoting Bhaya v. Westinghouse Elec. Corp., 709 F.Supp. 600, 601 (E.D.Pa.1989) (quoting Fed.R.Civ.P. 61)).

4

## III. DISCUSSION

In the instant matter, the only argument Regis advances in its Motion for New Trial is that the Court's decision to grant A.M. Best's Rule 50 motion was "wholly inconsistent with prior rulings" in this case. (Pl.'s Reply in Supp. 2; see also Pl.'s Mot. New Trial 2) ("The Court's decision that A.M. Best was entitled to judgment as a matter of law was particularly curious given the procedural history of this matter."). Regis asserts that the Court outlined various genuine issues of material fact in both its March 1, 2013 Memorandum Opinion denying in part Best's Motion for Summary Judgment, and it's April 19, 2013 Order denying A.M. Best's Motion for Interlocutory Appeal. Yet, Regis argues, the Court ultimately deprived Regis of the right to have a jury determine these genuine issues of material fact. Regis contends that the evidence it presented at trial (in particular it's Exhibit 41) was substantially similar to — if not greater than — the evidence it presented in opposition to Best's prior summary judgment and interlocutory appeal motions. (Pl.'s Reply in Supp. 2; Tr. Oral Argument 5:2-14, Oct. 9, 2013.) Thus, Regis concludes, "[i]f the record on summary judgment and the record presented at trial are substantially similar, then the only way the Court could rule in favor of A.M. Best at the close of...Regis' case was to engage in impermissible fact-finding." (Pl.'s Reply in Supp. 2.) Accordingly, Regis claims that it was improper for the Court to supplant its own judgment for that of the jury.

### A. The Court's March 1, 2013 Memorandum Opinion and April 19, 2013 Order

The Court will begin its analysis by noting that, problematically, Regis' theory of liability in this matter has been something of a moving target that has been difficult to pin down. (See e.g., Tr. Oral Argument 13:5-24.) Up until the summary judgment stage, it was Regis' position

5

that both A.M. Best's downgraded credit rating of Regis and the press release A.M. Best issued

announcing that downgrade were capable of defamatory meaning. Likewise, A.M. Best's

Motion for Summary Judgment also seemed to conflate the two. The Court, however, has

endeavored to stress that there is a vital distinction that must be drawn between the rating itself

and the press release. As the March 1, 2013 Memorandum Opinion stated:

> The Court finds it necessary at this juncture to distinguish between
> the two interrelated communications/statements that are at issue in
> this case: (1) the rating itself and (2) Best's press release, which is
> a reflection of the rating. A rating, standing alone, is an opinion,
> as Best adamantly avers. A rating, unless patently baseless, has
> no inherent truth; it is merely an estimation, arrived at
> through application of Best's methodologies, of the financial
> health of the rated organization. But in order for Best's
> "ratings opinion" to be entitled to the protection generally
> afforded to opinions in defamation actions, Best's
> methodologies must have actually been followed. Here, there
> remains a genuine issue of material fact as to whether Best
> followed its own methodologies in this particular instance.

Regis Ins. Co., 2013 WL 775521, at *10 (emphasis added); see also id. at n. 13 ("The Court also

rejects any assertion by Regis that Best should have not downgraded it at all."); id. at *6-9, 11

(discussing the arguable deficiencies in the language of the press release). Thus the Court has

emphasized two things: (1) for the reasons outlined, there were genuine issues of material fact as

to whether the press release was capable of defamatory meaning, and (2) the rating itself could

be capable of defamatory meaning *only if* A.M. Best did not follow its own methodologies in

reaching its ratings decision.

A.M Best's Motion for Certification for Interlocutory Appeal essentially sought

reconsideration of the Court's March 1, 2013 Memorandum Opinion. In denying the motion, the

Court's April 19, 2013 Order sought to clarify what had apparently been left unclear in the

March 1, 2013 Memorandum Opinion. Accordingly, the Court stated:

As Best pointed out in its briefs in support of summary judgment, it at times appears to be Regis' position that Best was not entitled to downgrade it at all. To the extent this is Regis' argument, this Court, like the Sixth Circuit in Compuware Corp. v. Moody's Investors Servs., Inc., 499 F.3d 520 (6th Cir. 2007), has emphatically rejected this assertion....But as the Court stated in its [March 1, 2013 Memorandum] Opinion, a distinction must be drawn between the rating itself and how that rating (and the reasons for it) was communicated to the public....Best has made much of the fact that the Court's Opinion states that Best's ratings process "appears to have been democratic and collaborative, and the Court does not believe that Best made the decision to downgrade Regis lightly."....Practically speaking, however, it matters little how democratic the ratings process was if the end result (the press release) is not as carefully considered as the ratings process itself. The public is not privy to the ratings process; all the public is privy to is the ultimate ratings decision, as communicated in the press release. The Court's Opinion focuses heavily on the wording of the press release because defamation requires publication and the press release is the only publication at issue.

(ECF No. 60 at 2-3) (internal citations omitted; emphasis added). The Court further stated:

At bottom, the viability of Regis' defamation and commercial disparagement claims come[s] down to this single question: whether Best properly communicated to its audience the bases for its decision to downgrade Regis. The Court found that there is a genuine issue of material fact on this question. To be clear: the problem with the press release is that it arguably implies Regis experienced certain financial difficulties in 2009 when, in fact, it had not. The only thing that had changed in 2009 was that Best learned of information about the financial health of Regis' parent company of which it was previously unaware. As detailed in the [March 1, 2013 Memorandum] Opinion.... a reasonable jury could find that Best recklessly framed its rating and press release in such a way as to create the false impression that Regis experienced certain financial difficulties in 2009.

(Id. at 3) (internal citations omitted; emphasis added). The Court, therefore, attempted to focus the parties' attention to the language of the press release, and again rejected Regis' broad

7

Case 2:10-cv-03376-PBT   Document 109   Filed 05/7/2014   Page 9 of 28

assertion that A.M. Best was not entitled to downgrade it at all.  Thus, on two occasions prior to

trial, the Court expressed doubt that the rating itself, if viewed in isolation, was defamatory.

### B.   Regis' Evidence at Trial[f]

At trial, however, Regis again returned to its insistence that both the downgraded credit

rating and the press release constituted defamation.  Over the course of six days the vast majority

of Regis' evidence was devoted to proving that the ratings downgrade itself was improper; Regis

only addressed the press release as an ancillary matter.  For instance, although opening

statements are not evidence, see Model Civ. Jury Instr. 3rd Cir. 1.12 (2011); Trial Tr. 25:18-22,

May 20, 2013, the arguments presented by Regis' counsel during opening arguments are

illustrative of how Regis sought to frame its case to the jury.  Regis argued: "If an insurance

company loses its rating, it is the death knell for that company. ...nobody is going to dispute that

fact.  The marketplace in the world of insurance is, like it or not, driven by the rating." (Trial Tr.

33:19-23, May 20, 2013.)  Regis then argued:

> If you saw it when it was up on that screen, you will see again that
> the press release disclosed that in January of 2010, A.M. Best
> dropped Regis' rating to a B-minus.  And that B-minus will in
> the very near future put Regis out of business.  And that's why
> we are here.  We are here not only because that's the outcome, but
> we are here because we challenge the rating and we challenge what
> was said about Regis in that press release.

(Id. at 34:19-35:2) (emphasis added).  The Court will review the testimony of each of Regis'

witnesses in turn.

_____

[f] The following is offered merely as a summary of the evidence the Court considered most relevant in rendering its
decision to grant A.M. Best's Rule 50 Motion.  Because it is only a summary, it is not intended to be a complete
reflection of all the evidence Regis presented over six days of testimony.

8

### 1. Testimony of Sharon Rinaldo

Sharon Rinaldo is the Comptroller at Regis. In this capacity, Ms. Rinaldo attended the meeting in fall 2009 which began the process for Regis' 2010 rating and had subsequent communications with A.M. Best regarding Tiber. Accordingly, Regis presented extensive testimony from Ms. Rinaldo about mechanics of A.M. Best's ratings process and her involvement in that process.

During this time, Regis repeatedly attempted to elicit testimony from Ms. Rinaldo that Regis' current financial troubles are directly attributable to the ratings downgrade. The Court ruled that Ms. Rinaldo, a fact witness, was not qualified to provide this kind of expert testimony. (Id. at 27:7-28:11; Trial Tr. 21:11-24:1, 68:6-21, 69:13-70:7, 71:14-73:22, May 21, 2013.)  The Court notes that Regis is not challenging that evidentiary ruling in the instant motion.

### 2. Testimony of Marc Liebowitz

Regis next called Marc Liebowitz to testify. Mr. Liebowitz was the A.M. Best junior analyst responsible for analyzing Regis in preparation for its 2010 rating. Mr. Liebowitz had been assigned to the Regis account since 2006. Mr. Liebowitz testified extensively to the mechanics of the ratings process from A.M. Best's perspective, and thus served to complement the testimony previously given by Ms. Rinaldo.

The first and second days of Mr. Liebowitz's testimony were apparently primarily intended to establish that A.M. Best and the service it provides is highly regarded in the marketplace, and consequently a lowered rating can have a damaging effect on a rated entity's ability to do business. The following is representative of Regis' line of questioning:

9

Q. Mr. Liebowitz, you are aware of the fact, are you not, that Best['s] rating drives the market? You know that, right?

A. It drives the market?

Q. It drives the market?

A. That's a broad statement again. It's certainly one of the aspects that would likely go into an—for a company to purchase insurance or for a broker to recommend. I could say it's certainly one of the driving or one of the forces that people would look to, perhaps.

Q. I want to go back to the statement that I quoted to you. ["]You are the largest and longest-established company devoted to issuing in-depth reports and financial strength ratings about insurance organizations.["] You certainly are the largest, correct?

A. I mean, there are certainly other companies that do credit ratings for insurance companies....[W]e could certainly be the largest, but there are certainly other companies that provide credit ratings for insurance.

Q. And those are who?

A. S&P, Moody's, Fitch...

Q. Well, of all of those companies that you have identified, only one of them is devoted to insurance, correct....Everyone else rates all kinds of other things, right?

A. Yeah....I just want to make sure the point is that they do offer ratings for insurance companies....

[...]

Q. Mr. Liebowitz, you are not a potted plant either. You understand the world of insurance and you understand the market of rating insurance companies. You can't really disagree with me, can you—

A. I can't.

Q. —that Best's rating is *it* when it comes to rating insurance companies, correct?

10

(Trial Tr. 13:8-15:23, May 21, 2013) (emphasis added).

Having established these purely background facts, Regis then interrupted Mr. Liebowitz's testimony to call Stephen Johnson to the stand. After Mr. Johnson testified, see section III.B.3, infra, Mr. Liebowitz then retook the stand, during which time Regis extensively questioned him about the history of the relationship between Regis and A.M. Best; Regis' past ratings history; Mr. Liebowitz's contact with Regis during the 2010 ratings process; and Regis' appeal from the ratings process. Regis' questioning of Mr. Liebowitz eventually got around to the 2010 press release, and what information Mr. Liebowitz used in constructing its language. (Trial Tr. 159:1, May 22, 2013.) This then led to a discussion of why Mr. Liebowitz recommended to his superiors at Best, on January 8, 2010, that Regis should maintain its B+ rating. (Id. at 161:8.)

The Court surmises from this line of questioning that Regis sought to establish that nothing had changed at Regis at the time of the January 2010 downgrade—as evidenced by the fact that (1) Mr. Liebowitz did not recommend downgrading Regis and (2) Mr. Liebowitz used the same language in recommending that Regis remain at a B+ as he had when prior B+ ratings decisions had been issued in previous years. (See id. at 183:9.) Regis further sought to establish that "the downgrade of Regis Insurance Company was predicated on Tiber Holding Company and nothing about Regis as a stand-alone entity." (Id. at 187:4-7.) Mr. Liebowitz refuted this assertion. (Id. at 187:8-188:4.) There then ensued an extended discussion in which Regis attempted to argue that it was improper for Best to consider the financial condition of Tiber in calculating Regis' credit rating— i.e., to allow Tiber to "drag down" Regis' rating. [2] (Id. at 188:5-207:11.)

---

[2] The following question by Regis' counsel is fairly typical of this exchange:

Ultimately, on redirect, Mr. Liebowitz provided testimony concerning an internal A.M. Best draft press release (Exhibit 41). This draft press release was not published or seen by anyone outside of A.M. Best.[3] (Id. at 33:9-35:17.) This initial version of press release stated the following:

> The recently received (by A.M. Best) audited financial statements of Tiber indicate potentially significant exposure to Regis should certain of Tiber's litigation-related liabilities be enforced. It should be noted that Tiber's litigation-related liabilities are not related to Regis, which is under the regulatory jurisdiction of the Pennsylvania Department of Insurance.

(Pl.'s Trial Ex. 41; see also Pl.'s Mot. New Trial, Ex. A.) Mr. Liebowitz testified that either he or Gerard Altonji wrote this language, and Matthew Mosher, an A.M. Best senior executive, deleted it. (Trial Tr. 35:9-17, May 22, 2013.)

3. Testimony of Stephen Johnson

Mr. Johnson is a Deputy Commissioner for the Pennsylvania Department of Insurance ("DOI"), and is in charge of corporate and financial regulation. Mr. Johnson, from his perspective as a regulatory authority, testified to his opinion of Regis' financial health. Mr. Johnson, at the behest of Regis, became involved in the 2009-2010 ratings process. He had several phone calls with A.M. Best's analysts, Mr. Liebowitz and Mr. Altonji, to "confirm" that Pennsylvania would not allow the New York Liquidator to seize Regis in order to satisfy Tiber's

---

Q. Mr. Helstrom told you Tiber has nothing to do with Regis. Mr. DiLoreto said Tiber has nothing to do with Regis. The insurance regulat[or], Department of Insurance of the Commonwealth of Pennsylvania said Tiber has nothing to do with Regis. Best ignored all that evidence.

(Trial Tr. 202:6-13, May 22, 2013.)

[3] Because this draft press release was not published or seen by anyone outside of A.M. Best, it is not a "communication" for purposes of defamation. The Court however, over the objection of A.M. Best, (see id. at 32:24-33:19), permitted Regis to question Mr. Liebowitz about this draft press release because it was relevant to the question of what language Regis chose to use or not use in crafting the language of the press release that was published.

12

debts. After Best made the final decision to downgrade Regis, Johnson had also written a letter to Best in which he urged Best to reconsider downgrading Regis.

In addition, Regis also attempted to elicit testimony from Mr. Johnson regarding what effect the downgrade had had on Regis' business. As the Court ruled at trial, Mr. Johnson was not proffered as an expert witness and therefore was not qualified to offer this kind of expert opinion testimony. (Id. at 4:3-18:8, 113:1-115:1.) The Court again notes that Regis is not challenging that evidentiary ruling.

### 4.  Testimony of Earl Helstrom

Regis next called Earl Helstrom, Regis' outside accountant during this time period, to testify. Like Ms. Rinaldo, Mr. Helstrom could only provide background information concerning A.M. Best's ratings process and his involvement in that process. Mr. Helstrom indicated that he was the accountant for all of Richard DiLoreto's companies, and had become involved in the 2009 ratings process at Mr. DiLoreto's request. Helstrom testified that he had conversations and exchanged emails with Mr. Liebowitz and Mr. Altonji in which he expressed his belief that Regis "need[ed] to be viewed as a stand-alone company for legal reasons and is insulated from" Mr. DiLoreto's other companies (Trial Tr. 47:5-7, May 23, 2013.) Mr. Helstrom then went on to provide extensive testimony regarding why, in his opinion, Regis should be viewed as a distinct entity, and that nothing about Tiber should have been taken into account in rating Regis. (Id. at 47:15-103:14.) Over A.M. Best's objection, the Court then permitted Mr. Helstrom to testify regarding what affect the downgrade allegedly had on Regis from a financial perspective. (Id. at 103:15-106:22.)

13

In summary, the gist of Mr. Helstom testimony was that A.M. Best should consider

Tiber's financial condition in rating Regis but, if it did so, it should reach the conclusion that

Tiber's financial condition had "no impact whatsoever on Regis." (Id. at 149:1-150:10.) On

cross examination, Mr. Helstrom summarized his opinion as follows:

> Q.    Okay. Does the first part that I referred to, the top-down
> analysis includes the exposure to risk generated by activities that
> the parent holding company. Doesn't that refer to Tiber?
>
> A.    That's the parent holding company and that is the debt of
> the New York Liquidator and which you can't get to the insurance
> company and that's the debt of the bonds that are not going to be
> paid. Neither—that does not go down to Regis either. So Regis
> really has no connection to the debt that is on the Tiber-corporation
> level.
>
> Q.    Whether that's true or not remains to be decided. But it's
> your analysis that the liabilities of Tiber will never be visited on
> Regis, correct?
>
> A.    That's correct.
>
> Q.    And that's the kind of dispute, the difference of opinion
> that you have with the people at A.M. Best in rating Regis,
> whether the A.M. Best people were correct that they should
> consider those liabilities that Tiber had in rating Regis, or
> whether they shouldn't. Doesn't that sum up what your
> difference of opinion is?
>
> A.    Not totally.
>
> Q.    No? What did I miss?
>
> A.    Well, I think when A.M. Best came in to study this
> thing, they didn't understand it, so they should have put a U
> [for "under review"] on the rating...and then just moved on
> until they fully understood it.

(Id. at 154:1-155:8) (emphasis added).

14

### 5. Testimony of Karen Standen

Regis next called Karen Standen, an insurance underwriter for Regis, to testify. Ms. Standen sells brokers insurance at Regis. Over the objection of A.M. Best, the Court permitted Ms. Standen to testify that since the 2010 downgrade Regis' ability to garner new business and renew policies has declined. (Id. at 193:4-194:8.) This was the full extent of Ms. Standen's testimony on direct examination, and she was not cross-examined by Best.

### 6. Testimony of Gerard Altonji

Regis then called Gerard Altonji, Mr. Liebowitz's supervisor, to testify. Mr. Altonji was the senior A.M. Best employee in charge of analyzing Regis in preparation for its 2010 Rating. Mr. Altonji, like Mr. Liebowitz, testified regarding Best's ratings methodologies. Mr. Altonji, like Mr. Liebowitz, testified that Best had requested the consolidated financial statements of Regis prior to 2009, but that none had ever been provided. Mr. Altonji further testified that Mr. DiLoreto had repeatedly represented to Best in the past that Tiber had "no debt." In light of the revelations of late 2009, Mr. Altonji came to believe that Mr. DiLoreto had misrepresented Tiber's financial condition to A.M. Best. Mr. Altonji further testified that, in his opinion, Mr. DiLoreto had a history of being less than truthful with A.M. Best, and provided background to that effect.

The following day, Mr. Altonji testified as to the information he and Mr. Liebowitz provided to the ratings committee, and how the ratings committee's process works. Mr. Altonji again confirmed that that he and Mr. Liebowitz recommended to the ratings committee that Regis maintain its B+ rating. In addition, while questioning Mr. Altonji, Regis again sought to emphasize that A.M. and the service it provides is highly regarded and that a lowered rating

15

would have damaging effect on a rated entity's ability to do business — just as Regis had

emphasized while questioning Mr. Liebowitz. The following is representative of Regis' line of

questioning:

Q. Now, yesterday, I think, Mr. Liebowitz was asked about whether or not...the impact of the rating is taken into consideration. And he said absolutely not, you are not permitted to [take that into consideration]. Is that right?

A. That's what he said.

Q. You don't disagree with that, do you?

A. None of us disagree with that.

Q. None of you meaning—

A. A.M. Best.

Q. You are not speaking for company policy, right?

A. Right.

Q. But although you don't—you are not permitted to take that into consideration, in point in fact, A.M. Best knows exactly what the consequence of its rating is, agree?

A. No, I don't agree.

Q. Well—

A. We have an idea there may be an impact, but we don't know what the exact impact will be.

Q. Well, Mr. Altonji, the whole promise of Best is that it's on top of the world of insurance, right?

A. Okay.

Q. What do you mean okay? Is that a yes or a no?

A. I will say yes.

16

Q. Okay. I mean—

A. Okay. Let's keep going.

Q. The theory is that A.M. Best knows insurance better than anybody else in the world. That's kind of what you hold yourself out as being.

A. Okay, yes.

Q. Okay, yes?

A. Yes.

Q. Okay. So you are not, like, unmindful of the fact that people buy insurance and people sell insurance and, in many instances, buyers and sellers of insurance rely on that rating?

A. Among other things, yes. It's not the sole consideration when they buy insurance, but yes.

Q. Well, that suggests you do know something about it, because that suggests that were are other considerations that you know about. You said among other things?

A. Is there a question?

Q. You said among other things?

A. Yes.

Q. Do you know—let me ask you this question. One of the reasons that you don't just publish a letter and a plus minus or whatever, and one of the reasons you provide substantive information, if you will, is to allow the reader to know what the basis for your rating is, correct?

A. Yes.

Q. You want to give the reader a transparent picture of here is why we have rated this particular insurance company this way, correct?

A. Correct.

17

19a

Q. Not what the speculation is, not what the world of possibilities is, but what are the facts, correct?

A. We look at the facts but we also consider, you know, possibilities, things that might happen in the future, could happen in the future.

Q. Well, you—

A. Because when you say facts, that would imply all we do is look at the latest financial statements, the numbers and going back. Obviously, those are facts, right. But we talk about the profile of the company and things that could affect it.

(Trial Tr. 6:15-10:6, May 24, 2013.) There then ensued a discussion of Best's methodology and what factors Best considers in calculating a rating. The clear purpose of this line of questioning was for Regis to critique the rating on the grounds that, in Regis' opinion, the judgments against Tiber were "not that big a deal" and that Tiber's financial condition should have no effect on Regis' rating. The following exchange is indicative:

Q. Okay. I am taking about as a general proposition. Putting aside now what everybody else has said—

A. Okay.

Q. —that a bare judgment against somebody does not have any meaning. It sounds like a big deal, but it does not have any meaning until some—

[...]

Q. Until somebody tries to execute it, correct?

A. Well, I didn't know that.

Q. You did not know that?

A. I assume that it's something that can be collected.

18

Q. I'm sorry?

A: It's a legal obligation so I assumed that at some point it would be collected?

Q. Well—

A: Or at least attempted to be collected.

Q. Well, did you understand that the existence of the judgment itself doesn't mean somebody has got to start writing checks?

A: No, I did not understand that.

(Id. at 17:13-18:17.) Additionally, Regis asked the following questions:

Q. ...So in the analysis that A.M. Best conducts, it has to not just look at possibility, it has to look at realistic possibilities. What are the realistic possibilities. Agreed?

A. Okay.

Q.   Mr. Altonji, when you downgraded Regis Insurance Company based on the judgments against Tiber, you had no idea what the realistic possibilities were, did you?

A. Did you just say that we downgraded Regis because of the— based on the judgments against Tiber?

Q. I did say that.

A. Okay. That's not why we downgraded Regis.

Q. Okay. We have been talking about the downgrade. It's up to the jury to decide in the final analysis why you downgraded....

(33:16-34:9) (emphasis added).

Regis again eventually got around to the question of the press release. Mr. Altonji

testified that Mr. Liebowitz drafted Exhibit 41, while Mr. Altonji edited the document, and Mr.

19

Mosher edited Mr. Altonji's edits. (Id. at 40:18-41:21.) Mr. Altonji offered the following

testimony regarding Exhibit 41 and the final 2010 press release.

> Q. Okay. Let's look at Exhibit 41. Now, if you will look at your e-mail [to Marc Liebowitz] that accompanies this document. You said in the e-mail: ["]see Matt [Mosher]'s edits, accept all of them and send to AMB Corporation Communication with a request that we have it back tomorrow morning and use it as a basis for the rationale. We will call Richard [DiLoreto] in the morning.["]

> [...]

> Q. Okay. You say: ["]Accept all [the changes] and send it to ABM.["] Is that because you believed that the edits better stated A.M. Best's rationale?

> A. No. I said it because my boss's boss's boss came back with those edits and I would defer to his judgment. If that's how he wanted it to look, then that's fine.

> Q. Well, let me give you an example...[T]he way the press release went out, ["]these rating actions reflect recent disclosures of the lack of financial flexibility at Regis's privately held parent, Tiber Holding Company.["] Because it's read that way, it read: ["]The recent—the recently received by A.M. Best.["] Right?

> A. That's what it says, yes.

> Q. That's the truth, correct?

> A. Correct.

> Q. But somebody said no, we don't want to say ["]recently received["] by A.M. Best. We want to say ["]these ratings actions reflect recent disclosures,["] leaving unclear where those recent disclosures came from. Right?

> A. Well, I think reasonable people can say it's clear or unclear. To me, it's still clear, these actions reflect the recent disclosures of lack of—

> Q. How about it I try this with you. Can't we agree that if you had...published as you said in the press release before it was edited

20

down, ["]The recently received by A.M. Best audited financial
statement of Tiber indicates potentially significant exposure to
Regis should certain of Tiber's litigation-related liabilities be
enforced.["] That's the story, isn't it?  And you all took it out.
Why?

A. Well, maybe you want to ask Matt Mosher that question.

Q. Well, I'm asking you since you told—

A. I did not take it out.  I have, you know, my opinions, but
they're really not relevant.  Mr. Mosher is the one that took it
out.

Q. Well, did you go to Mr. Mosher and say, Mr. Mosher, I know
you are my boss's boss's boss, but what we are saying here doesn't
accurately reflect the truth.

A. No.  I didn't say that and I wouldn't say that.  And...I disagree
with your comment that it does not accurately reflect the truth after
the edits.  The rating actions reflect recent disclosures.  This press
release is coming from A.M. Best.  I think a reasonable reader of
it, especially readers of A.M. press releases, all right, would
recognize that that means it's recently disclosed to A.M. Best.

Q. Mr. Altonji, there were no recent disclosures.  The fact that
there was a judgment had been known since 2002.  It was on the
record.

[...]

A. ....[The judgments are] not in the public domain in the sense
that it's been announced that there are these judgments out there.
How do I look for something that I don't know exists?

[...]

Q. Well, if you want to, in fact, know for sure about Tiber, all
you've got to do is ask.  Correct?

A. And we did ask.

Q. And you testimony is we asked Mr. Di Loreto and he didn't
produce?

21

A. That is correct.

(Id. at 41:22-46:5.)

7.    Testimony of Michael Cohen

Regis' final witness was Michael Cohen, who gave expert testimony regarding the A.M. Best ratings process, A.M. Best's ratings methodologies, and A.M. Best's alleged departure from those methodologies. Mr. Cohen had formerly been a vice president at A.M. Best. Because Mr. Cohen was offered as Regis' expert, his testimony warrants repeating at some length.

Q. Okay. So we are clear, did you look at…the methodologies that were employed in looking at Regis Insurance Company standing alone?

A. Repeat that, please.

Q. Sure. Did you look at the methodology that was employed in reviewing Regis Insurance Company as a stand-alone entity?

A. Yes, I did.

Q. Did you have any criticism or do you have any criticism of the way in which the methodologies applied to or were used in rating Regis standing alone?

A. No, I did not.

Q. So your opinions have to do with the way in which A.M. Best approached the parent?

A. That is correct.

Q. Would you explain to the jury…what your basis is for believing that A.M. Best failed to employ or utilize appropriate—its appropriate methodologies in analyzing the parent, Tiber Holding Company?

A. When they reviewed the financial statements of Tiber, which I believe you have seen, there is a—an obligation, a liability on their

22

24a

balance sheet for a judgment held by the New York Liquidation Bureau, and that number has grown over time so that at the point where these financial statements were reviewed, which was as of year-end 2008, that number was something on the order of $43 million.

And the analysts saw that number and assumed that, one, since the holding company had a very negative net worth technically speaking, that this financial stress of the holding company would spill over and impact the operating company, Regis, in a very negative way.

And where the methodology was not followed according to my opinion is that given the magnitude of this negative net worth, the analysts did not drill down into what is going on here and how can the situation that led to this in real-time business terms actually affect Regis.

The number looked large, and you could draw an analogy to if your spouse had entered a large check or withdrawal in your checkbook, you open up the checkbook and say, this is a large number, what is behind this. And my—the analogy that I am drawing here is that this number was so large that it bore additional and intense scrutiny to really find out what is going on there, what is this judgment all about, what is the history of it, how likely is it to actually come to fruition, who are the players involved, what have you.

Mr. Altonji noted on Friday that when he looked at it and his analytical colleagues looked at it that this was a very unusual situation that they hadn't seen before, and when I saw it, I said exactly the same thing. I have never seen in my analytical career and my consulting career and my executive career as an insurance consultant, I have never seen situation like that either.

And when you think about the methodologies, how does A.M. Best do its ratings, and these methodologies they put out are very well conceived, and I am not saying that because I participated in many of them. I think they are very thoughtful documents as to how do we rate companies, what is an intelligent way to analyze companies, and they are well conceived.

But to be able to explain—and you have also seen examples of press releases where a rating agency, and they all do this, it's here is why we are assigning—making a rating and assignment and here is why, and to dig down into complicated situations and explain [it to] the public is very important.

[...]

23

Q. Well, Mr. Cohen, didn't they in fact, quote, to use your phrase, drill down by contacting the Pennsylvania Department of Insurance and trying to find out what is going on here?

A. They talked to the Pennsylvania Department of Insurance, but there were other entities that had pivotal roles in this that were more central to the disposition of how this particular judgment would play out.

They asked the Deputy Commissioner of Pennsylvania, Mr. Johnson, who you met the other day...what position would they take in terms of how this judgment would play out, and he opined...to the analysts and opined to you and he said so in his deposition that this judgment would not have an impact on Regis.

So as the regulator for the companies domiciled, located in the state of Pennsylvania where his authority is, he opined that it would not have an impact on the financial strength and therefore the claims paying ability of Regis.

Q. In looking at an entity that is being rated by A.M. Best, is it a part of the methodology there to turn to the regulating authority in the jurisdiction where the insurance company exists to find out its position on issues?

A. Yes.

Q. ...Did you see that in terms of drilling down A.M. Best also turn to Regis's and Tiber's accountant to try to get to some understanding of what was going on here?

A. They did.

Q. Well, again, doesn't that constitute satisfying their methodology by doing this drill down that you have described?

A. It does not...Talking to their accountant, Mr. Helstrom, he works for Regis and he is a competent accounting professional, but he is not a rating analyst, so he is providing his opinion, but his opinion is that of a layperson and it is not legally binding. I mean, that's his judgment....

Mr. Helstrom is a very competent C.P.A., but that does not certify him to be rating expert any more than me being a rating expert certifies me to be an accounting expert....

24

26a

Q. In order to understand…in this particular case—

A: Yes.

Q. — what it was that was, as you described it, really going on here, what in your opinion did A.M. Best fail to do?

A. They needed to get a—as clear picture as possible connecting with the New York Liquidation Bureau, the holder of this judgment, what did it mean, what are you likely to do, what are your legal rights to enforce this judgment…And, the A.M. Best analysts needed to determine from direct contact with the New York Liquidation Bureau what does this judgment mean, what are you intentions, how will you pursue it, whatever they can seek to understand in and of itself, and particularly because this was a unique situation.…

[…]

Q. …[A]re you aware of anything that A.M. Best did to factually understand this situation other than the conversations that they had with…the Insurance Department of Pennsylvania, and Mr. Helstrom and Mr. DiLoreto?

A. I am aware of those three contacts and not any others.

Q. In your opinion, was that sufficient for them to make a judgment about the significance of the judgments and how they could affect Regis Insurance Company?

A. It was not….I believe they had to hear from the New York Liquidation Bureau directly…what their plans were and get an understanding the best they could of what action there would be.

(Trial Tr. 45:6-54:11, May 29, 2014) (emphasis added). Mr. Cohen then went on to discuss the

harm the lowered rating had on Regis' business. (Id. at 60:3-62:4.) Mr. Cohen did not offer any

opinions on the press release itself in his expert report, and therefore was not permitted to do so

-25-

at trial. (Id. at 56:16-59:16.) The Court again notes that Regis is not challenging that evidentiary ruling.

Additionally, Mr. Cohen did not state in his expert report what he believed the proper rating for Regis should have been in 2010. Mr. Cohen did, though, testify regarding what he believed the proper rating should have been at his deposition. However, Mr. Cohen did not provide any information to Best about his analysis in reaching this conclusion, and subsequent discovery requests to Regis' counsel went unanswered. Accordingly, the Court did not permit Mr. Cohen to testify to what he believed the correct rating for Regis should be. (Trial Tr. 6:19-10:11, May 28, 2013.) The Court again notes that Regis is not challenging that evidentiary ruling.

### C. Regis' Evidence at Trial was Insufficient to Prove Defamation and Commercial Disparagement, and therefore Judgment as a Matter of Law was Appropriate

A brief recap of the applicable law is in order. As the parties are well aware, under Pennsylvania law a plaintiff in a defamation action has the burden of proving the following:

    (1) The defamatory character of the communication.
    (2) Its publication by the defendant.
    (3) Its application to the plaintiff.
    (4) The understanding by the recipient of its defamatory meaning.
    (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
    (6) Special harm resulting to the plaintiff from its publication.
    (7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a). Once a plaintiff establishes these elements, the defendant has the burden of proving the following, when relevant to the claim:

    (1) The truth of the defamatory communication.
    (2) The privileged character of the occasion on which it was published.
    (3) The character of the subject matter of defamatory comment as of public concern.

26

Id. at § 8343(b).  At summary judgment and at trial, A.M. Best primarily challenged the

sufficiency of Regis' evidence with respect to two elements of a defamation action: (1) the

defamatory character of the communication, and (2) abuse of a conditional privilege.

    With respect to the first element, a communication or statement is defamatory "if it tends

to harm the reputation of another as to lower him in the estimation of the community or to deter

third persons from associating or dealing with him" or "if it ascribes to another conduct,

character or a condition that would adversely affect his fitness for the proper conduct of his

proper business, trade or profession." Regis Ins. Co., 2013 WL 775521, at *5 (internal citations

omitted).  Importantly, however, only statements of fact, rather than mere expressions of opinion,

are actionable under Pennsylvania law. Id. (citing Moore v. Cobb–Nettleton, 889 A.2d 1262,

1267 (Pa.Super.Ct.2005) and Smith v. Sch. Dist. of Philadelphia, 112 F.Supp.2d 417, 429

(E.D.Pa.2000).  Accordingly, an opinion can only be defamatory if it may "reasonably be

understood to imply the existence of undisclosed defamatory facts justifying the opinion." Id.

(citing Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir.2001) and Parano v. O'Connor, 433

Pa.Super. 570, 575, 641 A.2d 607, 609 (1994)).

    Additionally, abuse of a conditional privilege is indicated when the publication: (1) is

actuated by malice or negligence; (2) is made for a purpose other than that for which the

privilege is given; (3) is made to a person not reasonably believed to be necessary for the

accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably

believed to be necessary for the accomplishment of the purpose. Id. at *11 (internal citation

omitted).  Actual malice requires that the speaker acted with knowledge that a published

27

statement is false or that the speaker acted with reckless disregard for the truth or falsity of the statement. Id. (internal citations omitted).

Finally, under Pennsylvania law the requirements for proving commercial disparagement are substantially the same as the requirements for proving defamation. Id. ("The legal standards applicable to defamation claims—including those for determining the truth or falsity of statements—are appropriately applied in determining the sufficiency of [a] claim for commercial disparagement.) (quoting QVC, Inc. v. MJC Am., Ltd., CIV.A. 08–3830, 2011 WL 2843746 (E.D.Pa. July 18, 2011)). Accordingly, in order to prevail on a claim for commercial disparagement, a plaintiff must show that the defendant published a statement about plaintiff's business to another, and: (1) the statement was false; (2) the publisher either intended the publication to cause pecuniary loss or reasonably should have recognized that publication would result in pecuniary loss; (3) pecuniary loss did in fact result; and, (4) the publisher either knew the statement was false or acted in reckless disregard of its truth or falsity. Id. (internal citations omitted).

Thus, in order for Regis to have prevailed on either its defamation or commercial disparagement claims against A.M. Best, it would have to prove a false statement was made by A.M. Best either in connection with the rating or in connection with the press release. Regis failed on both accounts.

### 1. The Rating

The Court again reminds Regis that it has repeatedly expressed skepticism that the downgraded rating itself was defamatory. The Court's March 1, 2013 Memorandum Opinion, however, left open the possibility that the rating could be defamatory *if* Regis could prove A.M.

28

did not follow its own methodologies in arriving at the rating decision. Regis' evidence in this regard was wholly insufficient.

Two of Regis' witnesses, Ms. Rinaldo and Ms. Standen, could only testify to damages allegedly resulting from the ratings downgrade. See 42 Pa.C.S. § 8343(a)(7). Mr. Helstrom and Mr. Cohen also provided some testimony as to damages. Establishing damages, however, accomplishes little if you have not first proven liability. Mr. Liebowitz and Mr. Altonji testified to A.M. Best's internal methodologies and process for reaching the ratings decision. This was largely background information.[4]

The primary purpose of Mr. Johnson's testimony was clearly to call into question Best's decision to downgrade Regis. The Pennsylvania Department of Insurance is not a credit rating agency, however. Further, as A.M. Best has long argued, it is questionable whether Mr. Johnson's personal opinion represents the opinion of the Pennsylvania Department of Insurance. But even if Mr. Johnson's opinion does represent the position of the Department of Insurance, it is debatable what the DOI's position would be if Mr. Johnson no longer held his position. Still further, as Mr. Johnson conceded at trial, he is not in a position to demand that Best substitute its own opinion regarding Regis' financial health for his personal opinion regarding Regis' financial health. (Trial Tr. 2:10-8:3, May 22, 2013.) Thus, the most Mr. Johnson could testify to was his own opinion that Regis should not have been downgraded. This is plainly insufficient. Mr. Johnson is entitled to his own opinion regarding whether Regis should have been downgraded; likewise, A.M. Best is entitled to take into consideration what effect a change in leadership at the DOI could have on the New York Liquidator's ability to collect on its judgments against Tiber,

---

[4] The fact that Mr. Liebowitz and Mr. Altonji both initially recommended to the ratings committee that Regis maintain its B+ is irrelevant. As analysts, it is their job to make recommendations but it is the ratings committee that makes the final decision whether to adopt that recommendation.

29

and therefore how much weight to give Mr. Johnson's opinion. Further, Regis elicited no

testimony from Mr. Johnson regarding whether Best had followed its own methodologies in

reaching the ratings decision.

Similarly Mr. Helstrom testified that, in his opinion, Tiber's financial condition should

not have been factored into Regis' rating. However, Mr. Helstrom's testimony that A.M. Best did

not "understand" the judgments is purely speculative. Mr. Helstrom is an accountant, not an

expert on A.M. Best's specific methodologies or the methodologies of *any* credit rating agency.

(Trial Tr. 111:25-113:20, May 23, 2013.) Regis' own expert, Mr. Cohen, himself recognized as

much. More importantly, Mr. Helstrom conceded that A.M. Best's methodologies permit it to

consider the financial condition of a holding company in ratings its subsidiary. (Id. at 149:1-

150:24.) It is merely Mr. Helstrom's opinion that once A.M. Best considered Tiber's financial

condition, it should have reached the conclusion that Tiber's financial condition had no impact

on Regis. (Id.) That is not a failure by A.M. Best to "understand" the judgments; that is merely

Mr. Helstrom disagreeing with the conclusion A.M. Best reached. Mr. Helstrom is entitled to his

opinion, just as A.M. Best is entitled to reach its own opinion regarding the judgments.

The only witness who testified that A.M. Best departed from its methodologies was Mr.

Cohen. Mr. Cohen was only able to testify to the methodologies' *general* requirement that

Best's analysts take both a top-down and bottom-up approach in rating insurance companies.

What these approaches require in any given situation is obviously highly context-specific. In

this particular context, Mr. Cohen understood this to mean that A.M. Best needed to "drill down"

into Tiber and the judgments by contacting the New York Liquidator directly. **This was the**

**only flaw Mr. Cohen could identify.** But even in identifying this supposed flaw, Mr. Cohen

30

admitted that there could be a risk to Regis if A.M. Best were to contact the New York

Liquidator — although Mr. Cohen believed that risk was remote. (Trial Tr., 88:10-93:16, May

28, 2013.) But although Mr. Cohen considered the risk to be remote, he nonetheless

acknowledged that the New York Insurance Department had actively taken certain legal steps to

enforce the judgments. Mr. Cohen also acknowledged that no one at Regis ever asked

anyone at A.M. Best to contact the judgment holder. (Id. at 85:14-97:18.)

Thus, the gist of Mr. Cohen's expert opinion is that A.M. Best lacked sufficient

information to rate Regis because it did not contact the New York Liquidator directly. (Id. 97:19-

99:1.) However, it is entirely speculative what, if anything, contacting the Liquidator would have

revealed or whether it would have altered A.M. Best's decision to downgrade Regis. Even if

A.M. Best had contacted the Liquidator (and thereby, according to Mr. Cohen, fulfilled all its

duties under its methodologies), A.M. Best would still have been entitled to draw its own

conclusions regarding how much weight to give the judgments against Tiber. Thus, although

Mr. Cohen's expert opinion is couched in the language of disputing that A.M. Best followed

its methodologies, in reality Mr. Cohen is only disagreeing with the opinion that A.M. Best

ultimately formed. Mr. Cohen is entitled to his own opinion regarding what the judgments

mean, just as A.M. Best is entitled to form its own opinion regarding the judgments. Indeed, Mr.

Cohen himself agreed that a rating opinion is something about which reasonable people can

differ. (Id. at 66:13-22; 112:13-17.) Mr. Cohen further agreed that there is a "great deal of

judgment and discretion that has to be exercised by the analyst in trying to understand what

impact the parent will have on the operating insurance company." (Id. at 112:4-12.) Mr. Cohen

also agreed that in some circumstances the financial condition of a holding company could be so

31

weak that its weakness should have bearing on its subsidiary's rating. (Id. at 68:2-69:23.) More specifically, Mr. Cohen also agreed it was proper for A.M. Best to consider the financial condition of Tiber in rating Regis. (Id. at 70:3-18.) Finally, when asked to identify a *specific* provision in Best's policy that required it to contact the New York Liquidator, Mr. Cohen could not. (Id. at 107:12-112:25.) Mr. Cohen also could not identify a single instance in which a credit rating agency had contacted a judgment creditor about what its intentions were in trying to collect on its judgments against either an insurance company or its parent company. (Id.)

In sum, Regis presented no competent evidence that A.M. Best departed from its methodologies in rating Regis. As such there was no evidence from which a jury could conclude that the rating was anything other than an opinion, about which reasonable people could disagree.[5] Because the rating is an opinion, it cannot be false and cannot serve as a basis for a defamation or a commercial disparagement claim. (See Tr. Rule 50(a) Mot. Ruling 2:2-14, May 28, 2013) ("As to the rating, the Court is of the opinion that this is…a situation of an opinion about which reasonable persons can differ, and I don't find it a matter of false statements. But even assuming that the statements were false, the Court finds no evidence of reckless disregard or actual malice, which is necessary in order to proceed.")

Accordingly, the Court's Rule 50(a) ruling with respect to the rating was neither inconsistent with its March 1, 2013 Memorandum Opinion and April 19, 2013 Order, nor impermissible fact-finding. Curiously, Regis now appears to concede that a rating is an opinion

---

[5] Additionally, there was no support for Regis' previous contention that A.M. Best downgraded Regis as some kind of retribution for Mr. DiLoreto's perceived misrepresentations of Tiber's financial condition. (See Pl.'s Resp. Opp'n Mot. Summ J. n. 1, 5-6.) Thus, the fact that Mr. Altonji admittedly accused Mr. DiLoreto of being a "liar" is irrelevant — especially considering that even after this episode Mr. Altonji still recommended to the ratings committee that Regis maintain its B+ rating.

32

and cannot form the basis for a defamation or commercial disparagement claim. At oral

argument, Regis asserted the following:

> The issue was not recklessness with respect to A.M. Best'[s] decision making, although
> we contended that they had breached their own guidelines with respect to how they
> addressed the issue, the rating. The issue was reckless as it related to the press release.

(Tr. Oral Argument 4:1-6.) This belated realization, however, runs contrary to the vast majority

of the evidence Regis presented at trial. (See id. at 11:3-16.)

### 2.  The Press Release

Both the Court's March 1, 2013 Memorandum Opinion and April 19, 2013 Order

discussed potential deficiencies in A.M. Best's 2010 press release announcing the ratings

downgrade. At summary judgment, Regis identified four statements in Best's January 12, 2010

press release which it claimed were capable of defamatory meaning. Specifically, the press

release stated the following: Regis was being downgraded due to "the *recent* disclosure of the

*lack of financial flexibility* at Regis' privately held parent, Tiber Holding Corporation

(Wilmington, DE), due to that organization's high consolidated financial leverage, *lack of access*

*to additional capital* and *other operating issues.* Additionally, these ratings actions consider

Regis' *continued poor operating performance.*"[6] *Regis Ins. Co.*, 2013 WL 775521, at \*7.

As previously discussed, Ms. Rinaldo and Ms. Standen only testified to damages

allegedly resulting from the ratings downgrade. Neither, however, testified to any harm

allegedly resulting from the language of the press release. Neither Mr. Johnson nor Mr.

Helstrom provided any testimony regarding the press release, but instead offered only their

---

[6] At trial, Regis seemed to focus on only two of these statements: "the *recent* disclosure of lack of financial flexibility" at Tiber, and "lack of access to additional capital." Regis' introduction of Exhibit 41 challenges the "recent disclosure" language. With respect to "lack of access to additional capital," Regis did not argue or present evidence that this statement was false. Rather, the questions Regis directed toward its witnesses appeared aimed at asserting that Regis would not *need* access additional capital.

33

opinions regarding the rating itself. Further, because Mr. Cohen had not offered any opinions on the press release itself in his expert report, the Court did not permit him to belatedly do so at trial. (Trial Tr. 56:16-59:16, May 28, 2013.) This evidentiary ruling has not been challenged by Regis.

**The only witnesses who substantively testified regarding the press release were Mr. Liebowitz and Mr. Altonji.** When Mr. Liebowitz was questioned about the aforementioned statements in the 2010 press release, he expressed his opinion that Best's target audience consists of sophisticated insurance brokers who subscribe to Best's service. As subscribers, Mr. Liebowitz stated that Best's audience receives detailed information regarding ratings in Best's "Green Book," on a CD-ROM, and through access to Best's website. (See Trial Tr. 136:9-156:20, May 22, 2013.) Although it is somewhat unclear, the substance of Mr. Liebowitz's testimony was that to the extent statements in the press release are unclear, other resources available to Best's subscribers would serve to clarify the statements in the press release. Mr. Altonji was not questioned about specific statements in the 2010 press release, but as previously discussed, see section III.B.6, supra, he was questioned regarding certain edits that were made to the language of the internal draft press release (Exhibit 41).[7] In so questioning Mr. Altonji, Regis sought to draw a distinction between how information was conveyed in the internal draft press release and how it was conveyed in the final version. Regis now argues:

> **Certainly, Your Honor, if A.M. Best had included [the language of Exhibit 41], we could not have been here because they would have done exactly what Your Honor suggested they did not do. They would have accurately communicated to the reader the basis for the statement that the decision was predicated on the recent problems that arose at A.M. Best. But for reasons**

---

[7] The document now known as Exhibit 41 was not before the Court at the summary judgment stage.

34

that were never explained by anybody from A.M. Best, that sentence was extracted for no apparent substantive reason.

Instead of telling the whole story, A.M. Best chose to modify the story in a way [that] had we been offered the opportunity [to get to the jury] we would have argued proves reckless disregard for the truth.

(Tr. Oral Argument 6:2-15) (emphasis added). The Court agrees with Regis that the language of Exhibit 41 is a more accurate representation of Regis' situation than the information conveyed in the final 2010 press release. See Regis Ins. Co., 2013 WL 775521, at *7 ("Best's [final] press release is barely more than a page and neglects to mention—let alone disclose—the details of how Best arrived at such a substantial downgrade. That is to say, Best's press release is almost entirely devoid of context. When all the facts are disclosed, an opinion cannot be defamatory because the listener is able to evaluate the facts for himself and is free to disregard the conclusion the speaker made from these facts...But when an opinion discloses only *some* of the facts on which it based, it is capable of defamatory meaning and therefore actionable.") (internal citations omitted); (see also April 19, 2013 Order at 3) ("To be clear: the problem with the [final] press release is that it arguably implies Regis experienced certain financial difficulties in 2009 when, in fact, it had not. The only thing that had changed in 2009 was that Best learned of information about the financial health of Regis' parent company of which it was previously unaware.") The problem, however, is that Exhibit 41 *at most* only proves that A.M. Best could have used better, more accurate language. But the mere availability of better language, **without more, would have been insufficient for a jury to find that the language actually used rises to the level of falsity or reckless disregard for the truth.**[8] (See Tr. Rule 50(a) Mot.

---

[8] The Court remains unconvinced by Best's argument that the press release was not intended to be a complete reflection of Regis' circumstances. See e.g. Trial Tr. May 28, 2013, 138:22-139:5 ("The important point to

35

Ruling 2:15-20, May 28, 2013) ("As it relates to the press release, the Court is of the same

opinion that while the statements may have been changed, the substance of the press release was

the same, and the change was not so material that it entered into the area of actual malice.)

Because Regis devoted so much time at trial to "challenging" the mere fact of the ratings

downgrade, comparatively little time or testimony was devoted to exploring the press release.

Mr. Liebowitz could not recall whether he or Mr. Altonji wrote the relevant language of Exhibit

41. Mr. Altonji testified it was Mr. Liebowitz who wrote the language of Exhibit 41. *Both* Mr.

Liebowitz and Mr. Altonji testified that the language of the 2010 press release was the result of

final edits made by Mr. Mosher. The obvious conclusion is that Mr. Mosher was the best person

to testify as to why the language of the press release was changed. Regis did not call Mr.

Mosher; however, despite the fact that Mr. Mosher was identified as a witness in Regis' pretrial

memorandum. (See ECF No. 61 at 10.) Thus, to the extent that it was "never explained by

anybody from A.M. Best" why the edits were made, this is largely because Regis failed to ask

certain questions of Mr. Liebowitz and Mr. Altonji and elected not to call Mr. Mosher to testify.

Thus, based on the testimony that *was* presented at trial, there was no evidence that the

statements in the press release were false or defamatory.

---

remember about the press release is that the press release was not intended to be a report. And there has been no
evidence presented by the Plaintiff that this press release was supposed to be a full report regarding Regis. And no
one has disputed on the Plaintiff's side that the press release is an announcement of the rating action and a very short
summary of the reasons for the rating action."); see also Tr. 14:1-12 ("The press release most importantly is to
announce the rating event itself. Secondly, it is to explain in some summary manner the basis for that rating
decision. It is not designed or intended to include arguments on both sides as to why the credit rating agency, such
as A.M. Best, decided to rate the company in one way and the rated company's argument as to why it should have
been rated differently. And yet that is exactly the type information that Regis is now arguing should have been
included in the press release.")) The fact that a press release, by its nature, is not intended to be exhaustive does not
relieve A.M. Best from the responsibility of conveying information accurately. That said, however, the fact remains
that there is no evidence that the language actually used rises to the level of falsity or regardless disregard for the
truth.

Additionally, the Court also found salient Mr. Liebowitz's uncontroverted testimony that, on December 17, 2009, he sent a copy of the draft press release to Mr. DiLoreto and Mr. Helstrom (Trial Tr. 7:13-9:17, May 23, 2013; Def.'s Trial Ex. 52.) Sending draft versions of press releases to the rated entity is the standard practice of A.M. Best. However, neither Mr. DiLoreto nor Mr. Helstrom opted to comment on the language of the draft, or to propose changes to its language. Likewise, on January 6, 2010 following the Corporate Rating Committee meeting, Mr. Liebowitz also sent Mr. DiLoretro a revised draft press release. Again, Mr. Liebowtiz received no comments or proposed changes from Mr. DiLoreto, Mr. Helstrom, or anyone else at Regis. (Trial Tr. 11:3-12:4, May 23, 2013; Def.'s Trial Ex. 58.) The fact that A.M. Best gave Regis two opportunities to propose changes to the press release again undermines any assertion that Best acted with reckless disregard for the truth.

Finally, Regis also presented no evidence at trial that any current or prospective client read the press release, and opted not to renew or purchase insurance with Regis due to its contents. Again, Regis only offered evidence of alleged harm due to the rating itself. As such, Regis' defamation and commercial disparagement claims must also fail because there was no evidence that anyone read the allegedly defamatory statement, and reputational harm resulted. 42 Pa.C.S. § 8343(a)(4) & (5).

Accordingly, based on the foregoing, the Court's Rule 50(a) ruling with respect to the press release was neither inconsistent with its March 1, 2013 Memorandum Opinion and April 19, 2013 Order, nor impermissible fact-finding.

37

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Regis' Motion for New Trial is denied.  An appropriate

order follows.

38

# EXHIBIT 'B'

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REGIS INSURANCE COMPANY, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION |
| | : NO. 10-3171 |
| A.M. BEST COMPANY, INC., | : |
| Defendant. | : |

## ORDER

AND NOW, this ____ day of May, 2014, upon consideration of Plaintiff's Motion for New Trial (Doc. 90), Defendant's Response in Opposition (Doc. 92), and Plaintiff's Reply (Doc. 98), IT IS HEREBY ORDERED AND DECREED that Plaintiff's Motion is DENIED.

BY THE COURT:

/s/ Petrese B. Tucker
_____
Hon. Petrese B. Tucker, C. J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,               :

               *Plaintiff,*                :        C.A. No.: 10-3171

      vs.                              :

A.M. BEST COMPANY, INC.,               :

               *Defendant.*                :

### CERTIFICATE OF SERVICE

I, Danielle M. Weiss, Esquire hereby certify that I have caused the foregoing *Notice of Appeal* to be filed electronically on this day.  It is available for reviewing and downloading from the ECF System, and will be served electronically and via first class mail on all counsel.

/s/ Danielle M. Weiss
DANIELLE M. WEISS  (PA 201067)
Email: dweiss@haines-law.com
Haines & Associates
1835 Market Street - Suite 2420
Philadelphia, PA 19103
Telephone: 215-246-2200
Fax:   215-246-2211
*Attorney for Plaintiff*

Date:   June 18, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REGIS INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 10-3171 |
| A.M. BEST COMPANY, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

## ORDER

**AND NOW**, this _____ day of May, 2014, upon consideration of Plaintiff's Motion for New Trial (Doc. 90), Defendant's Response in Opposition (Doc. 92), and Plaintiff's Reply (Doc. 98), **IT IS HEREBY ORDERED AND DECREED** that Plaintiff's Motion is **DENIED**.

**BY THE COURT:**

/s/ Petrese B. Tucker

_____
Hon. Petrese B. Tucker, C. J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,    :
               :
    Plaintiff,      :
               :
  v.           :   CIVIL ACTION
               :
A.M. BEST COMPANY, INC.,    :   NO. 10-3171
               :
    Defendant.     :
               :
               :

## MEMORANDUM OPINION

Tucker, C. J.                   May 20, 2014

   Plaintiff Regis Insurance Company ("Regis") brought this civil action against Defendant

A.M. Best Company, Inc. ("A.M. Best" or "Best") for damages it allegedly suffered as a result of

A.M. Best's downgrade of Regis' credit rating in early 2010.  This matter proceeded to trial on

May 20, 2013.  After six days of Regis presenting its case in chief to the jury, A.M. Best moved

for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a).  The Court granted the motion.

Regis has now filed the instant Motion for New Trial pursuant to Fed. R. Civ. P. 59.  Upon

consideration of Regis' motion, all responses thereto, and following oral argument, Regis'

motion will be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

   The highly technical facts of this case were fully set forth in the Court's March 1, 2013

Memorandum Opinion. Regis Ins. Co. v. A.M. Best Co., Inc., CIV.A. 10-3171, 2013 WL

775521 (E.D. Pa. Mar. 1, 2013).  Regis's Complaint alleged five counts against A.M. Best: (1)

declaratory judgment, (2) defamation, (3) commercial disparagement, (4) tortious interference

1

with contractual relations, and (5) tortious interference with prospective contractual relations. Regis voluntarily withdrew its claim for a declaratory judgment. In the March 1, 2013 Memorandum Opinion, the Court granted A.M. Best's Motion for Summary Judgment as to both of Regis' tortious interference claims. However, the Court denied the Motion for Summary Judgment as to Regis' defamation and commercial disparagement claims. Subsequently, on March 13, 2013, Best filed a Motion for Certification for Interlocutory Appeal. On April 19, 2013, the Court entered an Order denying A.M. Best's Motion for Certification. (ECF No. 60) ("April 19, 2013 Order").

This matter proceeded to trial on May 20, 2013. After six days of Regis presenting its case in chief to the jury, A.M. Best moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The Court granted A.M.'s Best motion, stating the following:

> In considering the Rule 50 Motion, the Court is of the opinion that there is some issue as to whether or not there is sufficient evidence and I have to take the rating separate from the press release.
>
> As to the rating, the Court is of the opinion that this is...a situation of an opinion about which reasonable persons can differ, and I don't find it a matter of false statements. But even assuming that the statements were false, the **Court finds no evidence of reckless disregard or actual malice, which is necessary in order to proceed.**
>
> As it relates to the press release, the Court is of the same opinion that while the statements may have been changed, the substance of the press release was the same, and **the change was not so material that it entered into the area of actual malice.**
>
> So accordingly, **this Court finds that the evidence is insufficient on defamation and commercial disparagement as it relates to the rating and the press release for the claims to go to the jury.** And accordingly, the Court grants the Rule 50(a) motion in this matter.

2

(Tr. Rule 50(a) Mot. Ruling 2:2-3:1, May 28, 2013) (emphasis added). The instant Motion for New Trial challenges the Court's ruling granting A.M. Best's Rule 50(a) Motion.

## II. STANDARDS OF REVIEW

### A. Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs a motion for judgment as a matter of law ("JMOL"). A district court may grant JMOL only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party." Fed. R. Civ. P. 50(a)(1). Further, JMOL is appropriate only where, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." Warren v. Reading Sch. Dist., 278 F.3d 163, 168 (3d Cir. 2002); see also Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.") (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir.1978)).

### B. Motion for New Trial

Federal Rule of Civil Procedure 59 governs a motion for a new trial. A court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a). A court may grant a new trial on the grounds of: (1) improper admission or exclusion of evidence; (2) improper instructions to the jury; (3) newly discovered evidence exists that would likely have altered the outcome of the trial; (4) improper conduct by an attorney or the court unfairly influenced the verdict; (5) the jury's verdict is against the clear weight of the evidence; or (6) the verdict is so grossly excessive or

3

inadequate as to shock the conscience. See Goodman v. Pennsylvania Tpk. Comm'n, 293 F.3d

655, 676 (3d Cir. 2002) (citing Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir.2000));

Am. Bd. of Internal Med. v. Von Muller, 10-CV-2680, 2012 WL 2740852 (E.D. Pa. July 9,

2012); Suarez v. Mattingly, 212 F. Supp. 2d 350, 352 (D.N.J. 2002); Davis v. Gen. Acc. Ins. Co.

of Am., 153 F. Supp. 2d 598, 599-600 (E.D. Pa. 2001); Griffiths v. Cigna Corp., 857 F.Supp.

399, 410–11 (E.D.Pa.1994), aff'd, 60 F.3d 814 (3d Cir.1995) (unpublished table decision). The

overriding principle is that a court has the power and duty to order a new trial to prevent

injustice. 11 Charles Alan Wright et al., Federal Practice and Procedure § 2805 (2d ed.1995).

Determining whether to grant a new trial is within the "sound discretion of the trial court." Allied

Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980);

Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1017 (3d Cir.1995).

The standard that a district court is to apply when ruling on a motion for a new trial

differs with the grounds asserted in support of the motion. Lind v. Schenley Industries Inc., 278

F.2d 79, 89 (3d Cir.1960). The district court has broad discretion when the asserted ground for a

new trial is a ruling on a matter that initially rested within the discretion of the court, such as an

evidentiary ruling or jury instruction. Klein v. Hollings, 992 F.2d 1285, 1289–90 (3d Cir.1993);

Lind, 278 F.2d at 90; Farra v. Stanley–Bostitch, Inc., 838 F.Supp. 1020, 1026 (E.D.Pa.1993).

Where the motion for a new trial is based on an assertion of legal error, the court conducts a two-

step analysis. First, the court determines whether it erred at trial. Second, the court determines

"whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with

substantial justice.'" Farra, 838 F.Supp. at 1026 (quoting Bhaya v. Westinghouse Elec. Corp.,

709 F.Supp. 600, 601 (E.D.Pa.1989) (quoting Fed.R.Civ.P. 61)).

4

### III. **DISCUSSION**

In the instant matter, the only argument Regis advances in its Motion for New Trial is that the Court's decision to grant A.M. Best's Rule 50 motion was "wholly inconsistent with prior rulings" in this case. (Pl.'s Reply in Supp. 2; see also Pl.'s Mot. New Trial 2) ("The Court's decision that A.M. Best was entitled to judgment as a matter of law was particularly curious given the procedural history of this matter.") Regis asserts that the Court outlined various genuine issues of material fact in both its March 1, 2013 Memorandum Opinion denying in part Best's Motion for Summary Judgment, and it's April 19, 2013 Order denying A.M. Best's Motion for Interlocutory Appeal. Yet, Regis argues, the Court ultimately deprived Regis of the right to have a jury determine these genuine issues of material fact. Regis contends that the evidence it presented at trial (in particular it's Exhibit 41) was substantially similar to — if not greater than— the evidence it presented in opposition to Best's prior summary judgment and interlocutory appeal motions. (Pl.'s Reply in Supp. 2; Tr. Oral Argument 5:2-14, Oct. 9, 2013.) Thus, Regis concludes, "[i]f the record on summary judgment and the record presented at trial are substantially similar, then the only way the Court could rule in favor of A.M. Best at the close of...Regis' case was to engage in impermissible fact-finding." (Pl.'s Reply in Supp. 2.) Accordingly, Regis claims that it was improper for the Court to supplant its own judgment for that of the jury.

### A. **The Court's March 1, 2013 Memorandum Opinion and April 19, 2013 Order**

The Court will begin its analysis by noting that, problematically, Regis' theory of liability in this matter has been something of a moving target that has been difficult to pin down. (See e.g., Tr. Oral Argument 13:5-24.) Up until the summary judgment stage, it was Regis' position

5

that both A.M. Best's downgraded credit rating of Regis and the press release A.M. Best issued

announcing that downgrade were capable of defamatory meaning.  Likewise, A.M. Best's

Motion for Summary Judgment also seemed to conflate the two.  The Court, however, has

endeavored to stress that there is a vital distinction that must be drawn between the rating itself

and the press release.  As the March 1, 2013 Memorandum Opinion stated:

> The Court finds it necessary at this juncture to distinguish between
> the two interrelated communications/statements that are at issue in
> this case: (1) the rating itself and (2) Best's press release, which is
> a reflection of the rating. **A rating, standing alone, is an opinion,
> as Best adamantly avers. A rating, unless patently baseless, has
> no inherent truth; it is merely an estimation, arrived at
> through application of Best's methodologies, of the financial
> health of the rated organization. But in order for Best's
> "ratings opinion" to be entitled to the protection generally
> afforded to opinions in defamation actions, Best's
> methodologies must have actually been followed.** Here, there
> remains a genuine issue of material fact as to whether Best
> followed its own methodologies in this particular instance.

Regis Ins. Co., 2013 WL 775521, at *10 (emphasis added); see also id. at n. 13 ("The Court also

rejects any assertion by Regis that Best should have not downgraded it at all."); id. at *6-9, 11

(discussing the arguable deficiencies in the language of the press release).  Thus the Court has

emphasized two things: (1) for the reasons outlined, there were genuine issues of material fact as

to whether the press release was capable of defamatory meaning, and (2) the rating itself could

be capable of defamatory meaning only if A.M. Best did not follow its own methodologies in

reaching its ratings decision.

A.M Best's Motion for Certification for Interlocutory Appeal essentially sought

reconsideration of the Court's March 1, 2013 Memorandum Opinion.  In denying the motion, the

Court's April 19, 2013 Order sought to clarify what had apparently been left unclear in the

March 1, 2013 Memorandum Opinion.  Accordingly, the Court stated:

6

> As Best pointed out in its briefs in support of summary
> judgment, it at times appears to be Regis' position that Best
> was not entitled to downgrade it at all. To the extent this is
> Regis' argument, this Court, like the Sixth Circuit in
> Compuware Corp. v. Moody's Investors Servs., Inc., 499 F.3d
> 520 (6th Cir. 2007), has emphatically rejected this
> assertion....But as the Court stated in its [March 1, 2013
> Memorandum] Opinion, a distinction must be drawn between
> the rating itself and how that rating (and the reasons for it)
> was communicated to the public....Best has made much of the
> fact that the Court's Opinion states that Best's ratings process
> "appears to have been democratic and collaborative, and the Court
> does not believe that Best made the decision to downgrade Regis
> lightly."....Practically speaking, however, it matters little how
> democratic the ratings process was if the end result (the press
> release) is not as carefully considered as the ratings process itself.
> The public is not privy to the ratings process; all the public is privy
> to is the ultimate ratings decision, as communicated in the press
> release. **The Court's Opinion focuses heavily on the wording of
> the press release because defamation requires publication and
> the press release is the only publication at issue.**

(ECF No. 60 at 2-3) (internal citations omitted; emphasis added).  The Court further stated:

> At bottom, the viability of Regis' defamation and commercial
> disparagement claims come[s] down to this single question:
> whether Best properly communicated to its audience the bases
> for its decision to downgrade Regis. The Court found that
> there is a genuine issue of material fact on this question. To be
> clear: the problem with the press release is that it arguably
> implies Regis experienced certain financial difficulties in 2009
> when, in fact, it had not. The only thing that had changed in 2009
> was that Best learned of information about the financial health of
> Regis' parent company of which it was previously unaware. As
> detailed in the [March 1, 2013 Memorandum] Opinion... a
> reasonable jury could find that Best recklessly framed its rating
> and press release in such a way as to create the false impression
> that Regis experienced certain financial difficulties in 2009.

(Id. at 3) (internal citations omitted; emphasis added).  The Court, therefore, attempted to focus

the parties' attention to the language of the press release, and again rejected Regis' broad

7

assertion that A.M. Best was not entitled to downgrade it at all. Thus, on two occasions prior to trial, the Court expressed doubt that the rating itself, if viewed in isolation, was defamatory.

### B. Regis' Evidence at Trial[1]

At trial, however, Regis again returned to its insistence that both the downgraded credit rating and the press release constituted defamation. Over the course of six days the vast majority of Regis' evidence was devoted to proving that the ratings downgrade itself was improper; Regis only addressed the press release as an ancillary matter. For instance, although opening statements are not evidence, see Model Civ. Jury Instr. 3rd Cir. 1.12 (2011); Trial Tr. 25:18-22, May 20, 2013, the arguments presented by Regis' counsel during opening arguments are illustrative of how Regis sought to frame its case to the jury. Regis argued: "If an insurance company loses its rating, it is the death knell for that company….nobody is going to dispute that fact. The marketplace in the world of insurance is, like it or not, driven by the rating." (Trial Tr. 33:19-23, May 20, 2013.) Regis then argued:

> If you saw it when it was up on that screen, you will see again that the press release disclosed that in January of 2010, A.M. Best dropped Regis' rating to a B-minus. **And that B-minus will in the very near future put Regis out of business. And that's why we are here.** We are here not only because that's the outcome, but we are here because we challenge the rating and we challenge what was said about Regis in that press release.

(Id. at 34:19-35:2) (emphasis added). The Court will review the testimony of each of Regis' witnesses in turn.

---

[1] The following is offered merely as a summary of the evidence the Court considered most relevant in rendering its decision to grant A.M. Best's Rule 50 Motion. Because it is only a summary, it is not intended to be a complete reflection of all the evidence Regis presented over six days of testimony.

1.  Testimony of Sharon Rinaldo

Sharon Rinaldo is the Comptroller at Regis. In this capacity, Ms. Rinaldo attended the meeting in fall 2009 which began the process for Regis' 2010 rating and had subsequent communications with A.M. Best regarding Tiber. Accordingly, Regis presented extensive testimony from Ms. Rinaldo about mechanics of A.M. Best's ratings process and her involvement in that process.

During this time, Regis repeatedly attempted to elicit testimony from Ms. Rinaldo that Regis' current financial troubles are directly attributable to the ratings downgrade. The Court ruled that Ms. Rinaldo, a fact witness, was not qualified to provide this kind of expert testimony. (Id. at 27:7-28:11; Trial Tr. 21:11-24:1, 68:6-21, 69:13-70:7, 71:14-73:22, May 21, 2013.) The Court notes that Regis is not challenging that evidentiary ruling in the instant motion.

2.  Testimony of Marc Liebowitz

Regis next called Marc Liebowitz to testify. Mr. Liebowitz was the A.M. Best junior analyst responsible for analyzing Regis in preparation for its 2010 rating. Mr. Liebowitz had been assigned to the Regis account since 2006. Mr. Liebowitz testified extensively to the mechanics of the ratings process from A.M. Best's perspective, and thus served to complement the testimony previously given by Ms. Rinaldo.

The first and second days of Mr. Liebowitz's testimony were apparently primarily intended to establish that A.M. Best and the service it provides is highly regarded in the marketplace, and consequently a lowered rating can have a damaging effect on a rated entity's ability to do business. The following is representative of Regis' line of questioning:

9

**Q. Mr. Liebowitz, you are aware of the fact, are you not, that Best['s] rating drives the market? You know that, right?**

A. It drives the market?

Q. It drives the market?

A. That's a broad statement again. It's certainly one of the aspects that would likely go into an—for a company to purchase insurance or for a broker to recommend. I could say it's certainly one of the driving or one of the forces that people would look to, perhaps.

Q. I want to go back to the statement that I quoted to you. ["]You are the largest and longest-established company devoted to issuing in-depth reports and financial strength ratings about insurance organizations.["] You certainly are the largest, correct?

A. I mean, there are certainly other companies that do credit ratings for insurance companies....[W]e could certainly be the largest, but there are certainly other companies that provide credit ratings for insurance.

Q. And those are who?

A. S&P, Moody's, Fitch...

Q. Well, of all of those companies that you have identified, only one of them is devoted to insurance, correct....Everyone else rates all kinds of other things, right?

A. Yeah....I just want to make sure the point is that they do offer ratings for insurance companies....

[...]

Q. Mr. Liebowitz, you are not a potted plant either. You understand the world of insurance and you understand the market of rating insurance companies. You can't really disagree with me, can you—

A. I can't.

Q. —that **Best's rating is _it_** when it comes to rating insurance companies, correct?

10

(Trial Tr. 13:8-15:23, May 21, 2013) (emphasis added).

Having established these purely background facts, Regis then interrupted Mr. Liebowitz's testimony to call Stephen Johnson to the stand. After Mr. Johnson testified, see section III.B.3, infra, Mr. Liebowitz then retook the stand, during which time Regis extensively questioned him about the history of the relationship between Regis and A.M. Best; Regis' past ratings history; Mr. Liebowitz's contact with Regis during the 2010 ratings process; and Regis' appeal from the ratings process. Regis' questioning of Mr. Liebowitz eventually got around to the 2010 press release, and what information Mr. Liebowitz used in constructing its language. (Trial Tr. 159:1, May 22, 2013.) This then led to a discussion of why Mr. Liebowitz recommended to his superiors at Best, on January 8, 2010, that Regis should maintain its B+ rating. (Id. at 161:8.)

The Court surmises from this line of questioning that Regis sought to establish that nothing had changed at Regis at the time of the January 2010 downgrade—as evidenced by the fact that (1) Mr. Liebowitz did not recommend downgrading Regis and (2) Mr. Liebowitz used the same language in recommending that Regis remain at a B+ as he had when prior B+ ratings decisions had been issued in previous years. (See id. at 183:9.) Regis further sought to establish that "the downgrade of Regis Insurance Company was predicated on Tiber Holding Company and nothing about Regis as a stand-alone entity." (Id. at 187:4-7). Mr. Liebowitz refuted this assertion. (Id. at 187:8-188:4.) There then ensued an extended discussion in which Regis attempted to argue that it was improper for Best to consider the financial condition of Tiber in calculating Regis' credit rating— i.e., to allow Tiber to "drag down" Regis' rating.[2] (Id. at 188:5-207:11.)

---

[2] The following question by Regis' counsel is fairly typical of this exchange:

11

Ultimately, on redirect, Mr. Liebowitz provided testimony concerning an internal A.M.

Best draft press release (Exhibit 41). This draft press release was not published or seen by

anyone outside of A.M. Best.[3] (Id. at 33:9-35:17.) This initial version of press release stated the

following:

> The recently received (by A.M. Best) audited financial statements
> of Tiber indicate potentially significant exposure to Regis should
> certain of Tiber's litigation-related liabilities be enforced. It
> should be noted that Tiber's litigation-related liabilities are not
> related to Regis, which is under the regulatory jurisdiction of the
> Pennsylvania Department of Insurance.

(Pl.'s Trial Ex. 41; see also Pl.'s Mot. New Trial, Ex. A.) Mr. Liebowitz testified that either he

or Gerard Altonji wrote this language, and Matthew Mosher, an A.M. Best senior executive,

deleted it. (Trial Tr. 35:9-17, May 22, 2013.)

### 3. Testimony of Stephen Johnson

Mr. Johnson is a Deputy Commissioner for the Pennsylvania Department of Insurance

("DOI"), and is in charge of corporate and financial regulation. Mr. Johnson, from his

perspective as a regulatory authority, testified to his opinion of Regis' financial health. Mr.

Johnson, at the behest of Regis, became involved in the 2009-2010 ratings process. He had

several phone calls with A.M. Best's analysts, Mr. Liebowitz and Mr. Altonji, to "confirm" that

Pennsylvania would not allow the New York Liquidator to seize Regis in order to satisfy Tiber's

---

> Q. Mr. Helstrom told you Tiber has nothing to do with Regis. Mr. DiLoreto said Tiber has nothing to do
> with Regis. The insurance regulat[or], Department of Insurance of the Commonwealth of Pennsylvania
> said Tiber has nothing to do with Regis. Best ignored all that evidence.

(Trial Tr. 202:6-13, May 22, 2013.)

[3] Because this draft press release was not published or seen by anyone outside of A.M. Best, it is not a
"communication" for purposes of defamation. The Court however, over the objection of A.M. Best, (see id. at
32:24-33:19), permitted Regis to question Mr. Liebowitz about this draft press release because it was relevant to the
question of what language Regis chose to use or not use in crafting the language of the press release that *was*
published.

debts. After Best made the final decision to downgrade Regis, Johnson had also written a letter to Best in which he urged Best to reconsider downgrading Regis.

In addition, Regis also attempted to elicit testimony from Mr. Johnson regarding what effect the downgrade had had on Regis' business. As the Court ruled at trial, Mr. Johnson was not proffered as an expert witness and therefore was not qualified to offer this kind of expert opinion testimony. (Id. at 4:3-18:8, 113:1-115:1.) The Court again notes that Regis is not challenging that evidentiary ruling.

### 4. Testimony of Earl Helstrom

Regis next called Earl Helstrom, Regis' outside accountant during this time period, to testify. Like Ms. Rinaldo, Mr. Helstrom could only provide background information concerning A.M. Best's ratings process and his involvement in that process. Mr. Helstrom indicated that he was the accountant for all of Richard DiLoreto's companies, and had become involved in the 2009 ratings process at Mr. DiLoreto's request. Helstrom testified that he had conversations and exchanged emails with Mr. Liebowitz and Mr. Altonji in which he expressed his belief that Regis "need[ed] to be viewed as a stand-alone company for legal reasons and is insulated from" Mr. DiLoreto's other companies (Trial Tr. 47:5-7, May 23, 2013.) Mr. Helstrom then went on to provide extensive testimony regarding why, in his opinion, Regis should be viewed as a distinct entity, and that nothing about Tiber should have been taken into account in rating Regis. (Id. at 47:15-103:14.) Over A.M. Best's objection, the Court then permitted Mr. Helstrom to testify regarding what affect the downgrade allegedly had on Regis from a financial perspective. (Id. at 103:15-106:22.)

13

In summary, the gist of Mr. Helstom testimony was that A.M. Best should consider

Tiber's financial condition in rating Regis but, if it did so, it should reach the conclusion that

Tiber's financial condition had "no impact whatsoever on Regis." (Id. at 149:1-150:10.) On

cross examination, Mr. Helstrom summarized his opinion as follows:

> Q.    Okay. Does the first part that I referred to, the top-down analysis includes the exposure to risk generated by activities that the parent holding company. Doesn't that refer to Tiber?
>
> A.    That's the parent holding company and that is the debt of the New York Liquidator and which you can't get to the insurance company and that's the debt of the bonds that are not going to be paid. Neither—that does not go down to Regis either. So Regis really has no connection to the debt that is on the Tiber-corporation level.
>
> Q.    Whether that's true or not remains to be decided. But it's your analysis that the liabilities of Tiber will never be visited on Regis, correct?
>
> A.    That's correct.
>
> Q.    **And that's the kind of dispute, the difference of opinion that you have with the people at A.M. Best in rating Regis, whether the A.M. Best people were correct that they should consider those liabilities that Tiber had in rating Regis, or whether they shouldn't. Doesn't that sum up what your difference of opinion is?**
>
> A.    Not totally.
>
> Q.    No? What did I miss?
>
> A.    **Well, I think when A.M. Best came in to study this thing, they didn't understand it, so they should have put a U [for "under review"] on the rating...and then just moved on until they fully understood it.**

(Id. at 154:1-155:8) (emphasis added).

14

### 5.  Testimony of Karen Standen

Regis next called Karen Standen, an insurance underwriter for Regis, to testify; Ms.

Standen sells brokers insurance at Regis.  Over the objection of A.M. Best, the Court permitted

Ms. Standen to testify that since the 2010 downgrade Regis' ability to garner new business and

renew policies has declined. (Id. at 193:4-194:8.) This was the full extent of Ms. Standen's

testimony on direct examination, and she was not cross-examined by Best.

### 6.  Testimony of Gerard Altonji

Regis then called Gerard Altonji, Mr. Liebowitz's supervisor, to testify. Mr. Altonji was

the senior A.M. Best employee in charge of analyzing Regis in preparation for its

2010 Rating.  Mr. Altonji, like Mr. Liebowitz, testified regarding Best's ratings methodologies.

Mr. Altonji, like Mr. Liebowitz, testified that Best had requested the consolidated financial

statements of Regis prior to 2009, but that none had ever been provided.  Mr. Altonji further

testified that Mr. DiLoreto had repeatedly represented to Best in the past that Tiber had "no

debt."  In light of the revelations of late 2009, Mr. Altonji came to believe that Mr. DiLoreto had

misrepresented Tiber's financial condition to A.M. Best; Mr. Altonji further testified that, in his

opinion, Mr. DiLoreto had a history of being less than truthful with A.M. Best, and provided

background to that effect.

The following day, Mr. Altonji testified as to the information he and Mr. Liebowitz

provided to the ratings committee, and how the ratings committee's process works.  Mr. Altonji

again confirmed that that he and Mr. Liebowitz recommended to the ratings committee that

Regis maintain its B+ rating.  In addition, while questioning Mr. Altonji, Regis again sought to

emphasize that A.M. and the service it provides is highly regarded and that a lowered rating

15

would have damaging effect on a rated entity's ability to do business — just as Regis had

emphasized while questioning Mr. Liebowitz. The following is representative of Regis' line of

questioning:

> Q. Now, yesterday, I think, Mr. Liebowitz was asked about whether or not...the impact of the rating is taken into consideration. And he said absolutely not, you are not permitted to [take that into consideration]. Is that right?
>
> A. That's what he said.
>
> Q. You don't disagree with that, do you?
>
> A. None of us disagree with that.
>
> Q. None of you meaning—
>
> A. A.M. Best.
>
> Q. You are not speaking for company policy, right?
>
> A. Right.
>
> Q. But although you don't—you are not permitted to take that into consideration, in point in fact, A.M. Best knows exactly what the consequence of its rating is, agree?
>
> A. No, I don't agree.
>
> Q. Well—
>
> A. We have an idea there may be an impact, but we don't know what the exact impact will be.
>
> **Q. Well, Mr. Altonji, the whole promise of Best is that it's on top of the world of insurance, right?**
>
> A. Okay.
>
> Q. What do you mean okay? Is that a yes or a no?
>
> A. I will say yes.

16

Q. Okay. I mean—

A. Okay. Let's keep going.

Q. **The theory is that A.M. Best knows insurance better than anybody else in the world.   That's kind of what you hold yourself out as being.**

A. Okay, yes.

Q. Okay, yes?

A. Yes.

Q. **Okay.  So you are not, like, unmindful of the fact that people buy insurance and people sell insurance and, in many instances, buyers and sellers of insurance rely on that rating?**

A. Among other things, yes.  It's not the sole consideration when they buy insurance, but yes.

Q. Well, that suggests you do know something about it, because that suggests that were are other considerations that you know about.  You said among other things?

A. Is there a question?

Q. You said among other things?

A. Yes.

Q. Do you know—let me ask you this question.  One of the reasons that you don't just publish a letter and a plus minus or whatever, and one of the reasons you provide substantive information, if you will, is to allow the reader to know what the basis for your rating is, correct?

A. Yes.

Q. You want to give the reader a transparent picture of here is why we have rated this particular insurance company this way, correct?

A: Correct.

17

Q. Not what the speculation is, not what the world of possibilities is, but what are the facts, correct?

A. We look at the facts but we also consider, you know, possibilities, things that might happen in the future, could happen in the future.

Q. Well, you—

A. Because when you say facts, that would imply all we do is look at the latest financial statements, the numbers and going back. Obviously, those are facts, right. But we talk about the profile of the company and things that could affect it.

(Trial Tr. 6:15-10:6, May 24, 2013.) There then ensued a discussion of Best's methodology and what factors Best considers in calculating a rating. The clear purpose of this line of questioning was for Regis to critique the rating on the grounds that, in Regis' opinion, the judgments against Tiber were "not that big a deal" and that Tiber's financial condition should have no effect on Regis' rating. The following exchange is indicative:

Q. Okay. I am taking about as a general proposition. Putting aside now what everybody else has said—

A: Okay.

Q. —that a bare judgment against somebody does not have any meaning. It sounds like a big deal, but it does not have any meaning until some—

[...]

Q. Until somebody tries to execute it, correct?

A: Well, I didn't know that.

Q. You did not know that?

A: I assume that it's something that can be collected.

18

> Q. I'm sorry?
>
> A: It's a legal obligation so I assumed that at some point it would be collected?
>
> Q. Well—
>
> A: Or at least attempted to be collected.
>
> Q. Well, did you understand that the existence of the judgment itself doesn't mean somebody has got to start writing checks?
>
> A: No, I did not understand that.

(Id. at 17:13-18:17.) Additionally, Regis asked the following questions:

> Q. ...So in the analysis that A.M. Best conducts, it has to not just look at possibility, it has to look at realistic possibilities. What are the realistic possibilities. Agreed?
>
> A. Okay.
>
> **Q.    Mr. Altonji, when you downgraded Regis Insurance Company based on the judgments against Tiber, you had no idea what the realistic possibilities were, did you?**
>
> A. Did you just say that we downgraded Regis because of the— based on the judgments against Tiber?
>
> Q. I did say that.
>
> A. Okay. That's not why we downgraded Regis.
>
> **Q. Okay. We have been talking about the downgrade. It's up to the jury to decide in the final analysis why you downgraded....**

(33:16-34:9) (emphasis added).

Regis again eventually got around to the question of the press release. Mr. Altonji

testified that Mr. Liebowitz drafted Exhibit 41, while Mr. Altonji edited the document, and Mr.

Mosher edited Mr. Altonji's edits. (Id. at 40:18-41:21.)  Mr. Altonji offered the following

testimony regarding Exhibit 41 and the final 2010 press release.

> Q. Okay. Let's look at Exhibit 41. Now, if you will look at your e-mail [to Marc Liebowitz] that accompanies this document.  You said in the e-mail: ["]see Matt [Mosher]'s edits, accept all of them and send to AMB Corporation Communication with a request that we have it back tomorrow morning and use it as a basis for the rationale.  We will call Richard [DiLoreto] in the morning.["]
>
> [...]
>
> Q. Okay.  You say: ["]Accept all [the changes] and send it to ABM.["]  Is that because you believed that the edits better stated A.M. Best's rationale?
>
> **A. No. I said it because my boss's boss's boss came back with those edits and I would defer to his judgment.  If that's how he wanted it to look, then that's fine.**
>
> Q. Well, let me give you an example...[T]he way the press release went out, ["]these rating actions reflect recent disclosures of the lack of financial flexibility at Regis's privately held parent, Tiber Holding Company.["]  Because it's read that way, it read: ["]The recent—the recently received by A.M. Best.["]  Right?
>
> A. That's what it says, yes.
>
> Q. That's the truth, correct?
>
> A. Correct.
>
> Q. But somebody said no, we don't want to say ["]recently received["] by A.M. Best.  We want to say ["]these ratings actions reflect recent disclosures,["] leaving unclear where those recent disclosures came from.  Right?
>
> **A. Well, I think reasonable people can say it's clear or unclear.  To me, it's still clear, these actions reflect the recent disclosures of lack of—**
>
> Q. How about it I try this with you.  Can't we agree that if you had...published as you said in the press release before it was edited

20

down, ["]The recently received by A.M. Best audited financial statement of Tiber indicates potentially significant exposure to Regis should certain of Tiber's litigation-related liabilities be enforced.["] That's the story, isn't it? And you all took it out. Why?

**A. Well, maybe you want to ask Matt Mosher that question.**

Q. Well, I'm asking you since you told—

**A. I did not take it out. I have, you know, my opinions, but they're really not relevant. Mr. Mosher is the one that took it out.**

Q. Well, did you go to Mr. Mosher and say, Mr. Mosher, I know you are my boss's boss's boss, but what we are saying here doesn't accurately reflect the truth.

A. No. I didn't say that and I wouldn't say that. And...I disagree with your comment that it does not accurately reflect the truth after the edits. The rating actions reflect recent disclosures. This press release is coming from A.M. Best. I think a reasonable reader of it, especially readers of A.M. press releases, all right, would recognize that that means it's recently disclosed to A.M. Best.

Q. Mr. Altonji, there were no recent disclosures. The fact that there was a judgment had been known since 2002. It was on the record.

[...]

A ....[The judgments are] not in the public domain in the sense that it's been announced that there are these judgments out there. How do I look for something that I don't know exists?

[...]

Q. Well, if you want to, in fact, know for sure about Tiber, all you've got to do it ask. Correct?

A. And we did ask.

Q. And you testimony is we asked Mr. Di Loreto and he didn't produce?

21

A. That is correct.

(Id. at 41:22-46:5.)

### 7.  Testimony of Michael Cohen

Regis' final witness was Michael Cohen, who gave expert testimony regarding the A.M.

Best ratings process, A.M. Best's ratings methodologies, and A.M. Best's alleged departure from

those methodologies.  Mr. Cohen had formerly been a vice president at A.M. Best.  Because Mr.

Cohen was offered as Regis' expert, his testimony warrants repeating at some length.

Q. Okay. So we are clear, did you look at...the methodologies that were employed in looking at Regis Insurance Company standing alone?

A. Repeat that, please.

Q. Sure. Did you look at the methodology that was employed in reviewing Regis Insurance Company as a stand-alone entity?

A. Yes, I did.

**Q. Did you have any criticism or do you have any criticism of the way in which the methodologies applied to or were used in rating Regis standing alone?**

**A. No, I did not.**

**Q. So your opinions have to do with the way in which A.M. Best approached the parent?**

**A. That is correct.**

Q. Would you explain to the jury...what your basis is for believing that A.M. Best failed to employ or utilize appropriate—its appropriate methodologies in analyzing the parent, Tiber Holding Company?

A. When they reviewed the financial statements of Tiber, which I believe you have seen, there is a—an obligation, a liability on their

22

balance sheet for a judgment held by the New York Liquidation Bureau, and that number has grown over time so that at the point where these financial statements were reviewed, which was as of year-end 2008, that number was something on the order of $43 million.

And the analysts saw that number and assumed that, one, since the holding company had a very negative net worth technically speaking, that this financial stress of the holding company would spill over and impact the operating company, Regis, in a very negative way.

**And where the methodology was not followed according to my opinion is that given the magnitude of this negative net worth, the analysts did not drill down into what is going on here and how can the situation that led to this in real-time business terms actually affect Regis.**

The number looked large, and you could draw an analogy to if your spouse had entered a large check or withdrawal in your checkbook, you open up the checkbook and say, this is a large number, what is behind this. And my—the analogy that I am drawing here is that this number was so large that it bore additional and intense scrutiny to really find out what is going on there, what is this judgment all about, what is the history of it, how likely is it to actually come to fruition, who are the players involved, what have you.

Mr. Altonji noted on Friday that when he looked at it and his analytical colleagues looked at it that this was a very unusual situation that they hadn't seen before, and when I saw it, I said exactly the same thing. I have never seen in my analytical career and my consulting career and my executive career as an insurance consultant, I have never seen situation like that either.

**And when you think about the methodologies, how does A.M. Best do its ratings, and these methodologies they put out are very well conceived, and I am not saying that because I participated in many of them. I think they are very thoughtful documents as to how do we rate companies, what is an intelligent way to analyze companies, and they are well conceived.**

But to be able to explain—and you have also seen examples of press releases where a rating agency, and they all do this, it's here is why we are assigning—making a rating and assignment and here is why, and to dig down into complicated situations and explain [it to] the public is very important.

[…]

23

Q. Well, Mr. Cohen, didn't they in fact, quote, to use your phrase, drill down by contacting the Pennsylvania Department of Insurance and trying to find out what is going on here?

**A. They talked to the Pennsylvania Department of Insurance, but there were other entities that had pivotal roles in this that were more central to the disposition of how this particular judgment would play out.**
They asked the Deputy Commissioner of Pennsylvania, Mr. Johnson, who you met the other day...what position would they take in terms of how this judgment would play out, and he opined...to the analysts and opined to you and he said so in his deposition that this judgment would not have an impact on Regis.
So as the regulator for the companies domiciled, located in the state of Pennsylvania where his authority is, he opined that it would not have an impact on the financial strength and therefore the claims paying ability of Regis.

Q. In looking at an entity that is being rated by A.M. Best, is it a part of the methodology there to turn to the regulating authority in the jurisdiction where the insurance company exists to find out its position on issues?

A. Yes.

Q. ...Did you see that in terms of drilling down A.M. Best also turn to Regis's and Tiber's accountant to try to get to some understanding of what was going on here?

A. They did.

Q. Well, again, doesn't that constitute satisfying their methodology by doing this drill down that you have described?

**A. It does not...Talking to their accountant, Mr. Helstrom, he works for Regis and he is a competent accounting professional, but he is not a rating analyst, so he is providing his opinion, but his opinion is that of a layperson and it is not legally binding. I mean, that's his judgment....**
Mr. Helstrom is a very competent C.P.A., but that does not certify him to be rating expert any more than me being a rating expert certifies me to be an accounting expert....

24

Q. In order to understand…in this particular case—

A: Yes.

Q. — what it was that was, as you described it, really going on here, what in your opinion did A.M. Best fail to do?

**A. They needed to get a—as clear picture as possible connecting with the New York Liquidation Bureau, the holder of this judgment, what did it mean, what are you likely to do, what are your legal rights to enforce this judgment….And…the A.M. Best analysts needed to determine from direct contact with the New York Liquidation Bureau what does this judgment mean, what are you intentions, how will you pursue it, whatever they can seek to understand in and of itself, and particularly because this was a unique situation….**

[…]

Q. …[A]re you aware of anything that A.M. Best did to factually understand this situation other than the conversations that they had with…the Insurance Department of Pennsylvania, and Mr. Helstrom and Mr. DiLoreto?

A. I am aware of those three contacts and not any others.

Q. In your opinion, was that sufficient for them to make a judgment about the significance of the judgments and how they could affect Regis Insurance Company?

**A. It was not….I believe they had to hear from the New York Liquidation Bureau directly…what their plans were and get an understanding the best they could of what action there would be.**

(Trial Tr. 45:6-54:11, May 29, 2014) (emphasis added).  Mr. Cohen then went on to discuss the harm the lowered rating had on Regis' business. (Id. at 60:3-62:4.) Mr. Cohen did not offer any opinions on the press release itself in his expert report, and therefore was not permitted to do so

25

at trial. (Id. at 56:16-59:16.) The Court again notes that Regis is not challenging that evidentiary ruling.

Additionally, Mr. Cohen did not state in his expert report what he believed the proper rating for Regis should have been in 2010. Mr. Cohen did, though, testify regarding what he believed the proper rating should have been at his deposition. However, Mr. Cohen did not provide any information to Best about his analysis in reaching this conclusion, and subsequent discovery requests to Regis' counsel went unanswered. Accordingly, the Court did not permit Mr. Cohen to testify to what he believed the correct rating for Regis should be. (Trial Tr. 6:19-10:11, May 28, 2013.) The Court again notes that Regis is not challenging that evidentiary ruling.

### C. Regis' Evidence at Trial was Insufficient to Prove Defamation and Commercial Disparagement, and therefore Judgment as a Matter of Law was Appropriate

A brief recap of the applicable law is in order. As the parties are well aware, under Pennsylvania law a plaintiff in a defamation action has the burden of proving the following:

(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a). Once a plaintiff establishes these elements, the defendant has the burden of proving the following, when relevant to the claim:

(1) The truth of the defamatory communication.
(2) The privileged character of the occasion on which it was published.
(3) The character of the subject matter of defamatory comment as of public concern.

26

Id. at § 8343(b). At summary judgment and at trial, A.M. Best primarily challenged the sufficiency of Regis' evidence with respect to two elements of a defamation action: (1) the defamatory character of the communication, and (2) abuse of a conditional privilege.

With respect to the first element, a communication or statement is defamatory "if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" or "if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." Regis Ins. Co., 2013 WL 775521, at *5 (internal citations omitted). Importantly, however, only statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law. Id. (citing Moore v. Cobb–Nettleton, 889 A.2d 1262, 1267 (Pa.Super.Ct.2005) and Smith v. Sch. Dist. of Philadelphia, 112 F.Supp.2d 417, 429 (E.D.Pa.2000). Accordingly, an opinion can only be defamatory if it may "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Id. (citing Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir.2001) and Parano v. O'Connor, 433 Pa.Super. 570, 575, 641 A.2d 607, 609 (1994)).

Additionally, abuse of a conditional privilege is indicated when the publication: (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. Id. at *11 (internal citation omitted). Actual malice requires that the speaker acted with knowledge that a published

27

statement is false or that the speaker acted with reckless disregard for the truth or falsity of the statement. Id. (internal citations omitted).

Finally, under Pennsylvania law the requirements for proving commercial disparagement are substantially the same as the requirements for proving defamation. Id. ("The legal standards applicable to defamation claims—including those for determining the truth or falsity of statements—are appropriately applied in determining the sufficiency of [a] claim for commercial disparagement.) (quoting QVC, Inc. v. MJC Am., Ltd., CIV.A. 08–3830, 2011 WL 2843746 (E.D.Pa. July 18, 2011)). Accordingly, in order to prevail on a claim for commercial disparagement, a plaintiff must show that the defendant published a statement about plaintiff's business to another, and: (1) the statement was false; (2) the publisher either intended the publication to cause pecuniary loss or reasonably should have recognized that publication would result in pecuniary loss; (3) pecuniary loss did in fact result; and, (4) the publisher either knew the statement was false or acted in reckless disregard of its truth or falsity. Id. (internal citations omitted).

Thus, in order for Regis to have prevailed on either its defamation or commercial disparagement claims against A.M. Best, it would have to prove a false statement was made by A.M. Best either in connection with the rating or in connection with the press release. Regis failed on both accounts.

### 1. The Rating

The Court again reminds Regis that it has repeatedly expressed skepticism that the downgraded rating itself was defamatory. The Court's March 1, 2013 Memorandum Opinion, however, left open the possibility that the rating could be defamatory *if* Regis could prove A.M.

28

did not follow its own methodologies in arriving at the rating decision. Regis' evidence in this regard was wholly insufficient.

Two of Regis' witnesses, Ms. Rinaldo and Ms. Standen, could only testify to damages allegedly resulting from the ratings downgrade. See 42 Pa.C.S. § 8343(a)(7). Mr. Helstrom and Mr. Cohen also provided some testimony as to damages. Establishing damages, however, accomplishes little if you have not first proven liability. Mr. Liebowitz and Mr. Altonji testified to A.M. Best's internal methodologies and process for reaching the ratings decision. This was largely background information.[4]

The primary purpose of Mr. Johnson's testimony was clearly to call into question Best's decision to downgrade Regis. The Pennsylvania Department of Insurance is not a credit rating agency, however. Further, as A.M. Best has long argued, it is questionable whether Mr. Johnson's personal opinion represents the opinion of the Pennsylvania Department of Insurance. But even if Mr. Johnson's opinion does represent the position of the Department of Insurance, it is debatable what the DOI's position would be if Mr. Johnson no longer held his position. Still further, as Mr. Johnson conceded at trial, he is not in a position to demand that Best substitute its own opinion regarding Regis' financial health for his personal opinion regarding Regis' financial health. (Trial Tr. 2:10-8:3, May 22, 2013.) Thus, the most Mr. Johnson could testify to was his own opinion that Regis should not have been downgraded. This is plainly insufficient. Mr. Johnson is entitled to his own opinion regarding whether Regis should have been downgraded; likewise, A.M. Best is entitled to take into consideration what effect a change in leadership at the DOI could have on the New York Liquidator's ability to collect on its judgments against Tiber,

---

[4] The fact that Mr. Liebowtiz and Mr. Altonji both initially recommended to the ratings committee that Regis maintain its B+ is irrelevant. As analysts, it is their job to make recommendations but it is the ratings committee that makes the final decision whether to adopt that recommendation.

29

and therefore how much weight to give Mr. Johnson's opinion. Further, Regis elicited no

testimony from Mr. Johnson regarding whether Best had followed its own methodologies in

reaching the ratings decision.

Similarly Mr. Helstrom testified that, in his opinion, Tiber's financial condition should

not have been factored into Regis' rating. However, Mr. Helstrom's testimony that A.M. Best did

not "understand" the judgments is purely speculative. Mr. Helstrom is an accountant, not an

expert on A.M. Best's specific methodologies or the methodologies of *any* credit rating agency.

(Trial Tr. 111:25-113:20, May 23, 2013.) Regis' own expert, Mr. Cohen, himself recognized as

much. More importantly, Mr. Helstrom conceded that A.M. Best's methodologies permit it to

consider the financial condition of a holding company in ratings its subsidiary. (Id. at 149:1-

150:24.) It is merely Mr. Helstrom's opinion that once A.M. Best considered Tiber's financial

condition, it should have reached the conclusion that Tiber's financial condition had no impact

on Regis. (Id.) That is not a failure by A.M. Best to "understand" the judgments; that is merely

Mr. Helstrom disagreeing with the conclusion A.M. Best reached. Mr. Helstrom is entitled to his

opinion, just as A.M. Best is entitled to reach its own opinion regarding the judgments.

The only witness who testified that A.M. Best departed from its methodologies was Mr.

Cohen. Mr. Cohen was only able to testify to the methodologies' *general* requirement that

Best's analysts take both a top-down and bottom-up approach in rating insurance companies.

What these approaches require in any given situation is obviously highly context-specific. In

this particular context, Mr. Cohen understood this to mean that A.M. Best needed to "drill down"

into Tiber and the judgments by contacting the New York Liquidator directly. **This was the

only flaw Mr. Cohen could identify**. But even in identifying this supposed flaw, Mr. Cohen

30

admitted that there could be a risk to Regis if A.M. Best were to contact the New York

Liquidator — although Mr. Cohen believed that risk was remote. (Trial Tr., 88:10-93:16, May

28, 2013.) But although Mr. Cohen considered the risk to be remote, he nonetheless

acknowledged that the New York Insurance Department had actively taken certain legal steps to

enforce the judgments. **Mr. Cohen also acknowledged that no one at Regis ever asked**

**anyone at A.M. Best to contact the judgment holder.** (Id. at 85:14-97:18.)

Thus, the gist of Mr. Cohen's expert opinion is that A.M. Best lacked sufficient

information to rate Regis because it did not contact the New York Liquidator directly. (Id. 97:19-

99:1.) However, it is entirely speculative what, if anything, contacting the Liquidator would have

revealed or whether it would have altered A.M. Best's decision to downgrade Regis. Even if

A.M. Best had contacted the Liquidator (and thereby, according to Mr. Cohen, fulfilled all its

duties under its methodologies), A.M. Best would still have been entitled to draw its own

conclusions regarding how much weight to give the judgments against Tiber. **Thus, although**

**Mr. Cohen's expert opinion is couched in the language of disputing that A.M. Best followed**

**its methodologies, in reality Mr. Cohen is only disagreeing with the opinion that A.M. Best**

**ultimately formed.** Mr. Cohen is entitled to his own opinion regarding what the judgments

mean, just as A.M. Best is entitled to form its own opinion regarding the judgments. Indeed, Mr.

Cohen himself agreed that a rating opinion is something about which reasonable people can

differ. (Id. at 66:13-22; 112:13-17.) Mr. Cohen further agreed that there is a "great deal of

judgment and discretion that has to be exercised by the analyst in trying to understand what

impact the parent will have on the operating insurance company." (Id. at 112:4-12.) Mr. Cohen

also agreed that in some circumstances the financial condition of a holding company could be so

31

weak that its weakness should have bearing on its subsidiary's rating. (Id. at 68:2-69:23.) More specifically, Mr. Cohen also agreed it was proper for A.M. Best to consider the financial condition of Tiber in rating Regis. (Id. at 70:3-18.) Finally, when asked to identify a *specific* provision in Best's policy that required it to contact the New York Liquidator, Mr. Cohen could not. (Id. at 107:12-112:25.) Mr. Cohen also could not identify a single instance in which a credit rating agency had contacted a judgment creditor about what its intentions were in trying to collect on its judgments against either an insurance company or its parent company. (Id.)

In sum, Regis presented no competent evidence that A.M. Best departed from its methodologies in rating Regis. As such there was no evidence from which a jury could conclude that the rating was anything other than an opinion, about which reasonable people could disagree.[5] Because the rating is an opinion, it cannot be false and cannot serve as a basis for a defamation or a commercial disparagement claim. (See Tr. Rule 50(a) Mot. Ruling 2:2-14, May 28, 2013) ("As to the rating, the Court is of the opinion that this is...a situation of an opinion about which reasonable persons can differ, and I don't find it a matter of false statements.  But even assuming that the statements were false, the Court finds no evidence of reckless disregard or actual malice, which is necessary in order to proceed.")

Accordingly, the Court's Rule 50(a) ruling with respect to the rating was neither inconsistent with its March 1, 2013 Memorandum Opinion and April 19, 2013 Order, nor impermissible fact-finding. Curiously, Regis now appears to concede that a rating is an opinion

---

[5] Additionally, there was no support for Regis' previous contention that A.M. Best downgraded Regis as some kind of retribution for Mr. DiLoreto's perceived misrepresentations of Tiber's financial condition. (See Pl.'s Resp. Opp'n Mot. Summ J. n. 1, 5-6.) Thus, the fact that Mr. Altonji admittedly accused Mr. DiLoreto of being a "liar" is irrelevant — especially considering that even after this episode Mr. Altonji still recommended to the ratings committee that Regis maintain its B+ rating.

and cannot form the basis for a defamation or commercial disparagement claim. At oral

argument, Regis asserted the following:

> The issue was not recklessness with respect to A.M. Best'[s] decision making, although
> we contended that they had breached their own guidelines with respect to how they
> addressed the issue, the rating. The issue was reckless as it related to the press release.

(Tr. Oral Argument 4:1-6.) This belated realization, however, runs contrary to the vast majority

of the evidence Regis presented at trial. (See id. at 11:3-16.)

### 2.  The Press Release

Both the Court's March 1, 2013 Memorandum Opinion and April 19, 2013 Order

discussed potential deficiencies in A.M. Best's 2010 press release announcing the ratings

downgrade. At summary judgment, Regis identified four statements in Best's January 12, 2010

press release which it claimed were capable of defamatory meaning. Specifically, the press

release stated the following: Regis was being downgraded due to "the *recent* disclosure of the

lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation

(Wilmington, DE), due to that organization's high consolidated financial leverage, *lack of access*

*to additional capital* and *other operating issues.* Additionally, these ratings actions consider

*Regis' continued poor operating performance.*"[6] Regis Ins. Co., 2013 WL 775521, at *7.

As previously discussed, Ms. Rinaldo and Ms. Standen only testified to damages

allegedly resulting from the ratings downgrade. Neither, however, testified to any harm

allegedly resulting from the language of the press release. Neither Mr. Johnson nor Mr.

Helstrom provided any testimony regarding the press release, but instead offered only their

---

[6] At trial, Regis seemed to focus on only two of these statements: "the *recent* disclosure of lack of financial flexibility" at Tiber, and "lack of access to additional capital." Regis' introduction of Exhibit 41 challenges the "recent disclosure" language. With respect to "lack of access to additional capital," Regis did not argue or present evidence that this statement was false. Rather, the questions Regis directed toward its witnesses appeared aimed at asserting that Regis would not *need* access additional capital.

opinions regarding the rating itself. Further, because Mr. Cohen had not offered any opinions on the press release itself in his expert report, the Court did not permit him to belatedly do so at trial. (Trial Tr. 56:16-59:16, May 28, 2013.) This evidentiary ruling has not been challenged by Regis.

**The only witnesses who substantively testified regarding the press release were Mr. Liebowitz and Mr. Altonji.** When Mr. Liebowtiz was questioned about the aforementioned statements in the 2010 press release, he expressed his opinion that Best's target audience consists of sophisticated insurance brokers who subscribe to Best's service. As subscribers, Mr. Liebowitz stated that Best's audience receives detailed information regarding ratings in Best's "Green Book," on a CD-ROM, and through access to Best's website. (See Trial Tr. 136:9-156:20, May 22, 2013.) Although it is somewhat unclear, the substance of Mr. Liebowitz's testimony was that to the extent statements in the press release are unclear, other resources available to Best's subscribers would serve to clarify the statements in the press release. Mr. Altonji was not questioned about specific statements in the 2010 press release, but as previously discussed, see section III.B.6, supra, he was questioned regarding certain edits that were made to the language of the internal draft press release (Exhibit 41).[7] In so questioning Mr. Altonji, Regis sought to draw a distinction between how information was conveyed in the internal draft press release and how it was conveyed in the final version. Regis now argues:

> **Certainly, Your Honor, if A.M. Best had included [the language of Exhibit 41], we could not have been here because they would have done exactly what Your Honor suggested they did not do.** They would have accurately communicated to the reader the basis for the statement that the decision was predicated on the recent problems that arose at A.M. Best. **But for reasons**

---

[7] The document now known as Exhibit 41 was not before the Court at the summary judgment stage.

> **that were never explained by anybody from A.M. Best, that**
> **sentence was extracted for no apparent substantive reason.**
>
> Instead of telling the whole story, A.M. Best chose to modify the
> story in a way [that] had we been offered the opportunity [to get to
> the jury] we would have argued proves reckless disregard for the
> truth.

(Tr. Oral Argument 6:2-15) (emphasis added). The Court agrees with Regis that the language of

Exhibit 41 is a more accurate representation of Regis' situation than the information conveyed in

the final 2010 press release. See Regis Ins. Co., 2013 WL 775521, at*7 ("Best's [final] press

release is barely more than a page and neglects to mention—let alone disclose—the details of

how Best arrived at such a substantial downgrade. That is to say, Best's press release is almost

entirely devoid of context. When all the facts are disclosed, an opinion cannot be defamatory

because the listener is able to evaluate the facts for himself and is free to disregard the

conclusion the speaker made from these facts…But when an opinion discloses only *some* of the

facts on which it based, it is capable of defamatory meaning and therefore actionable.") (internal

citations omitted); (see also April 19, 2013 Order at 3) ("To be clear: the problem with the [final]

press release is that it arguably implies Regis experienced certain financial difficulties in 2009

when, in fact, it had not. The only thing that had changed in 2009 was that Best learned of

information about the financial health of Regis' parent company of which it was previously

unaware.") The problem, however, is that Exhibit 41 *at most* only proves that A.M. Best could

have used better, more accurate language. **But the mere availability of better language,**

**without more, would have been insufficient for a jury to find that the language actually**

**used rises to the level of falsity or reckless disregard for the truth.**[8] (See Tr. Rule 50(a) Mot.

---

[8] The Court remains unconvinced by Best's argument that the press release was not intended to be a complete
reflection of Regis' circumstances. See e.g. Trial Tr. May 28, 2013, 138:22-139:5 ("The important point to

Ruling 2:15-20, May 28, 2013) ("As it relates to the press release, the Court is of the same opinion that while the statements may have been changed, the substance of the press release was the same, and the change was not so material that it entered into the area of actual malice.)

Because Regis devoted so much time at trial to "challenging" the mere fact of the ratings downgrade, comparatively little time or testimony was devoted to exploring the press release. Mr. Liebowitz could not recall whether he or Mr. Altonji wrote the relevant language of Exhibit 41. Mr. Altonji testified it was Mr. Liebowitz who wrote the language of Exhibit 41. *Both* Mr. Liebowitz and Mr. Altonji testified that the language of the 2010 press release was the result of final edits made by Mr. Mosher. The obvious conclusion is that Mr. Mosher was the best person to testify as to why the language of the press release was changed. Regis did not call Mr. Mosher, however, despite the fact that Mr. Mosher was identified as a witness in Regis' pretrial memorandum. (See ECF No. 61 at 10.) Thus, to the extent that it was "never explained by anybody from A.M. Best" why the edits were made, this is largely because Regis failed to ask certain questions of Mr. Liebowitz and Mr. Altonji and elected not to call Mr. Mosher to testify. Thus, based on the testimony that *was* presented at trial, there was no evidence that the statements in the press release were false or defamatory.

---

remember about the press release is that the press release was not intended to be a report. And there has been no evidence presented by the Plaintiff that this press release was supposed to be a full report regarding Regis. And no one has disputed on the Plaintiff's side that the press release is an announcement of the rating action and a very short summary of the reasons for the rating action."); see also Tr. 14:1-12 ("The press release most importantly is to announce the rating event itself. Secondly, it is to explain in some summary manner the basis for that rating decision. It is not designed or intended to include arguments on both sides as to why the credit rating agency, such as A.M. Best, decided to rate the company in one way and the rated company's argument as to why it should have been rated differently. And yet that is exactly the type information that Regis is now arguing should have been included in the press release.")) The fact that a press release, by its nature, is not intended to be exhaustive does not relieve A.M. Best from the responsibility of conveying information accurately. That said, however, the fact remains that there is no evidence that the language actually used rises to the level of falsity or regardless disregard for the truth.

36

Additionally, the Court also found salient Mr. Liebowitz's uncontroverted testimony that, on December 17, 2009, he sent a copy of the draft press release to Mr. DiLoreto and Mr. Helstrom (Trial Tr. 7:13-9:17, May 23, 2013; Def.'s Trial Ex. 52.) Sending draft versions of press releases to the rated entity is the standard practice of A.M. Best. However, neither Mr. DiLoreto nor Mr. Helstrom opted to comment on the language of the draft, or to propose changes to its language. Likewise, on January 6, 2010 following the Corporate Rating Committee meeting, Mr. Liebowitz also sent Mr. DiLoretro a revised draft press release. Again, Mr. Liebowtiz received no comments or proposed changes from Mr. DiLoreto, Mr. Helstrom, or anyone else at Regis. (Trial Tr. 11:3-12:4, May 23, 2013; Def.'s Trial Ex. 58.) The fact that A.M. Best gave Regis two opportunities to propose changes to the press release again undermines any assertion that Best acted with reckless disregard for the truth.

Finally, Regis also presented no evidence at trial that any current or prospective client read the press release, and opted not to renew or purchase insurance with Regis due to its contents. Again, Regis only offered evidence of alleged harm due to the rating itself. As such, Regis' defamation and commercial disparagement claims must also fail because there was no evidence that anyone read the allegedly defamatory statement, and reputational harm resulted. 42 Pa.C.S. § 8343(a)(4) & (5).

Accordingly, based on the foregoing, the Court's Rule 50(a) ruling with respect to the press release was neither inconsistent with its March 1, 2013 Memorandum Opinion and April 19, 2013 Order, nor impermissible fact-finding.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Regis' Motion for New Trial is denied. An appropriate

order follows.

38

Case: 14-3040    Document: 003111768272    Page: 141    Date Filed: 10/16/2014.

Case 2:10-cv-03171-PBT   Document 85   Filed 05/29/13   Page 1 of 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


REGIS INSURANCE COMPANY     FILED       CIVIL ACTION

MAY 29 2013

    v.

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

A.M. BEST COMPANY, INC.          :        NO. 10-3171


CIVIL JUDGMENT

Before the Honorable Petrese B. Tucker, Chief Judge

       AND NOW, this   28th   day of May , 2013   in accordance with the Court

granting defendant's motion for a directed verdict,


       IT IS ORDERED that Judgment be and the same is hereby entered in favor of the

defendant and against plaintiff.


BY THE COURT


ATTEST:

Michael Owens
Deputy Clerk


Civ 1 (8/80)


83a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,                     :
                                             :
                    Plaintiff,               :        CIVIL ACTION
          v.                                 :
                                             :        NO.  10-3171
A.M. BEST COMPANY, INC.,                     :
                                             :
                    Defendant.               :
                                             :
                                             :

## ORDER

       **AND NOW**, this _____ day of February, 2013, upon consideration of Defendant's Motion for

Summary Judgment (Doc. 46), Plaintiff's Response in Opposition thereto (Doc. 47), and Defendant's

Reply (Doc. 49), **IT IS HEREBY ORDERED AND DECREED** that Defendant's Motion is

**GRANTED IN PART AND DENIED IN PART.**[1]

                                         **BY THE COURT:**

                                       /s/ Petrese B. Tucker

                                    _____
                                    Hon. Petrese B. Tucker, U.S.D.J.

---

[1] This Order accompanies the Court's memorandum opinion dated February ____, 2013.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,       :
                               :
              Plaintiff,       :        CIVIL ACTION
        v.                     :
                               :        NO. 10-3171
A.M. BEST COMPANY, INC.,       :
                               :
              Defendant.       :
                               :
                               :
                               :

## ORDER

AND NOW, this ____ day of March, 2013, upon consideration of Defendant's letter dated

March 18, 2013, **IT IS HEREBY ORDERED AND DECREED** that this matter shall have a

**TRIAL DATE CERTAIN** of **Monday, May 20, 2013 at 10:00 a.m.** in Courtroom 9B, 601 Market Street,

Philadelphia, PA 19106.[1]

BY THE COURT:

/s/ Petrese B. Tucker

Hon. Petrese B. Tucker, U.S.D.J.

---

[1] The Court sets this trial date with the understanding that Defendant has filed a Motion for Interlocutory Appeal which is still pending, and to which Plaintiff still has to submit a response.

Case: 14-3040    Document: 003111768272    Page: 144    Date Filed: 10/16/2014
Case 2:10-cv-03171-PBT    Document 57    Filed 04/05/13    Page 1 of 1
Case 2:10-cv-03171-PBT    Document 56-1    Filed 04/03/13    Page 1 of 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY      :

     vs.      :     No. 10-3171

A.M. BEST COMPANY, INC.      :

FILED
APR 5 2013

## ORDER

AND NOW, this 4th day of April , 2013 upon consideration of the

motion of defendant A.M. Best Company, Inc. ("A.M. Best") for leave to file a reply memorandum

of law in support of its Motion for Certification for Interlocutory Appeal of the Court's March 1,

2013 Order pursuant to 28 U.S.C. § 1292(b), and any response thereto, it is hereby ORDERED and

DECREED that:

    (1)     the motion is GRANTED; and

    (2)     the Reply Memorandum of Law and the Certification of Stephanie R. Wolfe, filed as

          Exhibits A and B to A.M. Best's motion, respectively, are hereby deemed filed

          pursuant to this Order as of today's date.

### BY THE COURT:

**Hon. Petrese B. Tucker**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,            :
                                    :
            Plaintiff,              :
                                    :
        v.                          :        CIVIL ACTION
                                    :
A.M. BEST COMPANY, INC.,            :        NO. 10-3171
                                    :
            Defendant.              :
                                    :
                                    :
                                    :
                                    :

## MEMORANDUM OPINION

Tucker, J.                                          February ___, 2013

 Presently before the Court are Defendant A.M. Best Company, Inc.'s Motion for

Summary Judgment (Doc. 46), Plaintiff Regis Insurance Company's Response in Opposition

thereto (Doc. 47), and Defendant's Reply (Doc. 49). Upon consideration of the parties' motions

with briefs and exhibits, and for the reasons set forth below, Defendant's motion will be **_granted_**

**_in part and denied in part_**.

## I. FACTUAL BACKGROUND[1]

 Regis Insurance Company ("Regis") is a property and casualty insurance company

operating out of offices in Wayne, Pennsylvania. Regis is owned by a holding company, Tiber

Holding Corporation ("Tiber"). Tiber's lone asset of value is Regis. Tiber is dormant and its

only function is to hold Regis and several other shell corporations that are no longer operating

companies. Regis underwrites commercial policies of insurance, and has done so for over 30

---

[1] Unless noted otherwise, the following facts are undisputed.

1

years.  Regis is operated by Richard Di Loreto ("Mr. Di Loreto"),[2] who has served as Regis'

president for the vast majority of its existence.  Tiber is owned by Mr. Di Loreto's wife,

daughter, and the Di Loreto Foundation.

A.M. Best Company, Inc. ("A.M. Best" or "Best") is a credit rating agency that develops

and publishes financial strength ratings ("FSRs") and issuer credit ratings ("ICRs") of insurance

companies for use by the public, including the subscribers to its publications.[3]  Best determines

credit ratings based on its own methodologies (both published and proprietary).  Best has been in

business since 1899.

Generally speaking, Best's ratings process is as follows.  Best first gathers information

from public and non-public sources.  Meetings and communications between Best personnel and

management of the entity being rated provide additional information.  In this regard, Best

reviews materials such as balance sheets, financial statements, filings with the company's

regulating authority, and other written material requested by Best at the meeting.  Best's analysts

then take the information provided and apply various published and proprietary formulae and

methodologies to the information in order to develop a rating for the entity.  The rating will

include a FSR, ICR, and predictive outlook for the coming year.  After a preliminary analysis

has been completed by Best's analytical team, the analysis is presented to a Peer Ratings

Committee comprised of senior Best executives and the analytic team.  A vote is then taken on

---

[2] This opinion refers to Richard Di Loreto as "Mr. Di Loreto" rather than simply "Di Loreto" in order to distinguish him from other members of his family, who are also involved with Regis, Tiber, and other related organizations.

[3] According to A.M. Best:

> The FSR is a figure specific to the insurer's ability to meet ongoing insurance policy and contractual obligations. The ICR is a figure as to the overall creditworthiness of an insurer from the perspective of its senior creditors. Since policyholders typically are among the senior-most creditors of an insurer, FSRs, in practice, have been the equivalent of the ICR for operating purposes. A.M. Best uses a translation table to determine an FSR from ICR.

(Def.'s Mot. Summ. J. n. 13.)

2

the appropriate rating to be given to the entity based on the analysis. A.M. Best then

disseminates its' ratings, the bases for its ratings, and information concerning its methodologies

on its website and in its various publications.

In connection with formulating this rating, Best engages in both a "top-down" and

"bottom-up" analysis to assess sources of risk to the rated entity. Best's standard methodology

provides:

> The top-down analysis includes the exposure to risk generated by activities at the parent/holding company[,] such as the potential strain on the operating entity from debt-service requirements related to the parent's borrowings, as well as the benefits of earnings diversification that may come from being a member of a diversified organization. For the non-rated subsidiaries, A.M. Best performs a detailed internal analysis of their risk profile and resulting effect on the rated entities within the group, including A.M. Best's judgment as to the exposure of that entity to debt or other borrowings at the holding company level.
>
> The bottom-up analysis focuses on an assessment of the risks generated directly by the operations of the rated entity itself, as well as any other rated affiliates. For insurers, this analysis includes an assessment of underwriting, credit, interest rate, market and other risks at the operating company level. The primary objective of this overall approach is to gain a broad understanding of the potential impact on the current and future balance sheet of the rated operating entity – both from its own operations and those of its parent and affiliates....

(Def.'s Ex. O at 20-21, "Excerpt's from 2010 Best's Credit Rating Methodology.") (emphasis

added). Accordingly, Best's analysis of risk explicitly includes, inter alia, consideration of the

risk generated by the activities at the parent/holding company, such as the potential strain on the

subsidiary from the parent's borrowings and whether a parent's activities could reasonably be

expected to place a call on the capital of the subsidiary or limit the insurer's access to capital

from investors or lenders.

Regis has been rated by A.M. Best every year since the mid-1980s. Over the decades in

which Regis has been rated by Best, Regis has enjoyed positive ratings. In 1999, Regis was

rated A- (Excellent). In 2000, Regis was downgraded to B+ (Very Good). From 2000 to 2009,

3

Regis was never given an FSR of less than a B (Fair), which it was rated in 2004 and 2005. In eight out of ten of those years (2000, 2001, 2002, 2003, 2006, 2007, 2008, and 2009), Regis was rated B+ (Very Good) by Best. The case at bar concerns A.M. Best's rating of Regis in 2010, at which time Regis was downgraded to from a B+ to a B- (Fair). This rating was the culmination of Best's annual review of Regis, which started in November 2009 and ended in January 2010.

Regis' 2010 rating analysis began with a meeting on November 12, 2009 at Best's offices. In attendance for Best were Gerald Altonji ("Altonji"), the analysts' team leader, and Marc Liebowitz ("Liebowitz"), a ratings analyst. In attendance for Regis were Jim Moll, Regis' then-president, and Sharon Rinaldo, Regis' comptroller. During this meeting, the representatives from Best requested that Regis produce a financial statement for its parent company, Tiber. Following the meeting, Regis promptly provided a copy of Tiber's Consolidated Financial Statements for 2008 and 2007. The statement was received by Regis on November 16, 2009, although due to a clerical error at Best the statement did not reach the property and casualty analytic team until approximately December 3, 2009.

According to the financial statement, there are two judgments against Tiber. (Def.'s Ex. Z at Note P, "Tiber Holding Corporation and Subsidiaries Consolidated Financial Statements Years Ending December 31, 2008 and 2007.") Mr. Di Loreto formerly operated a now-defunct insurance company, Nassau Insurance Company ("Nassau") that was the subject of litigation in New York. Tiber was the parent company of Nassau as well. As a result of the litigation, the Superintendent of Insurance of the State of New York (the "NY Liquidator") obtained judgments against Tiber in August 2000 and May 2002. These judgments totaled almost $43 million as of December 31, 2008, including interest. Thus, Tiber's financial statement reflects, and Regis concedes, that Tiber is insolvent. In addition, Tiber's accountants cautioned that Tiber's

4

financial and legal circumstances "create an uncertainty about the Company's ability to continue as a going concern." (<u>Id.</u> at Note R.)

The November 12, 2009 meeting was apparently the first time, in the entire history between these two companies, that A.M. Best requested Tiber's financial statement from Regis. Indeed, there is no proof in Best's file on Regis that such information about Tiber had ever been requested. Best, however, claims that on prior occasions Best's employees had inquired about the financial condition of Tiber. Best contends that Regis' representatives, including Mr. Di Loreto and Rinaldo, had always told them that Tiber had "no debt" and that it was financially sound. It is Best's position that, until late 2009, it had always taken Regis at its word. Regis, conversely, argues that Best has always been aware that Tiber is Regis' parent company and that it has never misrepresented Tiber's financial condition to Best. Regis further argues that the judgments against Tiber are and have always been a matter of public record. Accordingly, Regis denies have ever deceived Best and asserts that Tiber's financial condition has no impact at all on Regis.

On December 4, 2009, one day following the receipt of Tiber's financial statement by the proper individuals at Regis, a conference call took place between Altonji, Liebowitz, Mr. Di Loreto, and Earl Helstrom (Regis' accountant). Best expressed concern regarding the judgments and Tiber's insolvency. But unlike an ordinary business that may be seized to satisfy the debts of its parent company, an insurance company cannot be seized without the permission of its regulating authority. Accordingly, Mr. Di Loreto informed Altonji and Leibowitz that Stephen Johnson, Deputy Commissioner of the Pennsylvania Department of Insurance ("PA DOI"), would "confirm" that Pennsylvania would not allow the NY Liquidator to seize Regis in order to satisfy Tiber's debts.

On December 11, 2009, at the request of Mr. Di Loreto, Altonji and Leibowitz called Johnson. Johnson informed Altonji and Leibowitz that, in his view, the NY Liquidator's judgments were "meaningless."[4] (Def.'s Ex. OO, "Marc Liebowitz's Handwritten Notes from January 1, 2009 Call with Stephen Johnson.") However, Johnson also informed Altonji and Leibowitz the NY Liquidator had effectively blocked the sale of Regis by refusing to release its judgments against Tiber in return for being paid the proceeds of a proposed sale ($10 million).

Best did not contact NY Liquidator directly, nor did Regis request that Best contact the NY Liquidator directly. However, public records indicate that the NY Liquidator has taken various steps to collect on its judgments. For instance, in April 2003, the NY Liquidator recorded the judgments in Pennsylvania and served writs of execution on Regis for those judgments. The NY Liquidator also forced the sale of the Di Loretos' home in 2009 and obtained a payment of $1.1 million dollars from the eventual sale. The NY Liquidator also collected over $2.65 million from a malpractice action brought against the Di Loretos. Most recently, the NY Liquidator filed a complaint in the Eastern District of Pennsylvania against the Di Loretos, among others, alleging a "scheme" to transfer title to the Di Loreto home to a shell

---

[4] It is unclear exactly what Johnson meant by his use of the word "meaningless." Regis interprets Johnson's position as a "confirmation" that Regis could not be seized by the NY Liquidator. (Pl.'s Res. Opp'n 6.) However, according to Leibowitz's notes, it does not appear that Johnson ever used language as strong as "confirm." Further, at his deposition, Johnson testified that at no time did he express an opinion in his conversations with A.M. Best as to whether he would permit the NY Liquidator to take control of Regis. (Def.'s Ex. F, "Deposition of Stephen Johnson.") However, Johnson *has* expressed doubt as to the practical implications of the judgments. Specifically, in a letter to A.M. Best following its final ratings decision on Regis, Johnson stated the following:

> I have had two prior conversations with representatives from A.M. Best concerning Tiber's financial condition and the existing judgment against it and conveyed the opinion of the Department that the financial condition and judgment did not raise any concerns with respect to Regis. As you are aware, Regis has adequate capital, reserves[,] and liquidity to meet its obligations to its policyholders irrespective of Tiber's financial condition. The Department has seen no evidence to suggest that Regis would not continue to have adequate capital, reserves[,] and liquidity even if Tiber's financial condition deteriorated to the point where it was necessary for Tiber to file bankruptcy. In fact, even in the event Tiber filed for bankruptcy protection, there is no regulatory requirement that the Department place Regis under supervision.

(Def.'s Ex. TT, "Letter from Stephen Johnson to Andrew Collannino and Gerald Altonji, dated January 25, 2010.)

6

corporation using previously concealed funds and asserting claims for reverse veil-piercing, fraudulent transfer, constructive fraudulent transfer, unjust enrichment, and civil conspiracy.[5] That matter is still pending.

Following the phone call with Johnson, the A.M. Best Peer Ratings Committee ("PRC") met on December 14, 2009 to review Regis. The analytic team of Altonji and Leibowitz recommended to the PRC that Regis' 2009 rating (a B+ rating with stable outlook) be affirmed. However, the PRC (with the exception of Altonji) voted to downgrade Regis from a B+ to a B- (Fair).

The PRC's decision was then referred to a second rating committee, the Corporate Rating Committee ("CRC") because of "extraordinary notching" resulting from Tiber's low rating.[6] (Def.'s Mot. Summ. J. 13.) The CRC has different members from the PRC (with one exception) and its members are more senior that the PRC's members. On December 16, 2009, the CRC voted to downgrade Regis' FSR even further, to C+ (Marginal). All CRC members, except for one, voted to lower Regis' rating with a negative outlook.

The following day, December 17, 2009, Liebowitz sent a draft press release to Mr. Di Loreto, which stated Regis was being downgraded to a C+. This instigated a flurry of

---

[5] Regis takes issue with Best interjecting Mr. Di Loreto's "personal legal battles" in its motion for summary judgment. Regis asserts that "[n]one of this litigation involves Regis and is, therefore, utterly irrelevant to the instant matter." (Pl.'s Res. Opp'n n. 1.) Notably, however, Regis does not dispute the truth or substance of Mr. Di Loreto's legal troubles. The Court does not believe that these separate legal matters are "irrelevant" to the case at bar. On the contrary, the NY Liquidator's collection efforts are highly relevant to the question of how great a risk Regis is in of being seized in order to satisfy Tiber's debts. This is especially true given that these various legal matters, as well as reports made by the PA DOI, evidence a concern that there is a commingling of assets between Regis and Tiber and the two organizations are not operated as separate and distinct companies.

[6] "Notching" in this context appears to mean "downgrading." As previously noted, A.M. Best considers the operating insurer as well as its parent and affiliated companies in rating the insurer. With this information, Best decides whether the insurer's rating should be enhanced or "dragged down" by the financial conditions of the related companies. A holding company is assigned its own ICR as an independent entity. In this instance, Regis' ICR was effectively being dragged down by financial conditions at Tiber. (See Def.'s Ex. O at 50, "Excerpt's from 2010 Best's Credit Rating Methodology.")

7

correspondence between Regis and Best, during which Mr. Di Loreto appealed the downgrade. As part of this process, a second conversation between Best representatives and Johnson took place on January 5, 2010. Johnson again dismissed concerns that Regis was at risk. In sum, the position of the PA DOI, as expressed by Johnson, was that Regis was "walled off" from Tiber's judgments and therefore remained financially viable. Based on this additional conversation with Johnson, the CRC voted to revise Regis' FSR from C+ to B-. Best sent a revised draft of the press release to Mr. Di Loreto. Mr. Di Loreto again protested, expressing his opinion that Regis should be treated as a stand-alone company and independent of Tiber. Best maintained its position that the financial condition of Tiber had an adverse impact on Regis. Regis issued its final press release, reflecting the B- rating, on January 12, 2010. Regis, in turn, issued its own counter-press release on February 22, 2010. This litigation ensued.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed R. Civ P. 56(c); see also Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248; Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its

burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986).  Once the moving party has

carried its burden under Rule 56, "its' opponent must do more than simply show that there is

some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine

issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Martin

v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

　　　At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247,

253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light

most favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount

Communications, Inc., 258 F.3d 132 (3d Cir. 2001).  The court must award summary judgment

on all claims unless the non-moving party shows through affidavits or admissible evidence that

an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579

(D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J.

2002).

## III. DISCUSSION

　　　Regis brings claims for defamation, commercial disparagement, tortious interference

with contractual relations, and tortious interference with prospective contractual relations.[7]  The

Court will address each claim in turn.

### A. Defamation (Count I)

　　　Under Pennsylvania law, a plaintiff in a defamation action has the burden of proving the

following:

---

[7] Regis has withdrawn Count V of the Complaint, which sought a declaratory judgment. (Pl.'s Res. Opp'n 10.)

9

(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a).  Once a plaintiff establishes these elements, the defendant has the burden

of proving the following, when relevant to the claim:

(1) The truth of the defamatory communication.
(2) The privileged character of the occasion on which it was published.
(3) The character of the subject matter of defamatory comment as of public concern.

Id. § 8343(b).  "A communication is defamatory if it tends to harm the reputation of another as

to lower him in the estimation of the community or to deter third persons from associating or

dealing with him." Maier v. Maretti, 448 Pa.Super. 276, 671 A.2d 701, 704 (Pa.Super.Ct.1995)

(citing Elia v. Erie Ins. Exchange, 430 Pa.Super. 384, 634 A.2d 657 (1993)).  "A communication

is also defamatory if it ascribes to another conduct, character or a condition that would adversely

affect his fitness for the proper conduct of his proper business, trade or profession." Id. (citing

Gordon v. Lancaster Osteopathic Hosp. Ass'n, 340 Pa.Super. 253, 489 A.2d 1364

(Pa.Super.Ct.1985)).  However, "communications which may annoy or embarrass a person are

not sufficient as a matter of law to create an action in defamation." Gordon, 340 Pa. Super. at

263, 489 A.2d at 1369.  Importantly, only statements of fact, rather than mere expressions of

opinion, are actionable under Pennsylvania law. Moore v. Cobb-Nettleton, 889 A.2d 1262, 1267

(Pa.Super.Ct.2005) (internal citation omitted); see also Smith v. Sch. Dist. of Philadelphia, 112

F. Supp. 2d 417, 429 (E.D. Pa. 2000) ("[O]nly statements of fact can afford a basis for a

defamation action; expressions of opinion cannot.) (internal citation omitted).  In order for an

opinion to be deemed capable of defamatory meaning under Pennsylvania law, it must

10

"reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir.2001) (internal citation omitted); see also Parano v. O'Connor, 433 Pa. Super. 570, 575, 641 A.2d 607, 609 (1994) (statements of a defendant's opinion "are not actionable unless they imply undisclosed, false[,] and defamatory facts.") (internal citations omitted).

In addition, "Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010); see also Thomas Merton Ctr. v. Rockwell Int'l Corp., 497 Pa. 460, 467, 442 A.2d 213, 217 (1981); Bogash v. Elkins, 405 Pa. 437, 440, 176 A.2d 677, 679 (1962); Sarkees v. Warner-West Corporation, 349 Pa. 365, 367-368, 37 A.2d 544, 546 (1944) (all discussing defamation by innuendo). To establish defamation by innuendo, the "innuendo must be warranted, justified and supported by the publication." Thomas Merton Ctr, 497 Pa. at 467, 442 A.2d at 217; see also Sarkees, 349 Pa. at 367, 37 A.2d at 546. As further explained by the Pennsylvania Supreme Court:

> The purpose of an innuendo, as is well understood, is to define the defamatory meaning which the plaintiff attaches to the words; to show how they come to have that meaning and how they relate to the plaintiff[.] But it cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear[.] It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury.... [Consequently,] [i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication.

Sarkees, 349 Pa. at 368, 369, 37 A.2d at 546. In the instant case, A.M. Best challenges that Regis has not, and cannot, prove two elements of a defamation action: (1) the defamatory

11

character of the communication, and (2) abuse of a conditional privilege. The Court's analysis will therefore be limited to these two issues.

### 1. Capable of Defamatory Meaning

A.M. Best first contends Regis cannot satisfy the first element of a defamation action. Specifically, Best argues its rating is merely a statement of its opinion, and therefore is not capable of defamatory meaning. Regis counters that Best's rating is not "pure opinion speech" and therefore is not entitled to absolute protection. The Court agrees with Regis.

Whether a contested statement is capable of defamatory meaning is a question of law for the court to determine. Blackwell v. Eskin, 2007 PA Super 20, 916 A.2d 1123, 1125 (Pa. Super. Ct. 2007) (citing Tucker v. Philadelphia Daily News, 577 Pa. 598, 848 A.2d 113, 123 (2004)). So long as a statement is capable of defamatory meaning, whether it was actually defamatory is a jury question. See Brophy v. Phila. Newspapers, Inc., 281 Pa.Super. 588, 422 A.2d 625, 628 (1980) (holding that the case must proceed past summary judgment if the statement is capable of defamatory interpretation). In making this legal determination, the Court must view the statement in the context in which it was made. Baker v. Lafayette Coll., 516 Pa. 291, 296, 532 A.2d 399, 402 (1987) (internal citation omitted). "The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it was directed." Mzamane, 693 F. Supp. at 479; see also Marier v. Lance, Inc., 07-4284, 2009 WL 297713 (3d Cir. Feb. 9, 2009) ("In analyzing whether or not a statement is defamatory, Pennsylvania courts have held that '[t]he nature of the audience seeing or hearing the remarks is ... a critical factor in determining whether the communication is capable of a defamatory meaning.'") (internal citation omitted).

12

Here, Regis has identified four statements in Best's January 12, 2010 press release which it claims are capable of defamatory meaning. The press release stated Regis was being downgraded because of "the *recent* disclosure of the lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation (Wilmington, DE), due to that organization's high consolidated financial leverage, *lack of access to additional capital* and *other operating issues*. Additionally, these ratings actions consider *Regis' continued poor operating performance*." (Def.'s Ex. SS, "Press Release — January 12, 2010: A.M. Best Downgrades Ratings of Regis Insurance Company.") (emphasis added).

The Court agrees with Regis that some of these statements are capable of defamatory meaning. In its briefs, Best continually repeats that its ratings are opinions. Indeed, Best's publications emphatically state that its ratings are opinions.[8] However, Best entirely sidesteps the fact that even opinions are potentially defamatory if they could reasonably be understood by the average listener to imply the existence of undisclosed defamatory facts. Remick, 238 F.3d at 261; Parano, 433 Pa. Super. at 575. Best's sidestepping of this central issue is especially strange given that its brief cites language from Parano which makes clear that the "opinion" defense is conditional and not absolute.

It is undisputed that Regis' 2010 rating represented a substantial downgrade, so much so that the downgrade needed to be referred to a second voting committee to confirm the rating.

---

[8] For example, Best's 2010 and 2009 insurance reports both contain the following preface:

A Financial Strength Rating is an independent opinion of an insurer's financial strength and ability to meet its ongoing insurance policy and contract obligations. It is based on a comprehensive quantitative and qualitative evaluation of a company's balance sheet strength, operating performance[,] and business profile.

The Financial Strength rating opinion addresses the relative ability of an insurer to meet its ongoing insurance obligations....A Financial Strength Rating is not a recommendation to purchase, hold[,] or terminate any insurance policy, contract[,] or any other financial obligation issued by an insurer, nor does it address the suitability of any particular policy or contract for a specific purpose or purchaser.

(Def.'s Exs. M & N at Important Notice.) (emphasis added).

13

The parties, in their briefs, devote a substantial amount of time and space to detailing the history between their companies, Regis' ratings history, and the back and forth discussions, letters, meetings, and votes that went into formulating Regis' 2010 rating. And yet, Best's press release conveys none of the same information. Best's press release is barely more than a page and neglects to mention — let alone disclose — the details of how Best arrived at such a substantial downgrade. That is to say, Best's press release is almost entirely devoid of context. When all the facts are disclosed, an opinion cannot be defamatory because the listener is able to evaluate the facts for himself and is free to disregard the conclusion the speaker made from these facts. See Restatement (Second) of Torts § 566A; see also Mzamane, 693 F. Supp. 2d at 481. But when an opinion discloses only *some* of the facts on which it based, it is capable of defamatory meaning and therefore actionable. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19, 110 S. Ct. 2695, 2705-06, 111 L. Ed. 2d 1 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications....")

The Court finds that, without providing additional information, analysis, and context, it was misleading for Best to suggest that there had been a *"recent* disclosure of the lack of financial flexibility at Regis' privately held parent, Tiber Holding Corporation." Best's use of the term "recent" implies that something vague and unspecified had happened at Tiber in the last year to render it financially inflexible, and thereby putting Regis at risk. But in reality, Tiber had been insolvent for almost ten years at the time Best published its press release. News of Tiber's financial condition was only "recent" in the sense that Best had recently learned of it.[9] There is a

---

[9] The Court finds it strange that Best offers no explanation as to why it never asked Regis for Tiber's financial statements prior to 2009. For all the emphasis Best now places on how important the financial health of the parent company is in determining the rating of a subsidiary, it seems questionable that Best did not ask Regis for Tiber's financial statement before 2009. Prior to 2009, it seems that Best was perfectly content to take Regis' representatives

14

marked and appreciable difference between implying that Regis' parent company is experiencing recent financial difficulties and clearly stating that Regis has been operating for almost ten years *despite* its parent company's financial difficulties (and that Best is only now learning of it). Ultimately, it is for Best's readers to decide whether they still want to do business with Regis despite the risk posed by the insolvency of Tiber. But Best's readers lack the ability to make an informed decision on that point if Best deprives them of the information necessary to do so.

In addition, the Court also finds the press release's assertion that Regis was being downgraded because of Tiber's *"lack of access to additional capital and other operating issues"* to be capable of defamatory meaning. Best's allusion to "other operating issues" is vague on its face. With respect to the first clause of this sentence, Best's reference to Tiber's "lack of access to additional capital" is presumably intended to imply that, because Regis is Tiber's lone asset, Tiber's judgment-holder would go after Regis in order to satisfy the debts owed by Tiber. The Court agrees that Tiber's lack of access to additional capital is a business concern that could legitimately affect Regis' rating. Indeed Best's briefs, once again, have devoted substantial space to exhaustively detailing the collection efforts of the NY Liquidator. These details, though, were omitted from the press release. The press release fails to disclose that despite other numerous collection efforts, the NY Liquidator had never attempted to seize Regis. So while it is, of course, possible for the NY Liquidator to attempt to seize Regis (thereby making Regis an unsafe company with which to place insurance), the fact that the NY Liquidator had not successfully done so in almost ten years would be vital information for Best's readers to know.

The Court likewise finds the press release's statement that Best's ratings decision also took into account *"Regis' continued poor operating performance"* to be capable of defamatory

---

at their word that there was "no debt" at Tiber and that its financial condition was sound. (Def.'s Mot. Summ. J. 6.)

meaning. It is unclear what Best even means by its use of the word "continued." Best rated

Regis at a B+ (Very Good) for four straight years prior to the 2010 ratings debacle. Even

assuming Regis had a poor operating performance (which Best has not proved), by Regis' own

estimation that poor performance only recently occurred. There is nothing "continued" about a

precipitous drop after four straight years of favorable ratings.

Accordingly, the Court finds that Best's rating, as reflected in the press release, is

capable of defamatory meaning because it is an "opinion" that implies the existence of

undisclosed defamatory facts. The Court also finds that the press release is potentially

defamatory by innuendo.[10]

### 2. Abuse of a Conditional Privilege

Best next argues that Regis cannot establish the seventh element of a defamation action:

that Best abused its conditional privilege by publication of statements regarding Regis.

Under Pennsylvania law, "a publisher of a defamatory statement is not liable if the

statement was made subject to a conditional privilege and the privilege was not abused." Elia v.

Erie Ins. Exchange, 430 Pa.Super. 384, 634 A.2d 657, 660 (1993) (citing Chicarella v. Passant,

343 Pa.Super. 330, 494 A.2d 1109, 1112-13 (1985)). One instance in which a conditional

privilege arises is "when a recognized interest of the public is involved." Id. (internal citation

omitted); see also 42 Pa.C.S. § 8343(a)(2) & (3). The court determines whether a privilege

applies, but the jury considers whether that privilege was abused. Bargerstock v. Washington

Greene Community Action Corp., 397 Pa.Super. 403, 411, 580 A.2d 361, 364 (1990) (citing

Montgomery v. Dennison, 363 Pa. 255, 69 A.2d 520 (1949)).

---

[10] The theory of "defamation by innuendo" was not advanced by Regis, but the Court nonetheless finds this theory to be applicable to the facts of this case.

Once a matter is deemed conditionally privileged, the plaintiff has the burden of

establishing that the defendant abused that conditional privilege. Chicarella, 343 Pa. Super. at

337, 494 A.2d at 1112-13.  Abuse of a conditional privilege is indicated when the publication:

(1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the

privilege is given; (3) is made to a person not reasonably believed to be necessary for the

accomplishment of the purpose of the privilege; or (4) includes defamatory matter not

reasonably believed to be necessary for the accomplishment of the purpose. Beckman v. Dunn,

276 Pa. Super. 527, 537, 419 A.2d 583, 588 (1980) (citing Restatement (Second) Torts § 599

(1976)).  In the context of a defamation claim, actual malice means the speaker acted with

knowledge that a published statement is false or that the speaker acted with reckless disregard

for the truth or falsity of the statement. New York Times Co. v. Sullivan, 376 U.S. 254, 279-80,

84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964); see also Marcone v. Penthouse Int'l Magazine for

Men, 754 F.2d 1072, 1080-81 (3d Cir. 1985).

Here, Best contends that it is entitled to a conditional privilege because it speaks on

matters of public concern.  The Court agrees, as does Regis. (See Compl. 1.) ("Agents, brokers,

businesses[,] and individuals look to the A.M. Best rating as the definitive statement on the

health of an insurance company.") As a publisher of insurance company ratings, Best provides

vital information to the public about the financial condition of the companies it rates.  Having

determined that a conditional privilege applies, the question becomes whether Best abused that

conditional privilege.

The Court finds that there is a genuine issue of material fact on this point.  The Court

finds it necessary at this juncture to distinguish between the two interrelated

communications/statements that are at issue in this case: (1) the rating itself and (2) Best's press

release, which is a reflection of the rating. A rating, standing alone, is an opinion, as Best

adamantly avers. A rating, unless patently baseless, has no inherent truth; it is merely an

estimation, arrived at through application of Best's methodologies, of the financial health of the

rated organization. But in order for Best's "ratings opinion" to be entitled to the protection

generally afforded to opinions in defamation actions, Best's methodologies must have actually

been followed. Here, there remains a genuine issue of material fact as to whether Best followed

its own methodologies in this particular instance. Regis' expert stated in his report that Best'

analysis of Regis was flawed and inconsistent with Best's stated methodologies. Best's expert

concluded otherwise. The source of controversy appears to be whether Best placed too great an

emphasis on the judgments in reaching its ratings decision. In general, the Court does not doubt

that Best, based on its stated methodologies, has every right to consider the financial condition of

a parent holding company in rating a subsidiary organization. Accordingly, the Court patently

rejects any assertion by Regis that Best should not or could not consider Tiber's financial

condition in reaching its ratings decision on Regis.

The Court also rejects Regis' assertion that Best "failed" to investigate its concerns by

choosing not to contact the NY Liquidator directly. Nothing in the record suggests that Best was

under any obligation to contact the NY Liquidator directly.[11] Moreover, nothing in the record

suggests that Regis ever requested that Best contact the NY Liquidator directly. Conversely,

Regis *did* request that Best contact the Stephen Johnson at the PA DOI. Best complied, and

contacted Johnson on two separate occasions. If Regis truly wanted Best to contact the NY

Liquidator directly, it could and should have encouraged Best to do so — just as it did in

---

[11] Both Best and its expert have indicated that it is Best's policy not to contact third parties without the rated entity's express permission. This seems to be a prudent policy, especially given the obvious risks involved in contacting the NY Liquidator.

encouraging Best to contact Johnson. In general, the Court must recognize that Best made substantial efforts to cooperate with Regis as part of its rating process. Among other things, Best personnel met or spoke with members of Regis' senior management, communicated with Mr. Di Loreto on multiple occasions, spoke with Johnson twice, conferred with Regis' accountant on numerous occasions, conducted three separate committee meetings regarding Regis, considered Regis' appeal of its rating, and revised its initial rating of Regis. This entire process appears to have been democratic and collaborative, and the Court does not believe that Best made the decision to downgrade Regis lightly.

Nonetheless, there remains a question of whether Best's rating of Regis placed too great an emphasis on the mere existence of the judgments without giving enough consideration to other mitigating factors (such as the age of the judgments and the PA DOI's stated position on what impact Tiber's judgments could have on Regis). Best, of course, is under no obligation to accept either Regis' opinion of its own financial health or the PA DOI's position on whether it would allow Regis to be seized.[12] The age of the judgments does not eliminate the possibility that Regis could be seized. But it does, as Regis argues, cast doubt on whether that possibility would come to pass. A reasonable jury could find that it was reckless for Best to arrive at such a substantial downgrade knowing that other factors suggest the judgments are not as damning as Best contends.[13]

Further, as previously discussed at length, the Court finds that the press release — with its lack of context and inadequate language — is capable of defamatory meaning. A reasonable jury could find that it was an abuse of Best's conditional privilege for it to publish the press release without adequately disclosing the bases of Best's ratings decision.

---

[12] As Best has argued, a change in policy or leadership at the PA DOI could easily put Regis at risk of seizure.

[13] The Court also rejects any assertion by Regis that Best should have not downgraded it at all.

19

Based on the foregoing, the Court declines to grant A.M. Best summary judgment on the

Regis' defamation claim.

### C. Commercial Disparagement (Count II)

Under Pennsylvania law, in order to prevail on a claim for commercial disparagement, a

plaintiff must show that the defendant published a statement about plaintiff's business to another,

and: (1) the statement was false; (2) the publisher either intended the publication to cause

pecuniary loss or reasonably should have recognized that publication would result in pecuniary

loss; (3) pecuniary loss did in fact result; and, (4) the publisher either knew the statement was

false or acted in reckless disregard of its truth or falsity. Pro Golf Mfg., Inc. v. Tribune Review

Newspaper Co., 570 Pa. 242, 246, 809 A.2d 243 (2002) (citing Restatement (Second) of Torts §

623(A) (1977)); see also Neurotron v. Medical Serv. Assoc. of Pa., Inc., 254 F.3d 444, 448–49

(3d Cir.2001); Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 416 (E.D. Pa. 2009).

Here, A.M. Best reiterates the same arguments it made with respect to Regis' defamation

claim. Thus, according to Best, for all the reasons Regis' claim for defamation fails, its claim for

commercial disparagement must also fail. The Court has already found that Regis' defamation

claim demonstrates genuine issues of material fact. The Court therefore also finds that Regis'

commercial disparagement claim demonstrates genuine issues of material fact. See QVC, Inc. v.

MJC Am., Ltd., CIV.A. 08-3830, 2011 WL 2843746 (E.D. Pa. July 18, 2011) ("The legal

standards applicable to defamation claims — including those for determining the truth or falsity

of statements — are appropriately applied in determining the sufficiency of [a] claim for

commercial disparagement.); Gilbert v. The Bionetics Corp., No. 98–2668, 2000 WL 807015, at

*3–9 (E.D.Pa. June 6, 2000). Best is therefore not entitled to summary judgment on Regis'

commercial disparagement claim.

20

### D. Tortious Interference with Contractual Relations (Count III) and Tortious Interference with Prospective Contractual Relations (Count IV)

Under Pennsylvania law, the elements of a cause of action for tortious interference with a contractual relation, whether existing or prospective, are as follows:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3) the absence of privilege or justification on the part of the defendant; and
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (citing Pelagatti v. Cohen, 370 Pa.Super. 422, 434, 536 A.2d 1337, 1343 (1987)). Best contends that Regis cannot establish the second element — i.e., that it intended to harm Regis' contractual relations. Regis argues that the record supports an inference that Best was motivated to harm Regis because it was "upset" by not having learned of the judgment against Tiber for almost ten years. Under Regis' theory, Altonji and Liebowitz were "angry" and "embarrassed" when they learned of the judgments, and therefore intended to "punish" Mr. Di Loreto and Regis for their perceived deception.

The Court agrees with Best. Nothing in the record supports Regis' contention that Best specifically intended to harm Regis' existing or prospective contractual relations. As previously discussed, the Court believes that Best's 2010 ratings decision was the result of a democratic and collaborative deliberative process. If Best were "upset," "embarrassed," or "angry" about not having learned of the judgments earlier, then it never would have worked with or accommodated Regis to the extent that it did. In particular, it makes very little sense for Regis to attempt to attribute wrongdoing to Altonji and Leibowitz when the two analysts, as Regis concedes, actually recommended to the ratings committee that Regis' 2009 rating be affirmed. Moreover, it was the CRC, not Altonji and Leibowitz, that voted to downgrade Regis.

21

Further, nothing in the record supports the argument that Best downgraded Regis for the express purpose of causing it to lose existing or prospective business. It is clear that the very purpose of Best's ratings is to apprise the public of the potential risks involved in placing insurance with the rated entity. It is, of course, possible that if a rated entity is downgraded, this could cause harm to its business. But such harm is not the specific intent of the rating. It is merely an indirect effect.

Accordingly, the Court will grant Best's motion for summary judgment with respect to counts III and IV.

## V. CONCLUSION

For the reasons set forth above, Defendant A.M. Best's Motion for Summary Judgment is granted with respect to Counts III and IV and denied with respect to Counts I and II. Count V, which Plaintiff Regis Insurance Company has voluntarily withdrawn, is dismissed with prejudice.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIS INSURANCE COMPANY,                     :

                     **Plaintiff,**          :          **CIVIL ACTION**

        v.                               :

                             :          **NO. 10-3171**

A.M. BEST COMPANY, INC.,                     :

              **Defendant.**          :

                             :

                             :

## ORDER

     **AND NOW**, this ____ day of April, 2013, upon consideration of Defendant's Motion for

Certification for Interlocutory Appeal of the Court's March 1, 2013 Order (Doc. 53), Plaintiff's Response

in Opposition (Doc. 55), and Defendant's Reply (Doc. 58), **IT IS HEREBY ORDERED AND**

**DECREED** that Defendant's Motion is **DENIED.**[i]

---

   [i] On March 1, 2013, the Court denied Defendant A.M. Best's ("Best") motion for summary judgment on Plaintiff Regis Insurance Company's ("Regis") claims for defamation and commercial disparagement. Best now argues that the Court should certify this matter for interlocutory appeal because this case "raises serious First Amendment and freedom-of-speech concerns, including the risk that a credit rating agency will be exposed to litigation and potential liability every time it issues to its sophisticated audience (e.g., lenders, financiers, brokers[,] and insureds) a rating opinion and press release." (Doc. 53 at 1.) The Court disagrees. In its motion for summary judgment, and now in its motion to certify for interlocutory appeal, Best has stridently attempted to universalize the implications of this case by painting this case in the broadest strokes possible. At every turn, Best has insisted that its actions were absolutely protected: first by averring that its rating was merely its opinion, and now by attempting to bolster its previously asserted (and already considered) First Amendment arguments. At every turn, Best has raised the specter of the potential for litigation and the chilling effect on ratings issued by credit rating agencies that could result if the Court permits Regis's claims to proceed to trial. What Best has consistently failed to appreciate, however, is that the facts of this case are highly unusual. This case is unusual because this was not your typical ratings situation. It is precisely because this was not your typical ratings situation that Best's arguments in favor of summary judgment and certification of an interlocutory appeal fail. This Court did not find that the statements contained in the press release were defamatory as a matter of law, only that a reasonable jury could conclude that they were capable of defamatory meaning. Further, despite what Best argues, the Court has at no point ruled that Best is not

1

protected by the First Amendment. Rather, the Court has simply ruled that there are genuine issues of material fact that must be resolved by a jury in order to determine whether or not Best is protected by the First Amendment *in this particular instance*. Nothing Best argues in its motion for interlocutory appeal changes that determination.

Regis ably states the reasons why Best has failed to satisfy the standard for certification for interlocutory appeal set forth in 28 U.S.C. § 1292(b). The Court will not repeat that analysis here, but will specifically address Best's assertion that the Third Circuit's recent decision in Kendall v. Daily News Pub. Co., 11-4162, 2013 WL 856433 (3d Cir. Mar. 8, 2013), which was published seven days after the Court's March 1, 2013 Opinion, requires Third Circuit review of the Court's decision. As Regis states, Best seems to believe that Kendall creates a rule in the Third Circuit that ratings agencies are absolutely immune from liability in defamation. In actuality, however, Kendall does not involve a publication by a ratings agency. Further, despite its repeated attempts to locate absolute protection somewhere, Best has not pointed to a single case holding that ratings agencies cannot be held liable for defamation.

What Kendall does is clarify "what constitutes actual malice in defamation-by-implication cases." Id. at *5. Specifically, Kendall held that in order to prove actual malice in a defamation-by-implication case, Regis must show by clear-and-convincing evidence both (1) that the defendant either intended the defamatory meaning or knew of the defamatory meaning and were reckless in regard to it, and (2) that the defendant made the statement with knowledge that the statement was false or with reckless disregard of whether it was false or not. Id. at *9 (internal citations and quotation marks omitted). Importantly, "[t]his second element of actual malice—showing the defendant's communicative intent—can be satisfied…by demonstrating that the defendant either intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it. This approach necessarily follows from the Supreme Court's inclusion of recklessness in the actual-malice standard. Id. at *7 (internal citation omitted). Further, the "subjective nature" of the communicative intent element "requires that there be some evidence showing, directly or circumstantially, that the defendants themselves understood the potential defamatory meaning of their statement." Id. at *10. Thus, as the Kendall decision makes clear, "recklessness" is the touchstone of determining whether actual malice exists. And as the Court held in its Opinion, there are at least two grounds on which a reasonable jury could find that Best was reckless: (1) "arriv[ing] at such a substantial downgrade knowing that other factors suggest the judgments are not as damning as Best contends," and (2) issuing a press release that lacked context and contained arguably inadequate language. See Doc. 50 at 19-20.

As Best pointed out in its briefs in support of summary judgment, it at times appears to be Regis' position that Best was not entitled to downgrade it at all. To the extent this is Regis' argument, this Court, like the Sixth Circuit in Compuware Corp. v. Moody's Investors Servs., Inc., 499 F.3d 520 (6th Cir. 2007), has emphatically rejected this assertion. Id. at 18 & n.13; see also Compuware, 499 F.3d at 529 ("To the extent [the plaintiff] alleges that the *credit rating itself* was defamatory, as opposed to the facts or implications in the report, [the plaintiff] has failed to assert a cognizable defamation claim.") (emphasis in original). But as the Court stated in its Opinion, a distinction must be drawn between the rating itself and how that rating (and the reasons for it) was communicated to the public. Doc. 50 at 17. Best has made much of the fact that the Court's Opinion states that Best's ratings process "appears to have been democratic and collaborative, and the Court does not believe that Best made the decision to downgrade Regis lightly." Id. at 19. Practically speaking, however, it matters little how democratic the

2

**IT IS FURTHER ORDERED** that, as previously, the matter shall proceed to trial on May 20, 2013 on Counts III (commercial disparagement) and IV (defamation).[2]

BY THE COURT:

/s/ Petrese B. Tucker

Hon. Petrese B. Tucker, U.S.D.J.

ratings process was if the end result (the press release) is not as carefully considered as the ratings process itself. The public is not privy to the ratings process; all the public is privy to is the ultimate ratings decision, as communicated in the press release. The Court's Opinion focuses heavily on the wording of the press release because defamation requires publication and the press release is the only publication at issue.

At bottom, the viability of Regis' defamation and commercial disparagement claims come down to this single question: whether Best properly communicated to its audience the bases for its decision to downgrade Regis. The Court found that there is a genuine issue of material fact on this question. To be clear: the problem with the press release is that it arguably implies Regis experienced certain financial difficulties in 2009 when, in fact, it had not. The only thing that had changed in 2009 was that Best learned of information about the financial health of Regis' parent company of which it was previously unaware. As detailed in the Opinion, see Doc. 50. at 13-16, a reasonable jury could find that Best recklessly framed its rating and press release in such a way as to create the false impression that Regis experienced certain financial difficulties in 2009.

Further, in keeping with the communicative intent element required for establishing actual malice in a defamation-by-implication case, a reasonable jury could find that Best intentionally or recklessly worded its press release in this way because it was in the best interests of its company to do so. Id. at 14-15 ("There is a marked and appreciable difference between implying that Regis' parent company is experiencing recent financial difficulties and clearly stating that Regis has been operating for almost ten years *despite* its parent company's financial difficulties (and that Best is only now learning of it.")

In summary, the Court disagrees with Best's assertion that the Kendall decision is inconsistent with the Court's March 1, 2013 Opinion. Accordingly, Best' motion for certification of interlocutory appeal is denied.

---

[2] The text of the March 1, 2013 Opinion improperly labeled the counts of the Complaint.

3